# 14-0826-cv

## 14-0832-cv(CON)

IN THE

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

---

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

v.

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE, STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants.*

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK*

---

**BRIEF OF PROPOSED HUAORANI INTERVENORS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS, SUPPORTING PARTIAL REVERSAL SOLELY AS TO REMEDY**

---

JUDITH KIMERLING
23 WAVERLY PLACE, #4-F
New York, New York 10003
Telephone: (212) 777-2135

K. LEE CRAWFORD-BOYD
SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Boulevard, Suite 360
Los Angeles, California 90048
Telephone: (323) 302-9488
Facsimile: (323) 931-4990

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page(s)

**IDENTITY AND INTERESTS OF THE** *AMICI CURIAE* ...............................2

    I.   Identity of the Proposed Huaorani Intervenors ..........................2

    II.  Interests of the Proposed Huaorani Intervenors in the Lago Agrio Judgment................................................................................5

    III. Interests of the Proposed Huaorani Intervenors in the Appeal ..............12

**ARGUMENT** ........................................................................................15

    I.   The District Court's Remedy to Chevron Failed to Consider and Provide for the Valid Legal Interests of the Proposed Huaorani Intervenors ...............................................................15

    II.  Absent Application of Judicial Estoppel, the District Court's Opinion Creates an "Access to Justice" Gap for the Proposed Huaorani Intervenors ...............................................................19

    III. In the Alternative, Proceeds of the Lago Agrio Judgment Should be Administered Through a Truly Independent Entity from the United States........................................................................24

**CONCLUSION**....................................................................................26

**APPENDIX A: LIST OF** *AMICI CURIAE*

**APPENDIX B: COMPLAINT,** *KEMPERI BAIHUA HUANI v. DONZIGER*

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

# TABLE OF AUTHORITIES

**Page(s)**

## U.S. Federal and State Cases

*ACC Bondholder Group v. Adelphia Communs. Corp.*,
   367 B.R. 84 (S.D.N.Y. 2007) ...........................................................20

*Aguinda v. Texaco, Inc.,*
   142 F. Supp. 2d 534 (S.D.N.Y. 2001) ..........................................20
   303 F.3d 470 (2d Cir. 2002)...........................................................20

*American News Co., Inc. v Avon Publishing Co.,*
   283 131 N.Y.S.2d 566 (1st Dep't 1954) ..........................................8

*Amherst Magnetic Imaging Assoc. v. Community Blue*,
   659 N.Y.S.2d 657 (4th Dep't 1997) ...............................................11

*Arizona v. California,*
   460 U.S. 605 (1983).........................................................................16

*Brennan v. N.Y. City Bd. of Educ.,*
   260 F.3d 123 (2d Cir. 2001)............................................................13

*Crossland Sav. FSB v. Rockwood Ins. Co.,*
   700 F. Supp. 1274 (S.D.N.Y. 1988) ...............................................10

*Cruz v. McAneney,*
   816 N.Y.S.2d 486 (2d Dep't 2006) ..........................................10, 12

*Hamilton v. Patrolman's Benevolent Ass'n of City of New York,*
   93 N.Y.S.2d 220 (2d Dep't 1949) .....................................................9

*Hubei Gezhouba Sanlian Indus., Co. v. Robinson Helicopter Co.*,
   425 F. App'x 580 (9th Cir. 2011) ..................................................19

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803)..........................................................22

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*McDonald v. Lavino*,
430 F.2d 1065 (5th Cir. 1970) ........................................................19

*New Hampshire v. Maine*,
532 U.S. 742 (2001)........................................................................20

*Overview Books, LLC v. United States,*
438 Fed. Appx. 31 (2d Cir. 2011) .................................................13

*Republic of Ecuador v. Chevron*,
638 F.3d 384 (2d Cir. 2011)...........................................................22

*Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.,*
725 F.2d 871 (2d Cir. 1984) ..........................................................18

*Roni LLC v. Arfa,*
18 N.Y.3d 846 (N.Y. 2011) .............................................................9

*Torres v. $ 36,256.80 U.S. Currency*,
25 F.3d 1154 (2d Cir. 1994) ..........................................................18

*United States. v. Georgia-Pacific Co.*,
421 F.2d 92 (9th Cir. 1970)......................................................20, 24

*United States v. Peoples Benefit Life Ins. Co*.,
271 F.3d 411 (2d Cir. 2001) ..........................................................18

*United States v. Plugh,*
648 F.3d 118 (2d Cir. 2011)...........................................................16

*Weiner v. Lazard Freres & Co.,*
672 N.Y.S.2d 8 (1st Dep't 1998)....................................................10

- iii -

## **TABLE OF AUTHORITIES (continued)**

**Page(s)**

**U.S. Federal Rules of Procedure**

Fed. R. App. P. 29 ................................................................................1

Fed. R. Civ. P. 19 ...............................................................................17

Fed. R. Civ. P. 24 ..........................................................................3, 17

**Secondary Sources**

Christopher Whytock & Cassandra Burke Robertson, *Forum Non Conveniens and the Enforcement of Foreign Judgments*, 111 Colum. L. Rev. 1444 (2011) ..........22

Judith Kimerling, *Indigenous Peoples and the Oil Frontier in Amazonia: the Case of Ecuador, ChevronTexaco, and Aguinda v. Texaco,* 38 N.Y.U.J. Int'l L. & Pol. 413 (2006) ........................................................................21

Judith Kimerling, *Lessons From the Chevron Ecuador Litigation: The Proposed Intervenors' Perspective*, 1 Stan. J. Complex Lit. 241 (2013) ........................21, 23

Restatement (Third) of Restitution and Unjust Enrichment § 59 cmt. g ...............17

Pursuant to Federal Rule of Appellate Procedure 29, Proposed Huaorani Intervenors who were denied intervention by the district court below, respectfully submit this brief as *amici curiae* on behalf of themselves, on behalf of their family groups, on behalf of their communities, and on behalf of other members of the Huaorani people (also spelled "Waorani") in support of Defendants-Appellants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje (the "LAP Representatives"), and Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC (together, "Donziger"), supporting partial reversal of the remedy granted against Defendants-Appellants.[1] The Proposed Huaorani Intervenors do not support reversal of the judgment on liability based on the wrongdoing found by the district court which the Proposed Huaorani Intervenors find deeply troubling, but seek to ensure that their undisputed interests

---

[1]  No counsel for a party authored this *amicus curiae* brief in whole or in part, and no such counsel, party, or another person contributed money intended to fund the preparation or submission of this brief.  The *amici curiae* requested the parties' consent to the filing of this brief.  Counsel for Defendants-Appellants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje consented to the filing, but as of the filing of this brief, the *amici* have not yet received an answer to their recent request from counsel for Defendants-Appellants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, and counsel for Plaintiff-Appellee Chevron Corporation.  Accordingly, in order to be in strict compliance with Federal Rule of Appellate Procedure 29(a), the *amici* submit this brief subject to their accompanying motion seeking this Court's leave to file.

- 1 -

in the Lago Agrio Judgment[2] and in their underlying claims against Chevron Corporation ("Chevron") are protected as described herein.

**IDENTITY AND INTERESTS OF THE *AMICI CURIAE***

## I.    Identity of the Proposed Huaorani Intervenors

Proposed Huaorani Intervenors[3] are 42 members of the Huaorani people, an indigenous people and minority group in the Amazon region in Ecuador, whose injuries (among other affected indigenous groups' and colonists') were the subject of the action brought by Maria Aguinda and others (the "Lago Agrio Plaintiffs" or "LAPs") against Chevron in the courts of Ecuador (the "Lago Agrio Litigation"); whose ancestral lands and territory, natural resources, and environment have been contaminated, destroyed, degraded, depleted, and endangered by Chevron's petroleum activities in the Amazon region in Ecuador; who were displaced from large areas of their ancestral lands and territory as a result of Chevron's petroleum activities; whose culture, way of life, subsistence, and economy were severely disrupted, harmed, and endangered as a result of Chevron's conduct; whose health

---

[2] The de novo judgment of the Sala Única of the Provincial Court of Justice of Sucumbíos, dated January 3, 2012, as clarified by the same court in a clarification order dated January 13, 2012 and affirmed by the National Court of Justice of Ecuador on November 12, 2013.

[3] The Proposed Huaorani Intervenors' names appear in Appendix A at the end of this brief. Although they are erroneously listed on the docket of this appeal as "Defendants," that apparently reflects purely clerical notations resulting from the *amici*'s unsuccessful motion to intervene in the district court proceedings and must be corrected.

- 2 -

was harmed and endangered by Chevron's conduct; whose rights were violated and impaired; and on whose behalf, among others, the Lago Agrio Judgment was entered.

Proposed Huaorani Intervenors submit this brief as *amici curiae* in order to assist this Court in understanding their significant legal interests in this action and the impact on their rights and undisputed interests in the Lago Agrio Judgment – caused by the district court's failure to provide for protection of the Proposed Huaorani Intervenors' interests and the interests of other members of the Huaorani people pursuant to its own Memorandum and Order denying Proposed Huaorani Intervenors' motion to intervene in the proceedings below on the basis that the parties to this action would adequately protect their interests. *See* Docket Entry ("DE") 724.

The *amici* sought to intervene before the district court in this case in November 2012. *See* DE 645, 646, 647-1 and related documents. Specifically, the Proposed Huaorani Intervenors sought to intervene pursuant to Federal Rule Civil Procedure 24, in order to protect their interests in the Lago Agrio Judgment, as well as to bring cross-claims against Defendant-Appellant Donziger and his co-Defendant Frente de Defensa de la Amazonia a/k/a Amazon Defense Front ("ADF") for declaratory relief, breach of fiduciary duties, accounting, constructive trust, and unjust enrichment. *See id*. The Proposed Huaorani Intervenors' Proposed

- 3 -

Cross-Complaint was based on the same scheme of misconduct by the same wrongdoers which gave rise to the instant action on appeal, and alleged, *inter alia,* that Donziger secretly wrested ownership and control of the claims and interests of the Proposed Huaorani Intervenors and other members of the Huaorani people in the Lago Agrio Litigation and ceded that ownership and control to his cohort ADF; that Donziger procured tens of millions of dollars in funding from investors in New York and elsewhere, and that Donziger and ADF used those funds to enrich themselves and try to cover up and defend their wrongdoing; and that Donziger engaged in conduct that has dissipated the claims of the Proposed Huaorani Intervenors and other members of the Huaorani people for the injuries they suffered from Chevron's oil extraction activities in their lands and their interest in the Lago Agrio judgment. *See* DE 647-1.

The Proposed Huaorani Intervenors' motion was denied by the district court on January 14, 2013 primarily on timeliness grounds, although the district court acknowledged the Proposed Huaorani Intervenors' legal interests by holding that those interests would be protected by the parties to this appeal. DE 724. Shortly thereafter, in February 2013, the Proposed Huaorani Intervenors initiated suit in New York Supreme Court against Donziger and ADF seeking similar relief to their cross-claims in intervention. *See* Appendix B, Compl., *Kemperi Baihua Huani v. Donziger*, NYSC Index No. 151372/2013.

- 4 -

## II.    Interests of the Proposed Huaorani Intervenors in the Lago Agrio Judgment

It is undisputed that the Proposed Huaorani Intervenors and other members of the Huaorani people are intended beneficiaries of the Lago Agrio Judgment as part of the group of affected communities and community members (the "*Afectados*").[4] *See* Defendants' Exhibit ("DX") 8095, 2013 National Court of Justice Decision at 141, n.159, 195. Indeed, the Lago Agrio Judgment is based in significant part on injuries suffered by the Proposed Huaorani Intervenors and other members of the Huaorani people and their communities and family groups, and specifically recognizes their right to benefit from the Lago Agrio Judgment and their right to remedies, including environmental remediation and compensation and mitigation measures. *Id.;* DE 647-1, [Proposed] Answer and Cross-Complaint in Intervention at ¶ 3; *see also* Appendix B at ¶ 8.

Defendant-Appellant Donziger and the defaulted Defendant ADF have jeopardized the interests of the *amici* in the Lago Agrio Judgment and in their

---

[4] Neither the LAP Representatives, nor any of the LAPs named in the Lago Agrio Litigation, are members of the Huaorani people.  Moreover, while Appellant-Defendant Donziger and the defaulted Defendant ADF purport – without authorization – to represent the Huaorani's interests, in fact the Donziger and ADF Defendants unlawfully wrested control over the Huaorani's valid legal claims for their own enrichment to the detriment of the Huaorani. *See* DE 647-1; Appendix B at ¶¶ 53-68.  No party has disputed that the Ecuadorian courts recognize the Huaorani as beneficiaries of the Lago Agrio Judgment.

underlying claims for environmental (including cultural) damage, personal injury, and property damage, as follows:

- Donziger and ADF have on the one hand acknowledged the *amici* as beneficiaries of the Lago Agrio Judgment, but refused to acknowledge in any concrete way or by formal agreement or an accounting *amici*'s right and/or title to their portion of it.

- None of the *amici* has ever entered into any retainer agreement with Donziger, ADF, and/or any of their agents or associates to represent their interests in the Lago Agrio Litigation; and the *amici* are informed and believe that no member of the Huaorani people has ever done so. In other words, Donziger and ADF purport to represent the *amici*'s interests and represented to the Ecuadorian courts that they represented the *amici*'s interests, but they have not obligated themselves to the Proposed Huaorani Intervenors or other members of the Huaorani people by authorization or agreement or protected their interests.

- The *amici* deny having any part in the misconduct asserted by Chevron in this action, deny having any knowledge thereof, and are deeply troubled by the evidence of such misconduct.

- Donziger and ADF secretly conflated and converted *amici*'s interests to their own, to the detriment of *amici*, as evidenced by their agreements with third

party funders and investors, Donziger's retainer agreements, and other agreements, and additionally, have already collected tens of millions of dollars for their own benefit by selling shares in the Lago Agrio Judgment, and spent substantial sums to pay monies to themselves and to try to cover up their misdeeds – which, on information and belief, continue to this day.[5]

- Donziger and ADF secretly developed an "Invictus" enforcement plan to seek enforcement, around the world, of the Lago Agrio Judgment to which *amici* are beneficiaries, which includes, *inter alia*, establishing a vehicle outside of Ecuador and the United States for the purpose of distributing proceeds from the Lago Agrio Judgment to lawyers and investors before passing on the remaining monies – if any are left after litigation funders and shareholders in the Gibraltar-based company created by Donziger, ADF, and their cohorts (including Ecuadorian counsel Pablo Fajardo) to recover the Lago Agrio Judgment proceeds, Amazonia Recovery Limited, are paid (*see* DE 1874 at 269 n.1110, 477) – to the Ecuador trust controlled by ADF and/or whoever it selects, rather than the *amici*; and

---

[5] As further described *infra*, the *amici* do not know exactly how much money Donziger and ADF have collected in connection with the Lago Agrio Litigation, and therefore are seeking an accounting from Donziger and ADF in their ongoing New York state court proceedings.

- 7 -

- Donziger and ADF are aggressively pursuing legal actions in Ecuador, Canada, Brazil and Argentina[6] to enforce the Lago Agrio Judgment and collect monies from Chevron, which would then be subject to the already-executed and unlawful funding and retainer agreements.

*See* Appendix B at ¶¶ 8, 54-55, 62, 66, 68, 78-79, 87, 89, 94, 95, 107, 108.

In New York state court, the *amici* are seeking and are entitled to a declaration of their rights, a declaration of the duties owed to them by Donziger and ADF, including but not limited to, a duty to notify the *amici* of any arrangements with third parties to receive or administer any proceeds of the Lago Agrio Judgment, and a declaration that they and every Huaorani, their family groups, and their communities are entitled to recover their share of the judgment proceeds awarded under the Lago Agrio Judgment and any monies received from third parties by ADF and/or Donziger in exchange for selling the Huaorani's interests in the Lago Agrio Judgment (based on a full and accurate accounting). *See* Appendix B at ¶¶ 74-89, 117; *see also American News Co., Inc. v Avon Publishing Co.*, 131 N.Y.S.2d 566 (1st Dep't 1954) (action for declaratory relief is

---

[6] The district court's Memorandum Opinion indicated that the Argentine Supreme Court found that the LAPs failed to pierce the corporate veil with respect to Chevron Argentina, the defendant in the Argentine proceedings, and vacated a lower court's attachment order. *See* DE 1874 at 293 n.1189, 315 n. 1254. Because the *amici* are not, and have never been, in communication with Donziger or ADF, they are unaware of the current status of the Argentine proceedings; however, the *amici*'s understanding is that they are ongoing.

proper when complaint contains "factual allegations showing the existence of a real controversy concerning jural relations, and a sufficient basis for the invocation of the court's discretionary power to pronounce judgment declaring the rights and legal relations of the parties"); *Hamilton v. Patrolman's Benevolent Ass'n of City of New York,* 93 N.Y.S.2d 220 (2d Dep't 1949) (cause of action for accounting stated "[t]he allegations in the complaint sufficiently allege that the individual defendants have kept monies belonging to the membership corporation of which they are officers and trustees").

Moreover, by virtue of their representations and actions, Donziger and ADF owe certain fiduciary duties to the Proposed Huaorani Intervenors and other members of the Huaorani people,[7] including a duty to protect their interests in the

---

[7] As alleged in the New York state court action, those duties include, *inter alia,* duties to: (i) protect the *amici*'s interests in the Lago Agrio Judgment; (ii) notify *amici* of any arrangements with third parties – including, but not limited to, investors, funders, and/or the Republic of Ecuador – to receive or administer any proceeds from the Lago Agrio Judgment; (iii) notify *amici* of any actions taken by Donziger, ADF, and/or their associates to enforce the Lago Agrio Judgment; (iv) notify *amici* of and include them in any settlement talks, discussions, or negotiations related to the Lago Agrio Judgment and/or the underlying claims; (v) provide to *amici* an accounting of any proceeds received related to such Judgment or claims; and (vi) remit to *amici*, other Huaorani, and their communities their rightful portions of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable and of monies received from third parties by ADF and/or Donziger in exchange for selling the Huaorani's interests in the Lago Agrio Judgment. *See* Appendix B at ¶¶ 90-103 (claim for breach of fiduciary duty/constructive trust); *see also Roni LLC v. Arfa,* 18 N.Y.3d 846, 848 (N.Y. 2011) ("[A] fiduciary relationship arises 'between two

Lago Agrio Judgment, and have breached those duties. *See* Appendix B at ¶¶ 55, 72, 90-103; *see also Crossland Sav. FSB v. Rockwood Ins. Co.,* 700 F. Supp. 1274, 1281-1283 (S.D.N.Y. 1988) ("When the lawyer represents that she is acting on the third party's behalf, the attorney is estopped from denying the attorney-client relationship and may be held liable for breach of fiduciary duty or negligence.").

The *amici* also have asserted a claim for unjust enrichment against Donziger and ADF, based on the fact that Donziger and ADF have unjustifiably wrested control of the valid claims of the Proposed Huaorani Intervenors and other members of the Huaorani people against Chevron and their interests in the Lago Agrio Judgment by (1) receiving funding and investments from which they have personally benefitted, by representing that they represented *amici*'s interests when they did not, and (2) entering into a fraudulent and corrupt scheme before Ecuadorian courts and elsewhere, which they have used to enrich themselves to the *amici*'s detriment and which has also jeopardized both the legitimacy of the Lago Agrio Judgment (of which the Huaorani are rightful beneficiaries) and the viability of the *amici*'s underlying claims. *See* Appendix B at ¶¶ 104-115; *see also Cruz v. McAneney,* 816 N.Y.S.2d 486, 490-491 (2d Dep't 2006) ("to prevail on a claim for

---

person when one of them is under a duty to act for or give advice for the benefit of another upon matter with the scope of the relation."); *Weiner v. Lazard Freres & Co.,* 672 N.Y.S.2d 8, 14 (1st Dep't 1998) (It is "not mandatory that a fiduciary relationship be formalized in writing, and any inquiry into whether such obligation exists in necessarily fact-specific to the particular case").

- 10 -

unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain was is sought to be recovered." (internal quotations omitted)).

In addition, the *amici* have sought from the New York state court an accounting from Donziger and ADF in order to determine the portion of the proceeds to be paid to the *amici* and their communities in accordance with the Lago Agrio Judgment (as well as the portion to be paid to other Huaorani and their communities) and the portion of any monies received from third parties by ADF and/or Donziger in exchange for selling the Huaorani's interests in the Lago Agrio Judgment. *See* Appendix B at ¶¶ 116-118. An accounting is necessary because Donziger and ADF have (1) failed to share information about monies they have been paid in connection with the Lago Agrio Litigation, (2) dissipated those funds through lavish spending, mismanagement, and misconduct, (3) failed to disclose whether they agreed to pay the government of Ecuador any portion of the Judgment, and (4) previously denied the *amici's* request for an accounting. *See id.* ¶¶ 116-118; *see also Amherst Magnetic Imaging Assoc. v. Community Blue*, 659 N.Y.S.2d 657, 658 (4th Dep't 1997) (to state a cause of action for an accounting, plaintiffs need only plead that they had a confidential or fiduciary relationship with

defendant, and that defendant was entrusted with money and/or property belonging to plaintiff).

The *amici* believe and allege in their action that the conduct of Donziger and ADF have allowed Donziger and ADF to obtain putative title, possession, or other apparent right to property rightfully belonging to the *amici*, other Huaorani, and their communities under the Lago Agrio Judgment. The *amici* and other members of the Huaorani people are entitled to disgorgement and restitution, and are seeking from the NYSC the imposition of a constructive trust in favor of the *amici* and against Donziger and ADF over the Lago Agrio Judgment and any judgment (or settlement) proceeds recovered therefrom by Donziger, ADF and/or their associates (including the LAP Representatives), as well as any monies received by virtue of selling interests in the Lago Agrio Judgment. *See* Appendix B at ¶¶ 90-103; *see also Cruz,* 816 N.Y.S.2d at 490 (finding a constructive trust an appropriate remedy for unjust enrichment).

## III.    Interests of the Proposed Huaorani Intervenors in the Appeal

The *amici* moved to intervene in the district court proceedings in November 2012. *See* DE 645. In their motion, the Proposed Huaorani Intervenors articulated a number of interests they wished to protect: (1) their direct and significantly protectable interest in the Lago Agrio Judgment, regardless of any misconduct found in this action and without defending that misconduct, which the *amici* find

deeply troubling (*see Brennan v. N.Y. City Bd. of Educ.,* 260 F.3d 123, 129 (2d Cir. 2001)); (2) in light of Chevron's allegations that, *inter alia*, Donziger and ADF were planning to unlawfully control the proceeds from the Lago Agrio Judgment, funnel those proceeds to themselves and their funders (to whom they sold interests in the Lago Agrio Judgment) through off-shore havens, and remit the remainder to Ecuador to be controlled by ADF, their interest in ensuring that ADF properly distribute to the Proposed Huaorani Intervenors and other members of the Huaorani people their portion of the judgment proceeds; and (3) given that Chevron seeks here to invalidate the Lago Agrio Judgment, their interest in preventing the district court from making findings of fact and rulings of law that could have collateral estoppel effect on their ability and the ability of other members of the Huaorani people to seek redress for the damages Chevron caused to them (*see Overview Books, LLC v. United States,* 438 Fed. Appx. 31, 33 (2d Cir. 2011)). *See* DE 646 at 3-6.

In denying intervention, the district court acknowledged the *amici*'s valid claims by holding that *amici*'s interests would be protected and represented by the existing parties in the case. Proposed Huaorani Intervenors' interests in defending "the essential validity of the [Lago Agrio] Judgment" were "entirely aligned with those of the existing defendants, most notably but not exclusively the LAP Representatives." DE 724 at 4. It was only with respect to "misbehavior [asserted]

- 13 -

by [the Huaorani] to cut the Huaorani out of any benefits" of the Lago Agrio Judgment that Donziger and the LAP Representatives "would not represent the Huaorani position." DE 724 at 5-6. However, "Chevron can be relied upon to do so." DE 724 at 6. As the district court stated,

> The claim that Donziger and the ADF made the decision – later incorporated in the [Lago Agrio] Judgment – to award control over any recoveries to a trust run by the ADF falls well within Chevron's contention that the Judgment was ghost written by the LAPs and/or their allies, passed to the court ex parte, and adopted by the court. Moreover, Chevron has asserted vocally that Donziger and the other lawyers have schemed to ensure that any recovery that may be obtained be placed in a trust outside of Ecuador for the purpose of cutting up the pie among the lawyers and their financiers in a jurisdiction outside of Ecuadorian control, and then passing the residue to the Ecuadorian trusts which they control through ADF.

DE 724 at 6-7. Indeed, a key consideration of the district court's decision was the fact that an alternative state court forum exists. *Id.* at 8 ("They are free to pursue those claims in independent actions in the New York State and doubtless other courts.").

- 14 -

As noted *supra*, Proposed Huaorani Intervenors' New York state action was filed in February 2013 and is underway. *See* Appendix B.[8]

## ARGUMENT

**I.    The District Court's Remedy to Chevron Failed to Consider and Provide for the Valid Legal Interests of the Proposed Huaorani Intervenors**

The district court assumed, for purposes of the motion to intervene, that the interests articulated by Proposed Huaorani Intervenors were valid. *See* DE 724 at 6-8 (finding that the existing parties to the suit would adequately represent their interests). However, the district court's Judgment imposed a constructive trust *for the sole benefit of Chevron* over any and all property that Donziger or the LAP Representatives receive that is traceable to the Lago Agrio Judgment or its enforcement anywhere in the world. *See* DE 1875 at 1-2.

The district court's imposition of a constructive trust solely in favor of Chevron – without any consideration or further proceedings to determine the competing interests of the Proposed Huaorani Intervenors acknowledged to exist

---

[8] Currently pending is Donziger's motion to dismiss on the basis of forum non conveniens, inability to join ADF as a necessary party, and failure to state a claim. ADF was served on June 17, 2013, but failed to appear. In addition, the *amici* are in the process of serving ADF under the terms of the Inter-American Treaty on Letters Rogatory, to which Ecuador is a signatory.

by the district court and subject to adjudication in New York State court – was error which should be corrected on remand by this Court.

"As a general matter, [a court] will adhere to its own decision at an earlier stage of the litigation." *United States v. Plugh*, 648 F.3d 118, 123 (2d Cir. 2011) (citations and formatting omitted); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). The limited exceptions to the "law of the case" doctrine – including "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice" (*Plugh*, 648 F.3d at 123-124)  – do not exist here.

As directed by the district court, in New York state court the *amici* are concurrently seeking the imposition of a constructive trust over (1) the portion of any judgment (or settlement) proceeds recovered therefrom by Donziger, ADF and/or their associates traceable to injuries of the Proposed Huaorani Intervenors and other members of the Huaorani people, as well as (2) the portion traceable to the Proposed Huaorani Intervenors and other members of the Huaorani people of any monies received by Donziger and/or the ADF by virtue of unlawfully selling the Proposed Huaorani Intervenors' interests in the Lago Agrio Judgment. *See*

- 16 -

Appendix B at ¶¶ 90-103. The *amici* do not dispute that New York state court is an available alternative forum. *See* DE 724 at 7-8.

However, in fashioning a remedy solely for Chevron following trial that fails to take into account the *amici*'s interests, the district court wrongly precluded the Proposed Huaorani Intervenors from enforcing a state court judgment in their favor, and undermined its own finding that the parties to the underlying action – Chevron and the LAPs – would protect the legal interests of the Proposed Huaorani Intervenors.

The district court retains continuing jurisdiction for purposes of enforcing the constructive trust and resolving any disputes concerning its judgment. DE 1875 at 5. Should the New York court find in the *amici*'s favor, the appropriate forum for determining how to apportion the proceeds of the Lago Agrio Judgment (including settlement proceeds) and the monies received by Donziger and/or the ADF by virtue of unlawfully selling the Proposed Huaorani Intervenors' interests in the Lago Agrio Judgment to third parties, is the district court. *See* Fed. R. Civ. P. 19 (requiring joinder of certain parties); Fed. R. Civ. P. 24 (allowing intervention).

Accordingly, the case should be remanded with instructions to permit further proceedings with the joinder of the Proposed Huaorani Intervenors in the event they are successful in procuring a judgment in New York state court, in order to allow the district court to refashion a remedy that will take into account the *amici*'s

valid interests by including a "carve-out" to the constructive trust solely in favor of Chevron. *See, e.g*., Restatement (Third) of Restitution and Unjust Enrichment § 59 cmt. g (2011) ("the orthodox approach to multiple-fraud cases returns identifiable assets to their owners").

Having retained jurisdiction over the enforcement of the constructive trust in favor of Chevron, the district court is well-situated to permit intervention by the Proposed Huaorani Intervenors in enforcement proceedings in order to adjudicate the portion of any proceeds received by the Defendants-Appellants traceable to the Proposed Huaorani Intervenors and other members of the Huaorani people. *See, e.g., United States v. Peoples Benefit Life Ins. Co*., 271 F.3d 411, 416-417 (2d Cir. 2001) (discussing *Torres v. $ 36,256.80 U.S. Currency*, 25 F.3d 1154 (2d Cir. 1994) and finding that "a constructive trust may be a sufficient interest to confer standing in a particular [enforcement] proceeding," where (1) the property subject to the constructive trust is traceable, (2) the constructive trust involves the nominal owner of the subject property and the owner for whom the property was being held in trust, and (3) when doing so does not circumvent established procedures for distributing property to multiple claimants in order to give an advantage to a particular claimant); *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.,* 725 F.2d 871, 875-876 (2d Cir. 1984) (discussing cases and noting that intervention is appropriate where "the intervenor was already in the position of

- 18 -

being directly affected by the litigation"; for example, in *McDonald v. Lavino*, 430 F.2d 1065, 1071 (5th Cir. 1970), an insurance carrier had a subrogation interest and was allowed to intervene in employee's recovery proceedings once employee had obtained a favorable judgment on a workers' compensation claim when the fund had not yet been distributed).

## II.    Absent Application of Judicial Estoppel, the District Court's Opinion Creates an "Access to Justice" Gap for the Proposed Huaorani Intervenors

Having previously (1) argued that Ecuadorian courts were an adequate forum to litigate the *Aguinda v. Texaco, Inc.*[9] plaintiffs' and putative class members' claims and the only forum in which Ecuador and Petroecuador could be joined in the action, and (2) obtained the benefit it sought – a U.S. court order that the *Aguinda* plaintiffs must re-file their claims in Ecuador – Chevron should now be judicially estopped from denouncing the Lago Agrio Judgment and claiming that enforcement of such Judgment in the United States is improper. *See Hubei Gezhouba Sanlian Indus., Co. v. Robinson Helicopter Co.*, 425 F. App'x 580, 580

---

[9] The *amici* disagree with the district court's finding "that Chevron did not merge with Texaco" (*see* DE1874 at 456), in light of Chevron's own representations to this Court in its 2001 appellate brief that "[a]s generally known (and thus this Court may take judicial notice), Texaco merged with Chevron Inc." *Aguinda* Br. at 10 in *Aguinda v. Texaco, Inc.*, No. 2001-7756 (2d Cir., filed Dec. 20, 2001) (emphasis added).

- 19 -

(9th Cir. 2011) (failure to enforce a judgment procured in China after having dismissed for forum non conveniens "would create the perception that the [lower] court was 'misled' in granting [defendant's] forum non conveniens motion and would 'impose an unfair detriment' on [plaintiff]") (citing *New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001)). This is particularly so under principles of equity where Chevron's litigation tactics have ultimately resulted in decades of denial of a forum to the innocent third party Proposed Huaorani Intervenors and other members of the Huaorani people. *See United States v. Georgia-Pacific Co.*, 421 F.2d 92, 95-96 (9th Cir. 1970) (equity, justice, and good conscience preclude a party "from assuming inconsistent positions to the detriment of another party"); *see also ACC Bondholder Group v. Adelphia Communs. Corp.*, 367 B.R. 84, 93 (S.D.N.Y. 2007) (it is inequitable to allow one party "to obtain the benefits of [its] inconsistent positions to the detriment of" the other party).

Tellingly, during the 9-year litigation in U.S. federal courts over Chevron's assertion of forum non conveniens in *Aguinda*, Chevron explicitly took the position that Ecuador was an adequate forum for litigation because, *inter alia¸* there were numerous pending actions in Ecuador against other multinational corporations, and the then-current government of Ecuador had taken steps to "further independence and impartiality of the judiciary." *Aguinda v. Texaco,* 142 F. Supp. 2d 534, 544 (S.D.N.Y. 2001) *aff'd* 303 F.3d 470 (2d Cir. 2002) (relying on

affidavits and exhibits submitted by Texaco)); *see also* Judith Kimerling, *Indigenous Peoples and the Oil Frontier in Amazonia: the Case of Ecuador, ChevronTexaco, and Aguinda v. Texaco,* 38 N.Y.U.J. Int'l L. & Pol. 413, 546-552, 620-625 (2006) (discussing arguments and evidence submitted by Chevron in *Aguinda* in support of its argument that Ecuador offers independent and impartial tribunals).

Chevron also argued that Ecuador and Petroecuador could only be joined in the action if it were in Ecuador, and represented that it would seek to have them joined "as a matter of fundamental fairness." *See Aguinda,* 142 F. Supp. 2d at 551 (relying on Callejas Aff. submitted by Chevron); *see also* Kimerling, *Indigenous Peoples and the Oil Frontier in Amazonia,* at 601-603; Judith Kimerling, *Lessons From the Chevron Ecuador Litigation: The Proposed Intervenors' Perspective*, 1 Stan. J. Complex Lit. 241, 254 (2013) (citing transcript of oral argument on renewed motion to dismiss and Chevron's memorandum of law in support of renewed motion to dismiss). That factor was "significant" to the decision to send the plaintiffs to Ecuador. *Aguinda v. Texaco*, Inc., 303 F.3d 470, 479 (2d Cir. 2002). But Chevron never followed through on its promises, instead initiating arbitration against Ecuador and Petroecuador. Kimerling, *Lessons From the Chevron Ecuador Litigation: The Proposed Intervenors' Perspective*, at 254-255 (text and notes).

Thus, after having spent years vociferously arguing in favor of the Ecuadorian judicial system, then breaking its own representation to the New York district court, Chevron should not be permitted to once again take a contrary position – 21 years after the litigation began – where the result is a deprivation of any meaningful forum for those most harmed, including the Proposed Huaorani Intervenors and other members of the Huaorani people. *See, e.g., Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011) (judicial estoppel "prevents a party from asserting a factual position . . . clearly inconsistent with a position previously advanced by that party and adopted by . . . the court in some manner") (internal citations omitted).[10]

Indeed, Chevron's about-face creates an unconscionable "access to justice" gap depriving the *amici* and the larger group of *Afectados* of their fundamental right to a remedy. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803); *see also* Christopher Whytock & Cassandra Burke Robertson, *Forum Non Conveniens*

---

[10] The district court's finding that "Chevron is not bound by any of the statements made in *Aguinda* by Texaco and relied upon by defendants by virtue of any merger" (DE1874 at 457) is fundamentally inconsistent with this Court's previous statements that "Chevron Corporation [] remains accountable for the promises [made by Texaco] upon which we and the district court relied in dismissing Plaintiffs' action," and that "as a result, that promise, along with Texaco's more general promises to submit to Ecuadorian jurisdiction, is enforceable against Chevron in this action and any future proceedings between the parties, including enforcement actions, contempt proceedings, and attempts to confirm arbitral awards." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d at 388-390 n. 3&4.

*and the Enforcement of Foreign Judgments,* 111 Colum. L. Rev. 1444, 1482 (2011). Simply stated,

> Access to justice requires not only court access, but also a potential remedy. If the forum non conveniens doctrine is applied to deny the plaintiff court access in the United States and, in the same dispute, the judgment enforcement doctrine is applied to deny the plaintiff a remedy based on a foreign judgment, the plaintiff may be denied meaningful access to justice.

Whytock & Robertson, *Forum Non Conveniens and the Enforcement of Foreign Judgments* at 1450 (citations omitted).

That description could not be more apt here. The gap arises from the fact that "[t]he forum non conveniens doctrine and the judgment enforcement doctrine address different problems at different ends of the transnational litigation process." *Id*. at 1472. Moreover, the standards under each are very different: forum non conveniens employs a lenient foreign judicial adequacy standard and is necessarily ex ante (while the case is still in U.S. courts); whereas judicial enforcement requires a much stricter standard and is ex post (follows issuance of a judgment). *Id*. at 1459-60, 1470-71, 1472; *see also* Kimerling, *Lessons From the Chevron Ecuador Litigation: The Proposed Intervenors' Perspective*, at 259 (noting that "the standard to establish that an alternative forum exists is not exacting"). This

- 23 -

unintentional – but nevertheless highly inequitable – denial of justice to the *amici*
and the other individuals affected by Chevron's wrongdoing in Ecuador is best
remedied through application of judicial estoppel. *See Georgia-Pacific Co.*, 421
F.2d at 95-96.

## III.  In the Alternative, Proceeds of the Lago Agrio Judgment Should be Administered Through a Truly Independent Entity from the United States

While the *amici* are in favor generally of the LAP Representatives' proposal
that the collection and distribution of proceeds of the Lago Agrio Judgment, if any,
be administered by a third party, the *amici* object to the LAP Representatives'
suggestion that such an "independent" entity should be – or even could be – "fully
responsive to the plaintiffs" (*i.e*., the LAPs) or properly supervised by Ecuadorian
courts. *See* Op. Brief for Defendants-Appellants Hugo Gerardo Camancho Naranjo
and Javier Piaguaje Payaguaje, at 65-66. Both of the LAP Representatives stated in
verified Interrogatory responses filed in this action that they have "ceded all rights
to the proceeds from the Lago Agrio Judgment to the Amazon Defense Front." *See*
Defendant Hugo Gerardo Camancho Naranjo's Supplemental Objections and
Responses to Chevron Corporation's First Set of Interrogatories, Ex. 15 to
Declaration of Craig Smyser in support of Opposition to Motion for Summary
Judgment ("Smyser Decl."), DE 918-15 at 29 (Supplemental Response to

Interrogatory No. 11); Defendant Javier Piaguaje Payaguaje's Supplemental
Objections and Responses to Chevron Corporation's First Set of Interrogatories,
Ex. 16 to Smyser Decl., DE 918-16 at 29 (Supplemental Response to Interrogatory
No. 11).[11]  As set forth above and in the Proposed Huaorani Intervenors' New
York state court complaint, ADF and its cohorts (including Donziger and Fajardo)
have acted improperly and unlawfully toward the Proposed Huaorani Intervenors
and other members of the Huaorani people in assuming representation of them
without authorization, and secretly taking control and ownership over their valid
interests and claims against Chevron, for their own benefit and to the detriment of
the innocent Huaorani. *See* Appendix B at ¶¶ 55, 90-103.

Accordingly, the *amici* respectfully request that, should the Court grant such
alternative relief requested by the LAP Representatives, the third party
administrator should be *truly* independent of all the wrongdoers – supervised by a
U.S. court and answerable not to the LAPs, but to the legitimate representatives of
the *Afectados* including the *amici*.[12]

---

[11] Counsel for the *amici* observed the cross-examination at trial of one of the LAP
Representatives, Javier Piaguaje Payaguaje. When questioned about this particular
Interrogatory, it was counsel's impression that Mr. Piaguaje did not understand the
question and may not be aware that he had ceded all of his rights to ADF.

[12] The *Afectados* include the *amici* and their communities and family groups, other
Huaorani, and the Huaorani people, as well as other Indigenous groups including
the Cofan people, the Secoya people, the Siona people, and members of the
Kichwa people. In addition to the affected Indigenous communities, the Lago

## <u>CONCLUSION</u>

This Court should reverse in part the remedy granted against Defendants-Appellants insofar as the district court failed to fashion a constructive trust remedy that will take into account the interests of *amici curiae* Proposed Huaorani Intervenors and other members of the Huaorani people, and remand with instructions to permit further proceedings to allow the district court to refashion the constructive trust remedy and include a "carve-out" to the constructive trust solely in favor of Chevron for the *amici*, their family groups, their communities, and other members of the Huaorani people. In the alternative, the Court should appoint an independent administrator, supervised by a U.S. court and answerable to the legitimate representatives of the *Afectados* including the *amici*, to administer the proceeds of the Lago Agrio Judgment.

///

///

---

Agrio lawsuit asserted claims on behalf of "*colonos*" (colonists), or settlers who migrated to the affected areas after Chevron's petroleum activities began and who are also affected by contamination from Chevron's operations ("Colonists"). Most Colonists are *campesinos* who migrated to the Amazon region from Ecuador's coastal and highland regions, but some are Indigenous Kichwa or Shuar who migrated from other areas of the Amazon. *See* Appendix B at ¶ 17 (text and note).

DATED: July 8, 2014                Respectfully submitted,


By:   /s/ K. Lee Crawford-Boyd
K. Lee Crawford-Boyd
SCHWARCZ, RIMBERG, BOYD &
RADER, LLP
6310 San Vicente Boulevard, Suite 360
Los Angeles, California  90048
Telephone: (323) 302-9488
Facsimile: (323) 931-4990

Judith Kimerling
23 Waverly Place, #4-F
New York, New York  10003
Telephone: (212) 777-2135

Counsel for *Amici Curiae*
Proposed Huaorani Intervenors

# APPENDIX A

## LIST OF *AMICI CURIAE*

KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTO TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MEÑEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MIÑIHUA HUANI YATE, ÑAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA ÑAMA TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WIÑA ENOMENGA. CAHUIYA OMACA AND MIMA YETI, ON BEHALF OF THEMSELVES, ON BEHALF OF THEIR FAMILY GROUPS, ON BEHALF OF THEIR COMMUNITIES, AND ON BEHALF OF THE HUAORANI PEOPLE

- 1 -

**APPENDIX B**
**COMPLAINT, *KEMPERI BAIHUA HUANI v. STEVEN DONZIGER***
**NEW YORK SUPREME COURT INDEX NO. 151372/2013**

Case: 14-832    Document: 69-2    Page: 35    07/08/2014    1265548    86

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTO TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAMA TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA. CAHUIYA OMACA AND MIMA YETI, SUING ON BEHALF OF THEMSELVES, ON BEHALF OF THEIR FAMILY GROUPS, ON BEHALF OF THEIR COMMUNITIES, AND ON BEHALF OF THE HUAORANI PEOPLE<br><br>                    Plaintiffs,<br><br>     vs.<br><br>STEVEN DONZIGER, an individual; THE LAW OFFICES OF STEVEN R. DONZIGER, a sole proprietorship; DONZIGER & ASSOCIATES, PLLC, a New York professional liability corporation; FRENTE DE DEFENSA DE LA AMAZONIA A/K/A AMAZON DEFENSE FRONT OR AMAZON | **Index No.:**<br>**Date Index No. Purchased:**<br><br><br>**SUMMONS**<br><br>Plaintiffs designate New York County as the place of trial<br><br>The basis of venue is the residence of one or more of the parties pursuant to CPLR § 503 |

**Appendix B**

DEFENSE COALITION, an Ecuadorian
non-governmental organization; AND
DOES 1 THROUGH 20, INCLUSIVE,

Defendants.

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the Complaint in this action
and to serve a copy of your Answer, or if the Complaint is not served with this
Summons, to serve a Notice of Appearance on the Plaintiffs' attorneys within 20
days after the service of this Summons, exclusive of the day of service (or within
30 days after the service is complete if this Summons is not personally delivered to
you within the State of New York); and in case of your failure to appear or answer,
judgment will be taken against you by default for the relief demanded in the
Complaint.

Dated:  Los Angeles, California
        February 13, 2013

By:   /s/ Kathryn Lee Crawford
      Kathryn Lee Crawford, Esq.
      SCHWARCZ, RIMBERG, BOYD &
      RADER, LLP
      6310 San Vicente Blvd., Suite 360
      Los Angeles, CA 90048
      Telephone: (323) 302-9488
      Facsimile:  (323) 931-4990
      lboyd@srbr-law.com

      Judith Kimerling, Esq.
      23 Waverly Place, #4-F
      New York, NY 10003
      Telephone: (212) 777-2135
      judith.kimerling@gmail.com

      Attorneys for Plaintiffs

**Appendix B**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------

KEMPERI BAIHUA HUANI, AHUA
BAIHUA CAIGA, PENTIBO BAIHUA
MIIPO, DABOTO TEGA HUANI,
AHUAME HUANI BAIHUA, APARA
QUEMPERI YATE, BAI BAIHUA
MIIPO, BEBANCA TEGA HUANI,
COMITA HUANI YATE, COPE TEGA
HUANI, EHUENGUINTO TEGA,
GAWARE TEGA HUANI, MARTIN
BAIHUA MIIPO, MENCAY BAIHUA
TEGA, MENEMO HUANI BAIHUA,
MIIPO YATEHUE KEMPERI,
MINIHUA HUANI YATE, NAMA
BAIHUA HUANI, NAMO HUANI
YATE, OMARI APICA HUANI,
OMENE BAIHUA HUANI, YEHUA
TEGA HUANI, WAGUI COBA HUANI,
WEICA APICA HUANI, TEPAA
QUIMONTARI WAIWA, NENQUIMO
NENQUIMO VENANCIO NIHUA,
COMPA GUIQUITA, CONTA
NENQUIMO QUIMONTARI, DANIEL
EHUENGEI, NANTOQUI NENQUIMO,
OKATA QUIPA NIHUA, CAI BAIHUA
QUEMPERI, OMAYIHUE BAIHUA,
TAPARE AHUA YETE, TEWEYENE
LUCIANA NAMA TEGA, ABAMO
OMENE, ONENCA ENOMENGA,
PEGO ENOMENGA, WANE IMA,
WIÑA ENOMENGA. CAHUIYA
OMACA AND MIMA YETI, SUING ON
BEHALF OF THEMSELVES, ON
BEHALF OF THEIR FAMILY GROUPS,
ON BEHALF OF THEIR
COMMUNITIES, AND ON BEHALF OF
THE HUAORANI PEOPLE

　　　　　　Plaintiffs,

　　vs.

STEVEN DONZIGER, an individual;
THE LAW OFFICES OF STEVEN R.
DONZIGER, a sole proprietorship;
DONZIGER & ASSOCIATES, PLLC, a
New York professional liability
corporation; FRENTE DE DEFENSA DE
LA AMAZONIA A/K/A AMAZON

Index No.:


**<u>COMPLAINT</u>**


Jury Trial Demanded


Plaintiffs designate New York
County as the place of trial

**Appendix B**

DEFENSE FRONT OR AMAZON
DEFENSE COALITION, an Ecuadorian
non-governmental organization; AND
DOES 1 THROUGH 20, INCLUSIVE,

Defendants.

Plaintiffs Kemperi Baihua Huani, et al., on behalf of themselves, on behalf
of their family groups, on behalf of their communities, and on behalf of the
Huaorani people (collectively "Plaintiffs" or "Huaorani Plaintiffs"), complain and
allege against Defendants Steven Donziger, The Law Offices of Steven R.
Donziger, and Donziger & Associates, PLLC (collectively "Donziger Defendants")
and Frente de Defensa de la Amazonia a/k/a Amazon Defense Front or Amazon
Defense Coalition ("ADF"), as follows:

## INTRODUCTION

1.      This action seeks a declaration of rights that the Huaorani Plaintiffs
and other members of the Indigenous Huaorani people are the direct beneficiaries
of and are therefore entitled to a proportionate share of the judgment against
Chevron Corporation ("Chevron"), rendered by an Ecuadorian court on February
14, 2011and affirmed in all material respects and certified for enforcement on
appeal ("the Lago Agrio Judgment"), and an accounting of the allocation of
judgment proceeds, including the Huaorani Plaintiffs' portion of the judgment, and
additionally, asserts claims for unjust enrichment and breach of fiduciary duty
against the Defendants, who have represented (falsely) that they represented the
Huaorani Plaintiffs (and all members of the Huaorani people) in the litigation
leading up to the judgment, and therefore owe a duty to hold the Huaorani's
portion of the compensatory remedies and punitive damages in constructive trust.
More specifically, Plaintiffs request that this Court declare that Plaintiffs and their
communities have right and/or title to their portion of the Lago Agrio Judgment

1

**Appendix B**

(subject to proof based on rights and injuries denoted therein) to recompense them and their communities, and additionally, that every Huaorani and Huaorani community has right and/or title to their portion of the Lago Agrio Judgment, so that they may be recompensed for the significant harm and damage caused to their ancestral lands, territory and natural resources, and to their environment, subsistence, economy, cultural practices, way of life, and health, which were adversely affected and disrupted by Chevron's misconduct, as alleged and adjudged in the litigation in Ecuador ("the Lago Agrio Litigation"); so that they may implement effective mitigation measures to address the human and cultural consequences of the environmental harms which were alleged and adjudged in the Lago Agrio Judgment, including but not limited to displacement from ancestral lands and territory and impacts on human health and subsistence resources; and so that they may be indemnified for their pain and suffering.  Plaintiffs seek such compensation and funds for mitigation measures through the imposition of a constructive trust on the Lago Agrio Judgment and any proceeds collected on it and/or any final judgment affirming or recognizing the Lago Agrio Judgment in enforcement proceedings by the Donziger Defendants, ADF and/or their agents or associates, including but not limited to, the $100 million awarded for Cultural Damages, the $200 million awarded for damages to flora and fauna, the $1.4 billion awarded for health care, the $150 million awarded for potable water supplies, and the $8.64616 billion awarded as punitive damages by the Ecuadorian court.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over Defendant Steven Donziger ("Donziger") under CPLR § 301, because Donziger is a citizen of the State of New York and because he conducts extensive business activities within the state.  Upon

information and belief, Donziger is the sole proprietor of the Law Offices of Steven R. Donziger, which is located and does business in New York.

3.    This Court has jurisdiction over the Law Offices of Steven R. Donziger and Donziger and Associates, PLLC under CPLR § 301, because such entities are citizens of the State of New York, and because they conduct extensive business activities within the state.

4.    Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC are hereinafter referred to collectively as the "Donziger Defendants."

5.    This Court has jurisdiction over ADF under CPLR §§ 301 and 302, because ADF has been designated as the beneficiary of the trust that will administer the environmental remedial monies from the Lago Agrio Judgment and as the entity that will select the directors of said trust and a second trust that will administer the punitive damages monies, and stands to benefit if such proceeds are not used to remedy harms to Plaintiffs and compensate Plaintiffs for their pain and suffering, as required by the Ecuadorian court. Upon information and belief, at all times relevant herein, Donziger is or has been acting as an agent and/or alter ego of ADF with respect to the Lago Agrio Litigation. Through his activities in New York, Donziger has directly controlled and/or managed ADF, including, *inter alia,* supervising and controlling efforts by the Donziger Defendants and ADF to enforce the Lago Agrio Judgment, as well as the efforts to sell interests in the Lago Agrio Judgment to third party investors. Plaintiffs are further informed and believe and thereon allege that through its agents and representatives, including Pablo Fajardo Mendoza and Luis Yanza, ADF has transacted business and engaged in conduct in the United States and New York which give rise in part to Plaintiffs' claims. In particular, upon information and belief, representatives of ADF have visited the United States and New York, and have directed numerous telephone

**Appendix B**

calls, emails and other forms of communication to Donziger in New York for the purpose of furthering and controlling the Lago Agrio Litigation and the efforts to enforce the Lago Agrio Judgment.  In addition, upon information and belief, ADF maintains or causes to be maintained a website intentionally directed towards the United States and New York called www.texacotoxico.org through which ADF seeks to provide information regarding the Lago Agrio Litigation and its collection efforts, and garner support in the United States and New York for its activities related to the litigation and collection efforts.  Moreover, on information and belief, ADF, through its agents and Donziger, has solicited and received funds from persons in the United States and New York, including funds received in exchange for interests in the Lago Agrio Judgment and funds for the purpose of enforcing said Judgment.

6.     This Court further has jurisdiction over this matter under CPLR §3001, which provides for the Court's exclusive jurisdiction over declaratory proceedings as the Defendants reside and/or do business in New York.

7.     Venue for this action is proper in Supreme Court of New York, New York County, pursuant to CPLR § 503(a)(d), because Defendants Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, are residents of the State of New York in New York County, and a substantial part of the property that is the subject of this action is situated in New York County.

## PARTIES

8.     Plaintiffs are members of the Huaorani people, an Indigenous people and minority group in the Amazon region in Ecuador.  The Huaorani people are one of five groups of Indigenous peoples who have been harmed by Chevron's petroleum activities in the Amazon region of Ecuador,[1] and who are beneficiaries

---

[1]     Texaco, Inc. and its subsidiary Texaco Petroleum Company engaged in oil exploration and extraction activities in the Amazon region in Ecuador.  Because Chevron later acquired Texaco, it was named as a defendant in the Lago Agrio

of the judgment against Chevron which was issued by the Provincial Court of Justice of Sucumbíos in Ecuador on February 14, 2011 (in the form of a comprehensive, 188-page decision) and upheld in all material respects on appeal, in litigation arising out of Chevron's petroleum activities in the Amazon region in Ecuador (the Lago Agrio Judgment). [2]

9.    Plaintiffs are, and at all times mentioned herein were, members of the Indigenous Huaorani people, and citizens and residents of Ecuador.  Plaintiffs Kemperi Baihua Huani, Ahua Baihua Caiga, Pentibo Baihua Miipo, Daboto Tega Huani, Ahuame Huani Baihua, Apara Quemperi Yate, Bai Baihua Miipo, Bebanca Tega Huani, Comita Huani Yate, Cope Tega Huani, Ehuenguinto Tega, Gaware Tega Huani, Martin Baihua Miipo, Mencay Baihua Tega, Meñemo Huani Baihua, Miipo Yatehue Kemperi, Miñihua Huani Yate, Ñama Baihua Huani, Namo Huani Yate, Omari Apica Huani, Omene Baihua Huani, Yehua Tega Huani, Wagui Coba Huani, and Weica Apica Huani are members of the Huaorani community Bameno. Plaintiffs Tepaa Quimontari Waiwa, Nenquimo Nenquimo Venancio Nihua, Compa Guiquita, Conta Nenquimo Quimontari, Daniel Ehuengei, Nantoqui Nenquimo, and Okata Quipa Nihua are members of the Huaorani community Yawepare.  Plaintiffs Cai Baihua Quemperi, Omayihue Baihua, Tapare Ahua Yete, and Teweyene Luciana Ñama Tega are members of the Huaorani community Boanamo.  Plaintiffs Abamo Omene, Onenca Enomenga, Pego Enomenga, Wane Ima, and Wiña Enomenga are members of the Huaorani community Mihuaguno. Plaintiffs Cahuiya Omaca and Mima Yeti are members of the Huaorani community Wema.

---

Litigation.

[2]    The Lago Agrio litigation followed years of litigation in the United States, which began in 1993 in the case of *Aguinda v. Texaco, Inc.* in the Southern District of New York.  *See Aguinda v. Texaco, Inc.*, 303 F. 3d 470 (2d Cir. 2002).

**Appendix B**

10.    Plaintiffs are informed and believe and thereon allege that Defendant Donziger is currently a "consulting attorney" for ADF and the named plaintiffs in the Lago Agrio Litigation ("Lago Agrio Plaintiffs" or "LAPs").  On further information and belief, Donziger is an individual residing in New York, New York.

11.    Plaintiffs are informed and believe and thereon allege that Defendant the Law Offices of Steven R. Donziger, is a sole proprietorship located at 245 W. 104th Street, #7D, New York, New York 10025, and is therefore a citizen of the State of New York.

12.    Plaintiffs are informed and believe and thereon allege that Defendant Donziger & Associates, PLLC, is a professional limited liability corporation located at 245 W. 104th Street, #7D, New York, New York 10025, and is therefore a citizen of the State of New York.

13.    Plaintiffs are informed and believe and thereon allege that Defendant ADF is a "non-profit" organization purporting to represent the Plaintiffs and all of the communities and community members who have been harmed by Chevron's operations in Ecuador (collectively referred to as "the *Afectados*") in the Lago Agrio Litigation.  On further information and belief, ADF is the designated beneficiary of a trust ordered by judgment in the Lago Agrio Litigation to receive the monies awarded by the court for environmental remediation, compensation and mitigation measures (the Environmental Remedial Measures), and is also designated as the entity that will select the directors of said trust and of a second trust ordered by the court to receive punitive damages monies for indemnification of pain and suffering.  On further information and belief, ADF intends to administer the proceeds from the Lago Agrio Judgment or designate another person or persons and/or entity to administer all or part of said proceeds.  On further information and belief, ADF is a nongovernmental organization registered

6

**Appendix B**

under the laws of Ecuador with offices located in the town of Nueva Loja (Lago Agrio) in the province of Sucumbios, Ecuador, and in the city of Quito, in the province of Pichincha, Ecuador, and is therefore a citizen of Ecuador.

14.     Plaintiffs are informed and believe and thereon allege that ADF has established a second organization, the *Asemblea de Afectados y Afectadas por Texaco* (Assembly of Persons Affected by Texaco) ("ADAT"), which similarly purports to represent all of the *Afectados,* including the Huaorani.  Accordingly, Plaintiffs are informed and believe and thereon allege that ADAT was the agent of ADF and at all times was acting within the purpose and scope of such agency, with the permission and consent of ADF and with the knowledge, authorization, permission and consent and/or subsequent ratification and approval of ADF.

15.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, are unknown to Plaintiffs at this time ("Doe Defendants"), who therefore sue said Doe Defendants by such fictitious names.  When the true names and capacities of said Doe Defendants have been ascertained, Plaintiffs will seek leave to amend this Complaint accordingly.  Plaintiffs are informed and believe and thereupon allege that each defendant designated herein as a Doe Defendant is liable and/or responsible in some manner for the events and happenings herein complained of and have caused injuries and damages thereby to Plaintiffs, as hereinafter alleged.

16.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each of the Defendants sued herein was the agent and/or employee of each of the remaining Defendants and at all times were acting within the purpose and scope of such agency and employment, with the permission and consent of their Co-Defendants and with the knowledge, authorization, permission and consent and/or subsequent ratification and approval of each Co-Defendant.

**Appendix B**

## FACTUAL ALLEGATIONS

### A.     Background of the Lago Agrio Litigation

17.     The Lago Agrio Litigation, which gave rise to the Lago Agrio Judgment, was brought by forty eight (48) individuals from four communities (Lago Agrio Plaintiffs or LAPs), and asserted claims on behalf of all Indigenous and colonist (settlers) communities and community members who have been harmed by Chevron's activities in the Ecuadorian Amazon (collectively referred to as "the *Afectados*"), including Plaintiffs and their communities and family groups, other Huaorani, and the Huaorani people.[3]  None of the LAPs are members of the Huaorani people.

18.     For purposes of this Complaint, the background facts relevant to the history of the Lago Agrio Litigation and related litigation in the United States are succinctly stated by the Second Circuit in its January 26, 2012 decision regarding a preliminary injunction issued by the District Court.  *See Chevron Corp. v. Camacho Naranjo*, 667 F.3d 232, 234-239 (2d Cir. 2012).

19.     Following years of litigation in the Republic of Ecuador arising out of the environmental damage and devastation caused by Chevron, the Ecuadorian court found Chevron liable for more than $19 billion in total damages, approximately $8.646 billion of which are for environmental remediation, compensation and mitigation measures ("Environmental Remedial Measures"), including $600 million to remediate ground waters; $5.396160 billion to remediate

---

[3]     The other affected Indigenous groups include the Cofan people, the Secoya people, the Siona people, and members of the Kichwa people.  In addition to the affected Indigenous communities, the Lago Agrio lawsuit asserts claims on behalf of "*colonos*" (colonists), or settlers who migrated to the affected areas after Chevron's petroleum activities began and who are also affected by contamination from Chevron's operations ("Colonists").  Most Colonists are *campesinos* who migrated to the Amazon region from Ecuador's coastal and highland regions, but some are Indigenous Kichwa or Shuar who migrated from other areas of the Amazon.  The Defendants refer to all of these groups collectively as "the *Afectados.*"

soils; $200 million to restore native flora and fauna and help remedy the impact on the affected Indigenous peoples' food supply caused by damage to their sources of subsistence; $150 million to deliver potable water supplies; $800 million to develop and implement a health plan that includes treatment for people with cancer; and $1.4 billion to implement and maintain a permanent healthcare system to serve the affected populations.

20.    Recognizing that the environmental harms caused by Chevron's conduct can have "especially severe consequences in cases in which the ecosystem that is affected is a place where groups [of people] live whose cultural integrity is firmly associated with the health of the land, inasmuch as environmental degradation can potentially threaten the very existence of the group," the Environmental Remediation Measures awarded by the Ecuadorian Court also include $100 million for remedial measures to mitigate the unique harm to the affected Indigenous peoples' communities, including displacement from their ancestral territories and other cultural impacts ("Cultural Damages").

21.    The Lago Agrio Judgment in favor of the LAPs is based in significant part on injuries suffered by members of the Huaorani people and their communities and family groups, including Plaintiffs, and recognizes their right to benefit from the Lago Agrio Judgment and their right to remedies, including environmental remediation, compensation and mitigation measures as well as compensation for pain and suffering.

22.    The objective of the Environmental Remedial Measures awarded by the Ecuadorian Court is "to return things to their natural state," and restore natural resources and environmental conditions to the way they were before Chevron caused the environmental damage and devastation that gave rise to the Lago Agrio Litigation.  The Lago Agrio Judgment recognizes, however, that it will be impossible to achieve that objective in many cases, and for that reason, the

**Appendix B**

Environmental Remedial Measures include three types of remedies: "principal" remedial measures" to remediate soils and ground waters; "complementary" remedial measures to compensate for the inability to fully restore natural resources; and "mitigation" remedial measures to address the impacts on Indigenous cultures and impacts on human health that cannot be reversed or fully repaired.

23.    The Lago Agrio Judgment also orders Chevron to pay punitive damages in an amount equal to the total aggregate value of the Environmental Remedial Measures ($8,646,160,000) or, alternatively, to publicly apologize to the affected populations within fifteen days. Chevron failed to apologize and thus is further obligated to pay $8.64616 billion in punitive damages.

24.    The purpose of the punitive damages is to compensate the affected Indigenous communities and community members, including Plaintiffs and other Huaorani, as well as the colonists (settlers) who also have been harmed by the environmental damage, for their pain and suffering, and to punish Chevron for unreasonable and malicious conduct in the Lago Agrio Litigation which prolonged the suffering of the affected communities and community members. Plaintiffs and other Huaorani and their communities have experienced great pain and suffering as a result of the damage caused to their ecosystem, lives, culture, and health.

25.    The Lago Agrio Judgment further directs the plaintiffs to establish a trust fund for the judgment monies with Defendant ADF or the person or persons it designates as the beneficiary of the trust, and with ADF or the person or persons it designates as the director(s) of the trust tasked with distributing such monies.[4]

26.    By decision dated January 3, 2012, the Appellate Division of the Provincial Court of Justice of Sucumbios affirmed the judgment of the Lago Agrio

---

[4]    The Lago Agrio Judgment further orders Chevron to pay an additional amount equal to ten percent (10%) of the total "amount sentenced" or $1,729,232,000, to ADF.

**Appendix B**

court in all material respects, and ordered Chevron to pay the judgment and an additional 0.10 percent (0.10%) of the value of the judgment as legal fees. The Appellate Division also directed the plaintiffs to establish a second trust to administer the punitive damages monies, leaving its instructions and direction to the same board of directors that will manage the trust with the monies for the Environmental Remedial Measures.[5]

### B.    The Huaorani People and Their Culture

27.    The Amazon region in Ecuador forms part of the Upper Amazon basin. Plaintiffs are Indigenous persons who are members of the Huaorani people, whose Indigenous ancestors have lived in the forests of the Amazon basin ("Amazon Rainforest") since before written history. The Huaorani have developed a rich cultural heritage in harmony with their rainforest environment, and believe that their rainforest ecosystem territory "gives" them life and their way of life.

28.    Huaorani culture co-evolved with the Huaorani's rainforest ecosystem, so there is an inextricable relationship between Huaorani culture and the Huaorani's ecosystem, which includes relationships with specific plants and animals in their environment, and with specific places in their ancestral territory. The ability of the Huaorani to conduct their cultural practices, and to preserve their culture and transmit it to future generations, is firmly associated with the health of the rainforest ecosystem in their ancestral lands and territory. In addition to cultural survival, the means of subsistence, health, and well-being of the Huaorani also depend on their ancestral lands, territory and natural resources, and on maintaining a high level of environmental quality, and thus are also firmly associated with the health of the ecosystem in their ancestral lands and territory.

---

[5]    Clarifications of the Appellate Division judgment were issued by decision dated January 13, 2012.

29.     Plaintiffs live in the Amazon Rainforest in Ecuador, and represent Indigenous Huaorani communities and family groups whose existence, identity, culture, subsistence, health, well-being, economic livelihood, and way of life are closely associated with their ancestral lands, territory, and natural resources.

C.     **Chevron's Oil Exploration and Extraction in the Amazon and Its Impact on the Huaorani**

30.     From 1964 through 1992, Chevron and its subsidiary Texaco Petroleum, with various partners, including the Ecuadorian government, engaged in oil exploration and extraction in the Amazon Rainforest in Ecuador.  The environmental contamination and destruction caused by those operations are well-documented, and have received well-deserved national and international condemnation.

31.     Chevron made the first discovery of commercial quantities of petroleum in the Ecuadorian Amazon in 1967, to the north of Huaorani territory, and soon expanded its operations to find and extract petroleum in other locations, including ancestral Huaorani lands and territory, which had been inhabited, occupied, and used by Huaorani family groups since time immemorial.

32.     The Huaorani family groups who lived in the lands where Chevron wanted to carry out petroleum activities had little or no peaceful contact with the outside world at that time.  They were semi-nomadic hunters and gatherers, who lived freely and in accordance with their culture, in voluntary isolation in the forest.  They cultivated manioc and other subsistence crops, but relied mainly on hunting, gathering, and fishing for their daily consumption.  They were economically self-sufficient, and depended on their rainforest environment to survive.  Ecuadorian institutions had little or no presence or influence in said lands, and the Huaorani effectively exercised political sovereignty and self-determination.

33.    In furtherance of Chevron's petroleum activities which were the subject of the Lago Agrio Judgment, in order to locate and extract oil resources in ancestral Huaorani lands and territory, the government of Ecuador and Chevron collaborated with missionaries from the U.S.-based Summer Institute of Linguistics to displace and pacify the Huaorani family groups who inhabited the areas where Chevron wanted to operate, including Plaintiffs' family groups, by making (first) "contact" and trying to "civilize" them, change their culture, and end their way of life.  Plaintiffs refer to that period as the time "when the civilization arrived" and recall it as a time of great suffering, when outsiders first invaded and damaged their rainforest territory, and when new diseases sickened and, in numerous cases, killed many family members.

34.    The forced "contact" with Plaintiffs' family groups and other Huaorani caused great suffering and harm to Plaintiffs and other Huaorani, and changed their world forever.  Because of that unique history, and because the Huaorani are a recently-contacted Indigenous people, Plaintiffs and other Huaorani have been especially hard hit by Chevron's petroleum activities and the environmental harms caused thereby and adjudged in the Lago Agrio Judgment. As a consequence of said activities and harms to ancestral Huaorani lands, territory, and natural resources, Plaintiffs and other Huaorani have been forced to adapt and make changes to their way of life and, additionally, have been harmed by new illnesses and diseases, and continue to face an ongoing and ever-increasing risk of further adverse impacts on their health and culture.[6]

---

[6]    Part of one Huaorani family group has continued to resist "contact" with the outside world (the Tagaeri, or family of Taga).  Upon information and belief, the surviving Tagaeri reportedly now live with another Huaorani family group (the Taromenane) in voluntary isolation in the forest, in an extremely vulnerable situation due to the loss of ancestral lands and territory, damage to natural resources, and ongoing and ever-increasing external pressures which include the continued expansion of petroleum activities and colonization in ancestral Huaorani lands and territory.

**Appendix B**

35.    When Chevron first arrived, Huaorani territory was unspoiled rainforest, which had been inhabited, occupied and used by Huaorani family groups since time immemorial, in harmony with the environment.  In furtherance of its petroleum activities in Plaintiffs' oil-rich ancestral homeland, Chevron contaminated and damaged large areas of Plaintiffs' ancestral lands and territory, and destroyed and degraded natural resources that provided sustainable sources of food, water and, medicine, among other things, and which "gave" the Huaorani life and their way of life.

36.    Huaorani culture is firmly associated with the health of their rainforest environment, and environmental degradation and displacement from ancestral lands and territory can threaten the very existence of Huaorani family groups and the Huaorani people.  The environmental harms adjudged in the Lago Agrio Litigation have limited and undermined the ability of Plaintiffs and other Huaorani to conduct their cultural practices and enjoy their culture, as well as their ability to preserve their cultural legacy and transmit it to future generations.  As a consequence of said environmental harms and displacement from ancestral lands and territory, and additional related changes which began with Chevron's actions in furtherance of its petroleum operations and continue to the present day, Plaintiffs' very existence as Huaorani is endangered.

37.    Large areas of ancestral Huaorani lands and territory have been contaminated and damaged by Chevron's petroleum activities, and Huaorani family groups, including Plaintiffs' family groups, have been displaced from large areas of their ancestral lands and territory as a consequence of Chevron's activities for which Chevron was held liable in the Lago Agrio Judgment.  In addition, natural resources that provided the Huaorani with secure and sustainable sources of food, water, medicines, shelter, and other means of subsistence have been degraded and destroyed as a result of Chevron's activities, and the access of Huaorani

**Appendix B**

individuals, family groups, and communities to the rainforest flora and fauna that is needed to sustain both Huaorani culture and Huaorani subsistence activities has been harmed.  Without access to effective remedies, as adjudicated in the Lago Agrio Judgment, the threat of even greater harms to Plaintiffs and other Huaorani will remain.

### D.    The Huaorani's Interest in the Lago Agrio Judgment

38.    The Lago Agrio Judgment adjudged that Chevron is responsible for widespread contamination and environmental damage that has harmed and continues to harm and threaten the environment, health, culture, way of life, and subsistence of the Huaorani, including Plaintiffs, and other Afectados.

39.    Plaintiffs' ancestral lands and territory include lands where a significant portion of the oil extraction infrastructure that Chevron built and operated is located, as well as lands that were colonized by settlers from other areas (Colonists) after the Huaorani had been displaced.  Said infrastructure includes the so-called "*Via Auca* (Auca Road)"[7] and the wells, platforms, waste pits, pipelines, production stations, and other roads and facilities which were built and operated in order to locate and extract petroleum from the following oil fields: Auca, South Auca, Cononaco, Culebra, Rumiyacu, Yuca, South Yuca, and Yulebra.

40.    Plaintiffs' ancestral lands and territory include large areas that have been severely contaminated, degraded, and damaged by Chevron's petroleum activities, as alleged and adjudged in the Lago Agrio litigation.   Plaintiffs' ancestral lands and territory also include large areas where natural resources have been contaminated, degraded, and destroyed, as alleged and adjudged in the Lago Agrio Litigation.  The affected areas of Plaintiffs' ancestral lands and territory

---

[7]    Plaintiffs refer to that road as "the road" or "the Tiguino Road" because Auca is a derogatory term used to refer to the Huaorani, which means "savages" and is considered deeply insulting by the Huaorani.

include areas where the environmental damage is so severe that Plaintiffs have been displaced, and can no longer live there or use the lands, territory, and natural resources they relied on for their culture, subsistence, health, and way of life, as well as areas that are threatened with further harm because of the ongoing contamination, as alleged and adjudged in the Lago Agrio Judgment.

41.    As a result of Chevron's petroleum activities and the environmental harms caused thereby, Plaintiffs and other Huaorani have been displaced and dispossessed of lands and territory; additional lands and territory have been degraded and damaged; and the access of Plaintiffs and other Huaorani to the territory and natural resources they need for physical and cultural survival has been impaired, reduced, and endangered.

42.    As a result of Chevron's petroleum activities and the environmental harms caused thereby, the lives, cultural practices, and way of life of Plaintiffs and other Huaorani were severely disrupted and harmed, and they were forced to make changes and adapt in order to survive; their means of subsistence, food security, economy, heath, well-being, and ability to maintain a self-reliant and sustainable way of life were impaired and harmed; their ability to conduct their cultural practices and to preserve their culture and transmit it to future generations were impaired and harmed; they suffered from culture shock, hunger, and new diseases; they were exposed to toxic substances and an increased and ever-increasing risk of disease, illness, and malnutrition; they endured, and continue to endure, pain and suffering; and their health, means of subsistence, well-being, and very existence as Huaorani have become endangered.

43.    Additionally, the ongoing damage and continuing threats to human health and the environment caused by Chevron's conduct, as alleged and adjudged in the Lago Agrio Litigation, continue to threaten Plaintiffs and other Huaorani with ongoing and ever-increasing risks of further harm.

### E.    Early Efforts by Other Indigenous Groups to Sue Chevron

44.    On or about August 31, 1993, members of the Kichwa (also spelled "Quichua") people from the community Comuna San Carlos, who were affiliated with the Indigenous Kichwa organization FCUNAE (Federation of Comuas Union of Natives of the Ecuadorian Amazon)[8] and two officials of that community (Ignacio Sequihua and Mauricio Sequihua) filed suit against Chevron for environmental contamination and damages caused by Chevron's petroleum operations in the Ecuadorian Amazon.  Their action, *Sequihua v. Texaco, Inc*., 847 F. Supp. 61 (S.D. Tex. 1994), was brought by indigenous Kichwa from one Kichwa community (village), Comuna San Carlos.[9]  The Kichwa are an entirely different people and tribe from the Huaorani.  No Huaorani was a plaintiff in *Sequihua*, or had any involvement with that case.  The *Sequihua* action was dismissed in January 1994 on grounds of *forum non conveniens* and comity.

45.    Shortly after the *Sequihua* action was filed (but before it had been dismissed), a second lawsuit was filed in federal court in the Southern District of New York.  This second action, *Aguinda v. Texaco*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001), aff'd, 303 F.3d 470 (2d Cir. 2002), was filed on or about November 3, 1993 (the "*Aguinda* Action").  The *Aguinda* Action was filed as a class action, and the complaint defined the putative class to include the members of Comuna San Carlos, as well as members of many additional Kichwa communities affiliated with FCUNAE.  The plaintiffs in the *Aguinda* Action included twelve members of (two)

---

[8]    FCUNAE is an indigenous federation comprised of Kichwa communities in the Napo River basin, including Napo Runa Kichwa who are affected by the oil extraction operations in the Amazon.

[9]    It should be noted that the attorney for the plaintiffs in the *Sequihua* action was Charles B. Musslewhite.  Professor Judith Kimerling ("Professor Kimerling"), co-counsel for Plaintiffs in the instant action, did not represent the *Sequihua* plaintiffs in that litigation.  She did, however, work with FCUNAE and Comuna San Carlos at that time, and had been asked (and authorized) by the Kichwa community to put together a team of lawyers to pursue a lawsuit against Texaco in the United States, on behalf of Comuna San Carlos and its members.

**Appendix B**

communities affiliated with FCUNAE - were all Kichwa – as well as members of the Indigenous Secoya people and Colonists. Like the Kichwa, the Secoya are an entirely different people and tribe from the Huaorani. No Huaorani was a plaintiff in the *Aguinda* Action. In or about August 2002, the *Aguinda* Action was dismissed on the ground of *forum non conveniens,* in favor of litigation in Ecuador. The Lago Agrio Litigation was pursued in order to continue that litigation in Ecuador, and most of the Lago Agrio Plaintiffs were also plaintiffs in the *Aguinda* Action.

46.    Beginning in or aound1992, before Chevron's oil extraction contract with the Republic of Ecuador expired, Chevron and Ecuador's government and state oil company, Empresa Estatal Petróleos del Ecuador ("Petrocuador") undertook what they described as an "environmental audit" of Chevron's facilities.

47.    Beginning in or around 1994, and continuing through 1998, Chevron negotiated and undertook what it describes as an "environmental remediation," based on a series of agreements that it negotiated behind closed doors with Ecuador's government and Petroecuador. Plaintiffs did not participate in the negotiations or agreements, and were not consulted by the parties. The so-called remedial activities ("Remedial Activities") were not properly designed or implemented, and did not remedy or alleviate the injuries or threats suffered by Plaintiffs and other Huaorani, as described in this Complaint and as adjudged by the Ecuadorian Court. Plaintiffs and other Huaorani have not released, acquitted or discharged Chevron, Petroecuador or the Republic of Ecuador from any claims or liabilities to them, or renounced any rights or claims arising out of Chevron's petroleum operations and so-called Remedial Activities.

**Appendix B**

**F.      The Tena Action and the Procedural and Legal Impediments to Intervention and Litigation by the Huaorani in Ecuador**

48.      Contemporaneously with the initiation of the Lago Agrio Litigation by the LAPs in 2003, on or about July 30, 2003, eighty-seven members of twenty-eight (Kichwa) communities affiliated with FCUNAE, and three Huaorani, filed a lawsuit against ChevronTexaco and Texaco Petroleum in the Superior Court of Justice of Tena in Ecuador, seeking environmental and social remediation of the damage caused by Chevron's petroleum operations in Ecuador (the "Tena Action"). The Tena Action was the result of an initiative led by FCUNAE and its affiliated communities, in response to the dismissal of the *Aguinda* Action by the federal court in New York. None of the Huaorani Plaintiffs in the present case was a plaintiff in the Tena Action. The plaintiffs were represented in the Tena Action by Dr. Ernesto Lopez Freire, a former Judge and President of Ecuador's (former) constitutional court (Tribunal of Constitutional Guarantees), and respected lawyer based in Quito.

49.      On August 26, 2003, the president of the Tena Court refused to process the complaint in the Tena Action due to arbitrary reasons, thus precluding the Tena plaintiffs from proceeding with their claims.[10]

50.      Dr. Lopez appealed to the appellate chamber of the Superior Court of Justice of Tena (consisting of the same president of the court and two additional judges), but on October 29, 2003, the court sitting *en banc* denied that appeal. Dr. Lopez then filed a cassation appeal to Ecuador's Supreme Court of Justice in Quito. On January 31, 2006, the first Civil and Commercial division of the

---

[10]      Under applicable legal procedures in Ecuador, plaintiffs seeking to pursue a lawsuit must first present their complaint to the court of original jurisdiction, but do not serve the defendant. The judge reviews the complaint, and if the elements of the action are present, the court formally initiates the lawsuit and summons the defendant.

Supreme Court of Justice set aside the decision of the Tena court.  However, Dr. Lopez subsequently advised the Tena plaintiffs that it would be futile and ill-advised to attempt to begin that—or any lawsuit—anew, in the same court, against the same defendants, due to the improper and undue influence on the Tena court by representatives of ChevronTexaco and Texaco Petroleum and the serious misconduct by those defendants and the court.[11]

51.    Although the LAPs were able to separately proceed with their claims in the Lago Agrio Court, other *Afectados,* including members of the Huaorani people and other members of the Kicwha people[12] were unable to intervene in the Lago Agrio Litigation because there are no applicable Ecuadorian legal procedures that permit them to intervene in the Lago Agrio lawsuit.

### G.    The Chevron Action in the SDNY

52.    On February 1, 2011, Chevron filed an action in federal court in the Southern District of New York entitled *Chevron Corporation v. Steven Donziger*, Case No. 11 Civ. 0691(LAK) ("Chevron Action") against (i) the named plaintiffs in the Lago Agrio Litigation (the LAPs); (ii) their New York counsel, Steven Donziger ("Donziger"), the Law Offices of Steven R. Donziger, and Donziger and Associates, PLLC (collectively, the Donziger Defendants); (iii) U.S.-based environmental consultants hired by Donziger; and (iv) Donziger's Ecuadorian colleagues and their alleged "front organizations," including ADF, ADF's co-founder, Luis Yanza,  and ADF's lawyer, Pablo Fajardo Mendoza.  In its Amended Complaint, Chevron alleges, *inter alia,* that the Donziger Defendants and ADF

---

[11]    According to a declaration prepared by Dr. Lopez, the decision by the Tena court followed at least three *ex parte* visits to the court by legal representatives of ChevronTexaco and Texaco Petroleum.  Dr. Lopez attributed the decision by the Tena court to arbitrarily and illegally reject the Tena case to "an act of corruption" linked to the ex parte conversations by Chevron.

[12]    The Lago Agrio Plaintiffs include nine of the (twelve) Kichwa who were named plaintiffs in the *Aguinda* Action in New York.

conspired, together and with others, to "extort, defraud and otherwise tortuously injure" Chevron, by, among other things, bringing a "sham" lawsuit in Lago Agrio and obtaining the Lago Agrio Judgment against Chevron through a variety of illegal and corrupt means. Chevron seeks damages and injunctive relief against the Donziger Defendants and ADF.[13]

### H.    Defendants' Unauthorized Claimed Representation of the Huaorani

53.    ADF is not a plaintiff or party in the Lago Agrio Litigation but has claimed to represent all of the *Afectados,* including Plaintiffs and other Huaorani. Upon information and belief, Pablo Fajardo Mendoza, is both counsel of record for the LAPs and a lawyer for ADF, and is funded by the Donziger Defendants, and thus appears to have a conflict of interest. The Donziger Defendants have also claimed to represent all of the *Afectados*, including Plaintiffs and other Huaorani, in activities related to the Lago Agrio Litigation.

54.    Plaintiffs dispute the claim by ADF to represent all of the *Afectados,* including the Huaorani, as ADF was never authorized to represent the interests of Plaintiffs or the Huaorani in connection with the Lago Agrio Litigation. Plaintiffs

---

[13]    Chevron's Amended Complaint asserted nine causes of action, including substantive and conspiracy claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (against all defendants except the LAPs), fraud, civil conspiracy under state law, unjust enrichment, and (against the Donziger Defendants only) violation of Section 487 of the New York Judiciary Law. Chevron also sought a judicial declaration that the Lago Agrio Judgment is non-recognizable and unenforceable, and an injunction barring any attempt to enforce the Lago Agrio Judgment in any court or tribunal in the United States or abroad. In connection with such claim, Chevron requested, and the District Court granted, a preliminary injunction precluding enforcement of the judgment outside Ecuador. However, in September 2011, the Second Circuit vacated the preliminary injunction and stated that an opinion would follow, and on January 26, 2012, the Second Circuit remanded to the District Court with instructions to dismiss Chevron's claim for declaratory and injunctive relief. Chevron's current request for injunctive relief is based on the RICO, fraud, and civil conspiracy claims and also seeks to enjoin the Lago Agrio plaintiffs, Donziger Defendants, ADF, and others acting in concert with them, from enforcing the Lago Agrio Judgment.

**Appendix B**

dispute the claim by the Donziger Defendants to represent all of the *Afectados,* including the Huaorani, as the Donziger Defendants were never authorized to represent the interests of Plaintiffs or the Huaorani in connection with the Lago Agrio Litigation.  Indeed, none of the Plaintiffs ever entered into a retainer agreement with the Donziger Defendants, ADF, and/or any of their associates, and are informed and believe and thereon allege, that no Huaorani ever entered into a retainer agreement with the Donziger Defendants, ADF, and/or any of their associates to represent their interests in the Lago Agrio Litigation.

55.     While the Donziger Defendants and ADF appear to have represented to the Ecuadorian Courts that they represent Plaintiffs' interests and the interests of the Huaorani, and while the Lago Agrio Judgment, which directs that the proceeds of the litigation be received in trust for the benefit of the affected communities and community members (including Plaintiffs), appears to have been entered in reliance upon such representations, there is no client retainer or other express agreement between Plaintiffs and the Donziger Defendants, ADF, and/or any of their associates setting forth the Donziger Defendants' and ADF's obligations to Plaintiffs in connection with the Lago Agrio Litigation and/or authorizing ADF to control or administer proceeds from the litigation.[14]  Nonetheless, as a result of the Donziger Defendants' and ADF's actions in connection with the Lago Agrio Litigation, and of the Lago Agrio Judgment consequently entered and affirmed on appeal, the Donziger Defendants and ADF owe a fiduciary duty to Plaintiffs, including, *inter alia*, a duty to protect their interests in the Lago Agrio Judgment, a duty to notify Plaintiffs of any arrangements with third parties, including but not

---

[14]     As discussed more fully below, it was only after the Lago Agrio Judgment was rendered, that Plaintiffs learned for the first time that they have a substantial legal interest in the Lago Agrio Judgment and that their rights to the remedies awarded by the Lago Agrio Judgment appear to be controlled by ADF and the Donziger Defendants.

**Appendix B**

limited to investors, funders, and/or the Republic of Ecuador, to receive or administer any proceeds from the Lago Agrio Judgment, a duty to notify Plaintiffs of any actions taken by the Donziger Defendants, ADF and/or their associates to enforce the Lago Agrio Judgment, a duty to notify Plaintiffs of and to include Plaintiffs in any settlement talks, discussions or negotiations related to the Lago Agrio Judgment and/or the underlying claims, a duty to provide an accounting of any proceeds received related to such Judgment or claims, and a duty to remit to Plaintiffs and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable, and additionally, a duty to remit to other Huaorani and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable.

## I.    The Huaorani First Learn of Their Interest in the Lago Agrio Judgment

56.    Since 2007, Plaintiffs' co-counsel, Professor Kimerling, has worked with an alliance of Huaorani communities (comprised of three of the Plaintiffs' communities), Ome Gompote Kiwigimoni Huaorani (We Defend Our Huaorani Territory), also called "Ome Yasuni."  The communities came together to protect a 758,051-hectare area of rainforest known as "The Intangible Zone," and to defend the right of the Huaorani (including a neighboring Huaorani family group who still lives in voluntary isolation) to continue to live in freedom and in accordance with their culture in what remains of their ancestral territory.

57.    The first Plaintiffs to learn about the judgment by the Lago Agrio court are members of one of the Ome Yasuni communities, Bameno.  On February 16, 2011, a BBC television and radio crew visited Bameno to interview community members for news reports about conservation (and oil development) in the Yasuni National Park. (Part of Bameno is in the park.)  At that time, a community member

**Appendix B**

(and Plaintiff) was asked what he thought about the decision.  The question (and information from the BBC crew) sparked a conversation among community members, and Professor Kimerling, who was visiting Bameno at the time, was asked to investigate.  However, Bameno does not have phone or internet service (or direct access to media reports), so Professor Kimerling could not look into the matter until after she returned to New York on March 16. (Professor Kimerling spent roughly a month in Bameno).

58.    Back in New York, Professor Kimerling read the decision by the Lago Agrio court, and also read a decision in the Chevron Action granting a motion by Chevron for a preliminary injunction (enjoining the Defendants and their associates from enforcing the Lago Agrio Judgment)[15], as well the complaint in the Chevron Action.  After reading and studying the Lago Agrio judgment, Professor Kimerling thus learned that the Huaorani have a legally protectable interest in the Lago Agrio Judgment, and that the viability of the judgment might be in jeopardy because of the allegations by Chevron of misconduct by ADF, the Donziger Defendants, and their associates.  But the Huaorani did not yet know.

59.    In or about August 2011, Professor Kimerling had an opportunity to visit the Huaorani in Bameno again, and told them about what she had learned.  To reach Bameno, Professor Kimerling had to travel for several days.[16]  Neither the LAPs nor ADF, or their attorneys, had informed the Huaorani about the Lago Agrio Judgment, and representatives of Bameno asked Professor Kimerling to look into possible legal actions to protect their interests in the judgment.

---

[15]    As stated above, that injunction was subsequently overturned by the Second Circuit Court of Appeals.

[16]    Due to its remote location in the Amazon Rainforest, travel from New York to Bameno generally requires approximately three to five days, depending on the conditions.

**Appendix B**

60.    In January 2012, Professor Kimerling returned to the Amazon once again and after much deliberation and communication, was retained by Plaintiffs (forty-two Huaorani from five communities) to help them protect their interests in the Lago Agrio Judgment and underlying claims.

**J.    The Huaorani's Efforts to Obtain Meaningful Information from ADF**

61.    On January 18, 2012, various representatives of Plaintiffs sent a letter to ADF seeking clarification regarding the basis of ADF's and its lawyers' purported representation of Plaintiffs and the Huaorani people.  The letter also questioned claims by ADF's *Asemblea de Afectados y Afectadas por Texaco* (Assembly of Persons Affected by Texaco) ("ADAT"), which similarly purports to represent all of the *Afectados,* including the Huaorani, and additionally, asked ADF to provide the names of the members of ADAT.  The letter further explained that Plaintiffs had learned about claims by ADF that the Lago Agrio Litigation would remedy harms suffered by the Huaorani as a result of Chevron's activities, and requested meaningful information about plans to distribute any portion of the Lago Agrio Judgment to repair and compensate harms to Plaintiffs and the Huaorani. The letter further inquired about reports that the plaintiffs and lawyers in the Lago Agrio Litigation had made an agreement with the Republic of Ecuador for the government of Ecuador to administer proceeds of the litigation, and asked ADF to tell Plaintiffs if those reports are true, and provide them with a copy of all agreements between ADF and Ecuador.  The letter was directed to Luis Yanza and Pablo Fajardo [Mendoza], and asked ADF to provide the requested information in writing.

62.    ADF responded to the January 18, 2012 letter from the Huaorani representatives by letter dated January 26, 2012, and signed by Luis Yanza and Pablo Fajardo.  In said response, ADF admitted that it had attempted to

25

**Appendix B**

communicate with Plaintiffs and other Huaorani, but had not been able to do so –
clearly acknowledging that ADF and its lawyers had never obtained authorization
to represent the interests of Plaintiffs or any other Huaorani in the Lago Agrio
Litigation, and further acknowledging that ADF and the lawyers who work with
ADF in the litigation had never informed or consulted with Plaintiffs or other
representatives of the Huaorani in that matter, or included them in decision-making
related to their interests or to the conduct of the litigation.  The response letter from
ADF further admitted that the Huaorani people should benefit from the Lago Agrio
Litigation, and proposed that the Huaorani representatives organize a meeting for
ADF to attend and give them the information they require.

63.     By letter dated February 10, 2012, a Huaorani leader and
representative of Plaintiffs responded to the January 26, 2012 letter from ADF.
The February 10, 2012 letter stated that the Huaorani representatives would be
happy to meet with ADF, and explained that, in order to have a "serious meeting"
and not just talk in the air, they would need to get the information they had already
requested in their January 18, 2012 letter, before organizing the meeting to talk.
After learning about said information, the Huaorani representatives would be able
to engage in a meaningful dialogue with ADF and, as the February 10, 2012 letter
further explained, would then like to organize a meeting with ADF in order to talk
and find a solution.  To date, ADF has not responded to the February 10, 2012
letter, or provided any of the information requested by Plaintiffs' representatives in
their January 18, 2012 letter.

64.     As discussed more fully below, even after Plaintiffs attempted to
formally file this action as a party intervenor in the Chevron Action in the Southern
District of New York, ADF has refused to acknowledge what portion of the Lago
Agrio Judgment corresponds to Plaintiffs and other Huaorani.  ADF has also
refused to formally, or in writing, acknowledge how any portion of the Lago Agrio

Judgment would be used to remediate, compensate, and/or mitigate the harms that Plaintiffs and other Huaorani have suffered. In addition, ADF has refused to disclose the names of other persons (members of ADAT) who purportedly work with ADF and the Donziger Defendants to ostensibly represent the interests of Plaintiffs in the litigation, and who purport to make decisions in their name of all of the *Afectados*, including Plaintiffs. ADF has further refused to disclose whether reports regarding a possible arrangement or deal with the Republic of Ecuador that would entrust Ecuador's government to receive and administer monies from the Lago Agrio Judgment are true.

### K. Defendants' Wrongful Dissipation and Violation of the Plaintiffs' Rights to the Lago Agrio Judgment

65. Plaintiffs are informed and believe and thereon allege that any amounts that the Donziger Defendants, ADF, and/or their associates collect on the Lago Agrio Judgment will be "dissipated and funneled to off-shore havens beyond the reach of U.S. Courts," and that the Donziger Defendants and ADF intend to assign away their interest in the Lago Agrio Judgment in exchange for money.

66. Plaintiffs are informed and believe and thereon allege that the Donziger Defendants and ADF have made agreements with funders and third party investors in exchange for interests in the Lago Agrio Judgment, and have already collected more than $10 million by selling shares in the Lago Agrio Judgment.

67. Plaintiffs are informed and believe and thereon allege that the Republic of Ecuador reportedly expects to receive ninety percent (90%) of the proceeds of the Lago Agrio Judgment.

68. Plaintiffs are informed and believe and thereon allege that the Donziger Defendants and their counsel, Patton Boggs – who has been retained by Defendants to enforce the Lago Agrio Judgment - have developed an "Invictus" enforcement plan to seek enforcement of the judgment around the world, which

**Appendix B**

plan includes, *inter alia*, the establishment of a trust outside of Ecuador for the purpose of distributing proceeds from the judgment to lawyers and investors , before passing on the remaining monies to Ecuadorian trusts controlled by ADF and/or whoever it selects.  Plaintiffs are further informed and believe and thereon allege that the Donziger Defendants and ADF are currently aggressively pursuing legal actions in Canada, Brazil and Argentina to enforce the Lago Agrio Judgment and collect monies from Chevron, and that they are planning to initiate additional actions in other jurisdictions to achieve the same ends.

> **L.      Plaintiffs' Efforts to Intervene in the Chevron Action**

69.     Based on the foregoing, Plaintiffs have reason to believe that should the LAPs succeed at enforcement proceedings, the Donziger Defendants and/or ADF will not properly distribute any portion of the judgment proceeds to compensate, mitigate, and remediate the harm to Plaintiffs.  Further, Plaintiffs have reason to believe that the Donziger Defendants and/or ADF will not properly distribute any portion of the judgment proceeds to compensate, mitigate, and remediate the harm to other Huaorani.

70.     Accordingly, on July 19, 2012, Plaintiffs filed suit in the Southern District of New York, Case No. 12-cv-5570 (the "Huani Action"), for the purpose of asserting claims for declaratory relief, constructive trust, unjust enrichment, and accounting against the Donziger Defendants and ADF (the "Claims").  On or about September 6, 2012, the Huani Action was deemed related to the Chevron Action.

71.     On November 2, 2012, the Donziger Defendants in the Huani Action advised Plaintiffs that they [the Donziger Defendants] intended to file a motion to dismiss the Complaint in the Huani Action based on a lack of subject matter jurisdiction.

72.     In part to respond to such contention, and additionally, to ensure that the legally protected rights and interests of Plaintiffs would be best protected and

that judicial efficiency would be preserved, i.e., to prevent inconsistent findings of fact and rulings of law that could result if the plaintiffs in the Huani Action were compelled to re-file the Claims in state court, on November 28, 2012, Plaintiffs moved the district court in the Chevron Action for an order, pursuant to Federal Rule of Civil Procedure 24, to intervene to both defend the validity of the Lago Agrio Judgment and to assert cross claims against the Donziger Defendants and ADF for declaratory judgment, breach of fiduciary duty/constructive trust, unjust enrichment, and an accounting.

73.     On January 14, 2013, the district court denied the Motion to Intervene. The district court ruled that Plaintiffs were "free to pursue" their claims in an independent action in the New York State courts.  Consequently, Plaintiffs bring the instant action to assert their claims for declaratory judgment, breach of fiduciary duty/constructive trust, unjust enrichment, and an accounting arising out of the Donziger Defendants and ADF's actions in relation to the Lago Agrio Litigation, as well as the Chevron Action, including *inter alia*, their representation to those courts that they represent Plaintiffs' interests in the Lago Agrio Litigation.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

### (Against Donziger Defendants, ADF and Does 1-20)

74.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 73 above.

75.     Pursuant to the Lago Agrio Judgment, Chevron was ordered to pay more than $19 billion to remedy damages caused by Chevron's petroleum activities in the Ecuadorian Amazon, including damage to both the environment and the affected Indigenous and colonist (settler) communities and community members.  Said damages include, *inter alia*, $600 million to remediate ground waters, $5.39616 billion to remediate soils, $200 million to restore native flora and

fauna and help remedy the impact on the affected Indigenous peoples' food supply caused by damage to their sources of subsistence, $150 million to deliver potable water supplies, $800 million to develop and implement a health plan that includes treatment for people with cancer, and $1.4 billion to establish and maintain a permanent healthcare system to serve the affected populations.  In addition, Chevron was ordered to pay $100 million for remedial measures to mitigate the unique harm to the affected Indigenous peoples' communities, including displacement from their ancestral lands and territories and other cultural impacts, and $8.64616 billion in punitive damages to compensate the *Afectados* for their pain and suffering.

76.     The Lago Agrio Judgment further directed the plaintiffs to establish a trust fund to administer the monies for the Environmental Remedial Measures set forth in the judgment, with ADF or the person or persons it designates as the beneficiary of the trust, and with ADF or the person or persons selected by ADF in the name of the *Afectados* as the directors of the trust.  The decision of the Appellate Division of the Provincial Court of Justice of Sucumbios affirming the judgment by the Lago Agrio trial court in all material respects further directed the plaintiffs to establish a second trust to administer the punitive damages monies, leaving its instructions and direction to the same board of directors as the trust that will manage the monies for the Environmental Remedial Measures.

77.     Plaintiffs are informed and believe and thereon allege that the decision to award control over the judgment monies to ADF – which is not a plaintiff in the Lago Agrio litigation – was made by the Donziger Defendants and ADF, without consulting Plaintiffs and/or the other affected Indigenous groups.

78.     ADF claims to represent all of the *Afectados* affected by Chevron's actions in the Ecuadorian Amazon, including all of the affected Indigenous peoples, communities, and community members.  Plaintiffs, however, dispute such

**Appendix B**

representation, asserting that ADF was never authorized to represent their interests in connection with the Lago Agrio Litigation.  Indeed, none of the Plaintiffs ever entered into a retainer agreement with the Donziger Defendants, ADF, and/or any of their associates, and are informed and believe and thereon allege that no member of the Huaorani people entered into a retainer agreement with the Donziger Defendants, ADF and/or any of their associates providing that any of the Donziger Defendants and/or ADF would represent their interests in the Lago Agrio Litigation.  While the Donziger Defendants and ADF appear to have represented to the Lago Agrio Court that they represented Plaintiffs' interests and while the Lago Agrio Judgment, which directs that the funds be received in trust for the affected communities and community members (including Plaintiffs), appears to have been entered in reliance upon such representations, there is no client retainer or other express agreement between Plaintiffs and the Donziger Defendants, ADF, and/or any of their associates setting forth the Donziger Defendants' and ADF's obligations to Plaintiffs in connection with the Lago Agrio Litigation.

79.    Nonetheless, as a result of the Donziger Defendants' and ADF's actions in connection with the Lago Agrio Litigation and of the Lago Agrio Judgment consequently entered and affirmed on appeal, the Donziger Defendants and ADF owe fiduciary duties to Plaintiffs, including, *inter alia*, a duty to protect their interests in the Lago Agrio Judgment and their right to adjudicated remedies, a duty to notify Plaintiffs of any arrangements with third parties, including but not limited to investors, funders, and/or the Republic of Ecuador, to receive or administer any proceeds from the Lago Agrio Judgment, a duty to notify Plaintiffs of the status of any enforcement proceedings and efforts undertaken by the Donziger Defendants, ADF, and/or their associates to enforce or collect on the Lago Agrio Judgment, a duty to notify the Plaintiffs of and to include Plaintiffs in any settlement talks, discussions or negotiations related to the Lago Agrio

31

**Appendix B**

Judgment and/or the underlying claims, a duty to provide an accounting of any proceeds received related to such Judgment or claims, and a duty to remit to Plaintiffs and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable, and additionally, a duty to remit to other Huaorani and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable.

80.    In conjunction with the foregoing, on or about January 18, 2012, various representatives of Plaintiffs sent a letter to Luis Yanza ("Yanza") and Pablo Fajardo Mendoza ("Fajardo") of ADF, to inquire into the status of and process for administration and distribution of the Lago Agrio Judgment proceeds.

81.    More specifically, the letter requested that ADF provide information regarding which portion of the Lago Agrio Judgment corresponds to Plaintiffs and other Huaorani, and regarding how and when it would repair and compensate the damages sustained by Plaintiffs and other Huaorani as a result of Chevron's petroleum activities.  In addition, the letter requested that ADF clarify and explain the basis for its claim and the claim of its lawyers to represent Plaintiffs and other Huaorani (including the claim of ADF's ADAT to represent Plaintiffs and the Huaorani people, and the claim by the Donziger Defendants to represent Plaintiffs and the Huaorani people.)  The letter further inquired about reports that plaintiffs and lawyers in the Lago Agrio Litigation had made an agreement with the Republic of Ecuador for the government of Ecuador to administer the proceeds of the litigation, and asked ADF to tell Plaintiffs if those reports are true and provide them with a copy of any agreements between ADF and Ecuador.  The letter demanded that ADF respond and provide the requested information in writing within fifteen (15) days, otherwise Plaintiffs would seek legal measures against ADF to defend their rights.  The Huaorani representatives who signed the letter are

**Appendix B**

members of four Huaorani communities (Bameno, Boanamo, Wema and Yawepare).

82.    Thereafter, on or about January 26, 2012, Yanza and Fajardo sent a letter on behalf of ADF responding to Plaintiffs.  In their letter, Yanza and Fajardo advised Plaintiffs that they [ADF] had tried to speak with Plaintiffs and other Huaorani since a long time ago, through the leaders and other members of the Huaorani people, but that it had not been possible to do so.

83.    The letter from Yanza and Fajardo admitted that the Huaorani people should benefit from the Lago Agrio Litigation, but refused to acknowledge that it would pay the Plaintiffs and/or other Huaorani any portion of the Lago Agrio Judgment to compensate, mitigate, or repair the injuries they have suffered, or to otherwise explain how those injuries would be repaired, mitigated, or compensated by the remedies ordered in the Lago Agrio Judgment. The letter proposed that the Huaorani representatives organize a meeting for ADF to attend and give them the information they require. The letter, however, did not provide any information regarding the distribution of judgment proceeds to remedy the harms to Plaintiffs, or the basis for ADF's and its lawyers' claims to represent Plaintiffs and other Huaorani. The letter also failed to disclose the names of the members of ADF's ADAT, or provide any information regarding the basis for ADF's claim that ADAT represents Plaintiffs and the Huaorani people, and further failed to provide any information regarding possible agreements with the government of Ecuador related to the Lago Agrio Litigation.

84.    On February 10, 2012, Plaintiff Pentibo (Nagaipe) Baihua Miipo ("Penti"), Coordinator of the Huaorani community Bameno and General Coordinator of the Huaorani community alliance *Ome Gompote Kiwigimoni Huaorani* (We Defend Our Huaorani Territory), sent a letter to Yanza and Fajardo responding, on behalf of Plaintiffs, to the January 26, 2012 letter from ADF.  In his

**Appendix B**

letter, Penti explained that Plaintiffs would welcome a meeting with ADF but that in order to have a "serious meeting" and not simply talk in the air, ADF would first need to provide the information requested in the January 18 letter.  After learning about said information, the Huaorani representatives would be able to engage in a meaningful dialogue with ADF and, as the February 10 letter further explained, would then like to organize a meeting with ADF in order to talk and find a solution. Yanza and Fajardo, however, failed to respond to the February 10 letter, and have not provided any of the information requested in the January 18 letter.

85.    Efforts by Plaintiffs to obtain meaningful information from ADF regarding the scope and basis of its (and its lawyers) purported representation of the Huaorani and the identity of other persons (members of ADAT) who work with ADF and purport to make decisions in the name of Plaintiffs and the Huaorani people, regarding which portion of the Lago Agrio Judgment corresponds to the Huaorani and whether ADF will distribute any portion of the judgment to Plaintiffs and other Huaorani or expend any proceeds to remedy the harms suffered by the Huaorani, and regarding whether reports of a possible agreement between ADF and Ecuador that would turn over judgment monies to the government of Ecuador are true, have been systematically rebuffed.

86.    Moreover, Plaintiffs are informed and believe and thereon allege that the Donziger Defendants' and ADF's interests in the Lago Agrio Litigation lie not in securing the Plaintiffs' rights and interest in the Lago Agrio Judgment, but rather in collecting as much of the judgment as possible for their own use and benefit.

87.    Indeed, as noted above, in the Chevron Action, Chevron has asserted numerous claims, including claims for fraud and racketeering against the Donziger Defendants and ADF seeking hundreds of millions of dollars in damages and injunctive relief.  Plaintiffs are informed and believe and thereon allege that the

**Appendix B**

Donziger Defendants and/or ADF have incurred tremendous debt and/or other obligations, both in litigating the Lago Agrio Litigation and in defending Chevron's claims in the Chevron Action, and are further informed and believe and thereon allege that the Donziger Defendants and/or ADF have sold interests in the Lago Agrio Judgment to investors and/or funders. Accordingly, upon information and belief, the Donziger Defendants and ADF do not intend to distribute any portion of the Lago Agrio Judgment proceeds to Plaintiffs to remedy their harms, as any judgment proceeds recovered from Chevron will go first to filling the coffers of the Donziger Defendants and ADF, not to compensating Plaintiffs and other Huaorani for the harm that they suffered at the hands of Chevron or otherwise remedying said harm.

88.    Declaratory relief is therefore appropriate and necessary here because a conflict of rights and justiciable controversy exists between Plaintiffs and the Donziger Defendants and ADF concerning Plaintiffs' right and/or title to their portion of the Lago Agrio Judgment, and as to whether the Donziger Defendants and ADF owe Plaintiffs fiduciary duties, including the duty to protect their interests in the Lago Agrio Judgment.

89.    Plaintiffs therefore request a declaratory judgment from this Court pursuant to CPLR § 3001 that Plaintiffs and their family groups and their communities are entitled to recover their share of the judgment proceeds awarded under the Lago Agrio Judgment, and additionally, that every Huaorani community and every Huaorani is also entitled to recover their share of the judgment proceeds, and that the Donziger Defendants and ADF owe Plaintiffs fiduciary duties, including, *inter alia*, a duty to protect their interests in the Lago Agrio Judgment and their right to remedies, a duty to notify Plaintiffs of any arrangements with third parties, including but not limited to investors, funders, and/or the Republic of Ecuador, to receive or administer any proceeds of the Lago Agrio Judgment, a duty

to notify Plaintiffs of the status of any enforcement proceedings and efforts undertaken by the Donziger Defendants, ADF, and/or their associates to enforce or collect on the Lago Agrio Judgment, a duty to notify the Plaintiffs and to include the Plaintiffs in any settlement talks, discussions or negotiations related to the Lago Agrio Judgment and/or the underlying claims, a duty to provide an accounting of any proceeds received from such Lago Agrio Judgment and/or the underlying claims, and a duty to remit to Plaintiffs and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable, and additionally, a duty to remit to other Huaorani and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty/Constructive Trust)

### (Against Donziger Defendants, ADF and Does 1-20)

90.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 89 above.

91.    The Lago Agrio Judgment provides that the judgment monies for environmental remediation, compensation and mitigation measures (the Environmental Remedial Measures) are to be deposited into a trust fund, with the beneficiary to be ADF or the person or persons it designates, and with the directors to be ADF or any person or persons it selects in the name of the *Afectados*.  Per the order of the Ecuadorian court, ADF is obligated to administer the trust monies for the benefit of the affected communities and community members, including Plaintiffs and other Huaorani.  The decision of the Appellate Division affirming the judgment of the Lago Agrio trial court in all material respects further provides that the punitive damages monies awarded to compensate the *Afectados* for their pain

36

**Appendix B**

and suffering and to punish Chevron for prolonging said pain and suffering through unreasonable and malicious conduct in the Lago Agrio Litigation, are to be deposited in a second trust fund, with the same directors as the trust that will manage the monies for environmental remediation, compensation and mitigation. Per the order of the Ecuadorian court, ADF is obliged to select the directors of the trust funds for the benefit of the *Afectados,* and the directors of the trust that receives the punitive damages monies are also obligated to remit those monies for the benefit of the affected communities and community members, including Plaintiffs and other Huaorani.

92.     While the Donziger Defendants and ADF appear to have represented to the Lago Agrio Court that they represent Plaintiffs' interests and while the Lago Agrio Judgment, which directs that the proceeds of the judgment be received in trust for the affected communities (including Plaintiffs), appears to have been entered in reliance upon such representations, there is no client retainer or other express agreement between Plaintiffs and the Donziger Defendants, ADF, and/or their associates setting forth the Donziger Defendants' and ADF's obligations to the Plaintiffs in connection with the Lago Agrio Litigation.  Nonetheless, as a result of the Donziger Defendants' and ADF's actions in connection with the Lago Agrio Litigation and of the Lago Agrio Judgment consequently entered and affirmed on appeal, the Donziger Defendants and ADF owe a fiduciary duty to Plaintiffs, including a duty to protect their interests in the Lago Agrio Judgment.

93.     Efforts by Plaintiffs to obtain meaningful information from the Donziger Defendants and ADF concerning the scope and basis of their purported representation of the Huaorani people, regarding which portion of the Lago Agrio Judgment corresponds to the Huaorani and whether they will distribute any portion of the Lago Agrio Judgment to Plaintiffs and other Huaorani, or expend any proceeds to remedy harms to Plaintiffs and other Huaorani, and regarding whether

**Appendix B**

reports of a possible agreement between ADF and Ecuador that would turn over judgment monies to the government of Ecuador are true, have been systematically rebuffed.

94.    Plaintiffs are informed and believe and thereon allege that the Donziger Defendants and/or ADF have monetized a portion of the Lago Agrio Judgment by selling shares in it to third-party investors.  Indeed, Plaintiffs are informed and believe and thereon allege that the Donziger Defendants and/or ADF have entered into funding agreements with various third parties through which the Donziger Defendants and/or ADF have already been paid in excess of $10.760 million[17], and that the Donziger Defendants and ADF intend to continue selling off pieces of the judgment to investors.

95.    Plaintiffs are informed and believe and thereon allege that since 2010, the Donziger Defendants have obtained funding commitments of over $25 million from twelve (12) different companies and individuals, and that in return for each such investment, these third parties or funders are entitled to recover a portion of the total amount that the Donziger Defendants, ADF, and/or their associates collect on the Lago Agrio Judgment.

96.    Moreover, it has been estimated that the current market value of the Lago Agrio Judgment is at least $200 million based on an analysis of the shares already sold by the Donziger Defendants and ADF to third party investors.

97.    Plaintiffs are informed and believe and thereon allege that the Republic of Ecuador expects to receive ninety percent (90%) of the proceeds of the Lago Agrio Judgment.

---

[17]    Plaintiffs are informed and believe and thereon allege that these funding agreements include, *inter alia,* (1) the Torvia Limited May 16, 2011 funding agreement (2) the David Sherman funding agreement; (3) the Glen Krevlin funding agreement; (4) the Michael Donziger funding agreement; and (5) the Russell O' Wiese funding agreement.

98.     Pursuant to the Lago Agrio Judgment, ADF has been designated as the beneficiary of the trust that will receive the proceeds of the judgment which have been awarded for Environmental Remedial Measures, as well as the entity that selects the directors of said trust and of a second trust that will receive the punitive damages monies awarded by the judgment, and thus has obtained legal title to the Lago Agrio Judgment and any proceeds or monies paid in connection with said Judgment, which it is supposed to receive for the benefit of the affected communities and community members, including Plaintiffs and other Huaorani and their communities, who are in good conscience entitled to a portion of said proceeds.

99.     The Donziger Defendants and ADF owe fiduciary duties to Plaintiffs, including the duty to protect their interests in the Lago Agrio Judgment and to not encumber, diminish or dissipate proceeds of the Lago Agrio Judgment to the detriment of Plaintiffs.

100.   The Donziger Defendants and ADF have wrongfully failed to inform Plaintiffs regarding their efforts to enforce the Lago Agrio Judgment, have failed to disclose to Plaintiffs their actions to sell to third parties interests in the Judgment to the detriment of Plaintiffs, have failed to disclose to Plaintiffs whether they will distribute any portion of the judgment proceeds to the government of Ecuador, and have failed to agree to distribute any portion of the judgment proceeds to Plaintiffs or expend any portion of the proceeds to remedy harms to Plaintiffs and other Huaorani, who are the intended beneficiaries of a portion of such proceeds since their ancestral lands, territory and natural resources were contaminated and damaged by Chevron's petroleum activities, and their means of subsistence, health, way of life, and ability to enjoy their culture and transmit it to future generations were harmed thereby, and who have endured great pain and suffering.

**Appendix B**

101.    Defendants' actions as alleged herein have, on information and belief, allowed Defendants to obtain putative title, possession, or other apparent right to property rightfully belonging to Plaintiffs under the Lago Agrio Judgment, as well as property rightfully belonging to other Huaorani, that the Donziger Defendants and ADF, in equity and good conscience, should not be allowed to hold and enjoy.

102.    By failing to inform Plaintiffs of the status of enforcement proceedings and of the Donziger Defendants' and ADF's plans for distribution of any proceeds collected on the judgment, by pursuing the Lago Agrio Litigation based on the asserted interests, claims and rights of Plaintiffs and other Huaorani, by failing to inform Plaintiffs regarding which portion of the Lago Agrio Judgment proceeds correspond to Plaintiffs and other Huaorani, by failing to agree to pay Plaintiffs any portion of the Lago Agrio Judgment proceeds and/or expend any portion of the judgment proceeds to remedy the harms to Plaintiffs and other Huaorani, by failing to disclose to Plaintiffs whether they (the Donziger Defendants and/or ADF) intend to distribute any portion of the judgment proceeds to the government of Ecuador to the detriment of Plaintiffs, and by selling interests in the Judgment to third parties to the detriment of Plaintiffs, the Donziger Defendants and ADF have breached their fiduciary duties to Plaintiffs and have been, and will continue to be unjustly enriched, by the possession of those monies awarded for the benefit of Plaintiffs and other Huaorani, unless the Court issues a constructive trust against the Donziger Defendants and ADF and in favor of Plaintiffs.

103.    Justice is effectuated by establishing a constructive trust over any monies collected on the Lago Agrio Judgment because the trust prevents the Donziger Defendants and ADF from breaching their duties to Plaintiffs and from profiting from their own wrong doing - the wrongful retention and/or siphoning

**Appendix B**

away of any judgment (or settlement) proceeds owed to Plaintiffs and other Huaorani.

### THIRD CLAIM FOR RELIEF

**(Unjust Enrichment)**

**(Against Donziger Defendants, ADF and Does 1-20)**

104.   Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 103 above.

105.   The Lago Agrio Judgment provides that the judgment monies for Environmental Remedial Measures are to be deposited in a trust fund, with the beneficiary to be ADF or the person or persons it designates, and the directors to be ADF or any person or persons it selects in the name of the *Afectados*.  Per the order of the Ecuadorian court, ADF is obligated to pay that portion of the judgment proceeds to remediate, compensate and mitigate harms to the affected communities and community members, including Plaintiffs and other Huaorani.

106.   The decision of the Appellate Division affirming the Lago Agrio trial court judgment in all material respects further provides that the punitive damages monies for indemnification for pain and suffering are to be deposited in a trust fund, with the same directors as the trust which will administer the judgment monies for the Environmental Remedial Measures.  Per the order of the Ecuadorian court, ADF (and the board it designates) are obliged to remit the punitive damages monies for the benefit of the affected communities and community members, including Plaintiffs and other Huaorani, and to pay that portion of the judgment proceeds to compensate the affected communities and community members, including Plaintiffs and other Huaorani and their communities, for their pain and suffering.

107.   Plaintiffs are informed and believe and thereon allege that the Donziger Defendants and/or ADF have monetized a portion of the Lago Agrio

Judgment by selling shares in it to third-party investors. Indeed, Plaintiffs are informed and believe and thereon allege that the Donziger Defendants and/or ADF have entered into funding agreements with various third parties through which the Donziger Defendants and/or ADF have already been paid in excess of $10.760 million[18], and that the Donziger Defendants and ADF intend to continue selling off pieces of the judgment to investors.

108.    Plaintiffs are informed and believe and thereon allege that since 2010, the Donziger Defendants have obtained funding commitments of over $25 million from twelve (12) different companies and individuals, and that in return for each such investment, these third parties or funders are entitled to recover a portion of the total amount that the Donziger Defendants, ADF, and/or their associates collect on the Lago Agrio Judgment.

109.    Moreover, it has been estimated that the current market value of the Lago Agrio Judgment is at least $200 million based on an analysis of the shares already sold by the Donziger Defendants and ADF to third party investors.

110.    Plaintiffs are informed and believe and thereon allege that the Republic of Ecuador expects to receive ninety percent (90%) of the proceeds of the Lago Agrio Judgment.

111.    Pursuant to the Lago Agrio Judgment, ADF has been designated the beneficiary of the trust that will receive the proceeds of the judgment which have been awarded for Environmental Remedial Measures, as well as the entity that selects the directors of said trust and of a second trust that will receive the punitive damages monies awarded by the judgment, and thus has obtained legal title to the Lago Agrio Judgment and any proceeds or monies paid in connection with said

---

[18]    Plaintiffs are informed and believe and thereon allege that these funding agreements include, *inter alia,* (1) the Torvia Limited May 16, 2011 funding agreement (2) the David Sherman funding agreement; (3) the Glen Krevlin funding agreement; (4) the Michael Donziger funding agreement; and (5) the Russell O' Wiese funding agreement.

**Appendix B**

Judgment, which it is supposed to receive for the benefit of the affected communities and community members, including Plaintiffs and other Huaorani and their communities, who are in good conscience entitled to a portion of said proceeds.

112.   The Donziger Defendants and ADF owe fiduciary duties to Plaintiffs, including the duty to protect their interests in the Lago Agrio Judgment and to not encumber, diminish or dissipate proceeds of the Lago Agrio Judgment to the detriment of Plaintiffs.

113.   The Donziger Defendants and ADF have wrongfully failed to inform Plaintiffs regarding their efforts to enforce the Lago Agrio Judgment, have failed to disclose to Plaintiffs their actions to sell to third parties interests in the Judgment to the detriment of Plaintiffs, have failed to disclose to Plaintiffs whether they will distribute any portion of the judgment proceeds to the government of Ecuador, and have failed to agree to distribute any portion of the judgment proceeds to Plaintiffs or expend any portion of the proceeds to remedy harms to Plaintiffs and other Huaorani, who are the intended beneficiaries of a portion of such proceeds since their ancestral lands, territory and natural resources were contaminated and damaged by Chevron's petroleum activities, and their means of subsistence, health, way of life, and ability to enjoy their culture and transmit it to future generations were harmed thereby, and who have endured great pain and suffering.

114.   The actions by the Donziger Defendants and ADF, as alleged herein have, on information and belief, allowed the Donziger Defendants and ADF to obtain putative title, possession, or other apparent right to property rightfully belonging to Plaintiffs and their communities under the Lago Agrio Judgment, as well as to property rightfully belonging to other Huaorani and their communities, which the Donziger Defendants and ADF, in equity and good conscience, should not be allowed to hold and enjoy.

**Appendix B**

115.   By selling interests in the Judgment to third parties, the Donziger Defendants and ADF have attempted to diminish and encumber Plaintiffs' interests in the Judgment proceeds without agreement or approval of Plaintiffs, and have benefited to the detriment of Plaintiffs and other Huaorani.  The Donziger Defendants and ADF have been, and will continue to be unjustly enriched by the possession of those monies received as a result of the Lago Agrio Judgment which was awarded for the benefit of Plaintiffs and other Huaorani.  Under the principles of equity and law, the Donziger Defendants and ADF must disgorge such enrichment to Plaintiffs and make restitution to Plaintiffs and other Huaorani.

## FOURTH CLAIM FOR RELIEF

### (Accounting)

### (Against All Defendants)

116.   Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 115 above.

117.   As a direct result of the Donziger Defendants' and ADF's actions as alleged herein above, the Donziger Defendants and ADF have received and are in possession of assets and/or monies which rightfully belong to Plaintiffs as well as assets and/or monies which rightfully belong to other Huaorani.  The amount of monies and/or property due to Plaintiffs and other Huaorani and their communities from the Donziger Defendants and ADF is unknown to Plaintiffs and cannot be ascertained without an accounting thereof.  The Donziger Defendants and ADF have failed to share any information regarding any of the proceeds or monies they have been paid in connection with the Lago Agrio Judgment, including, *inter alia*, monies received from third parties in exchange for interests in the judgment.  The Donziger Defendants and ADF have also failed to disclose whether they have agreed to pay any portion of the judgment proceeds to the government of Ecuador. As such, Plaintiffs cannot calculate the sum certain that they are owed by the

**Appendix B**

Donziger Defendants and ADF.  An accounting from the Donziger Defendants and ADF is therefore required to determine the portion of the judgment proceeds to be paid Plaintiffs and their communities in accordance with the Lago Agrio Judgment, and the portion to be paid to other Huaorani and their communities.

118.   Plaintiffs have demanded an accounting, but the Donziger Defendants and ADF have failed and/or refused, and continue to fail and/or refuse to provide Plaintiffs with any information regarding what portion of the judgment proceeds is to be paid to Plaintiffs and other Huaorani and/or used to remedy harms to Plaintiffs and other Huaorani, and what portion of the judgment has been sold, encumbered, diminished or dissipated to the detriment of Plaintiffs, and thus an accounting is necessary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief against the Donziger Defendants and ADF, as set forth below:

1.     For entry of judgment in favor of Plaintiffs and against the Donziger Defendants and ADF declaring that Plaintiffs and their communities and family groups are entitled to recover their share of the judgment proceeds awarded under the Lago Agrio Judgment, and additionally, that every Huaorani community and every Huaorani is also entitled to recover their share of the judgment proceeds; and that the Donziger Defendants and ADF owe Plaintiffs fiduciary duties, including a duty to protect their interests in the Lago Agrio Judgment and their right to remedies, a duty to notify Plaintiffs of any arrangements with third parties, including but not limited to investors, funders, and/or the Republic of Ecuador, to receive or administer any proceeds of the Lago Agrio Judgment, a duty to notify Plaintiffs of the status of any enforcement proceedings and efforts undertaken by the Donziger Defendants, ADF and/or their associates to enforce or collect on the Lago Agrio Judgment and/or appellate judgment affirming the Lago Agrio

Judgment, a duty to notify Plaintiffs of and to include Plaintiffs in any settlement talks, discussions or negotiations related to the Lago Agrio Judgment and/or the underlying claims, a duty to provide an accounting of any proceeds received from such judgment, and a duty to remit to Plaintiffs and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries for which Chevron was held liable, and additionally, a duty to remit to other Huaorani and their communities their rightful portion of the Lago Agrio Judgment (and/or any settlement) corresponding to their injuries.

2.      For the imposition of a constructive trust in favor of Plaintiffs and against the Donziger Defendants and ADF over the Lago Agrio Judgment and any judgment (or settlement) proceeds recovered therefrom by the Donziger Defendants, ADF and/or their associates, as well as any monies received by virtue of selling interests in the Lago Agrio Judgment;

3.      For restitution in an amount to be determined at trial;

4.      For an accounting of any interests in the Lago Agrio Judgment purportedly sold, of any monies received thereby, of any interests in the Lago Agrio Judgment otherwise encumbered, of any arrangements with the Republic of Ecuador and/or any other entity to receive or administer any proceeds of the judgment, of any judgment proceeds paid to or collected by the Donziger Defendants and/or ADF and/or their associates in connection with the Lago Agrio Judgment, and of any proceeds anticipated or paid to or collected by the Donziger Defendants and/or ADF and/or their associates by virtue of any settlement talks, discussions or negotiations related to the Lago Agrio Judgment and/or the underlying claims;

5.      For interest at the legal rate in an amount to be proved at trial;

6.      For costs and attorneys' fees awardable under the law; and

7.      For such other and further relief as the Court may deem just and

**Appendix B**

proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury herein.


Dated:  Los Angeles, California
       February 13, 2013

Respectfully submitted,


By:   /s/ Kathryn Lee Crawford
      Kathryn Lee Crawford, Esq.
      (NY State Bar No. 2370443)
      SCHWARCZ, RIMBERG, BOYD &
      RADER, LLP
      6310 San Vicente Blvd., Suite 360
      Los Angeles, CA 90048
      Telephone: (323) 302-9488
      Facsimile:  (323) 931-4990
      lboyd@srbr-law.com

      Judith Kimerling, Esq.
      (NY State Bar No. 1864750)
      23 Waverly Place, #4-F
      New York, NY 10003
      Telephone: (212) 777-2135
      judith.kimerling@gmail.com

      Attorneys for Plaintiffs

**Appendix B**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(d), and using the word count function of Microsoft Word, the undersigned hereby certifies that this brief of *amici curiae* Proposed Huaorani Intervenors contains 6,330 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced, roman typeface in 14-point using Microsoft Word.

DATED: July 8, 2014                    Respectfully submitted,


By: _____ /s/ K. Lee Crawford-Boyd _____
K. Lee Crawford-Boyd
SCHWARCZ, RIMBERG, BOYD &
RADER, LLP
6310 San Vicente Boulevard, Suite 360
Los Angeles, California  90048
Telephone: (323) 302-9488
Facsimile: (323) 931-4990

Judith Kimerling
23 Waverly Place, #4-F
New York, New York  10003
Telephone: (212) 777-2135

Counsel for *Amici Curiae*
Proposed Huaorani Intervenors

- 1 -

## CERTIFICATE OF SERVICE
When All Case Participants are Registered for the
Appellate CM/ECF System

I hereby certify that I electronically filed the

**BRIEF OF PROPOSED HUAORANI INTERVENORS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS, SUPPORTING PARTIAL REVERSAL SOLELY AS TO REMEDY**

with the clerk of the court for the United States Court of Appeals for the Second Circuit by Using the Appellate CM/ECF system on

**July 8, 2014**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_____/s/ Kathryn Lee Boyd_____
Kathryn Lee Boyd