**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Docket Number(s): 14-0826 (L)                                                                Caption [use short title]

Motion for: Leave to file brief of amicus curiae

Chevron Corporation v. Hugo Gerardo Camacho Naranjo, et al.

Set forth below precise, complete statement of relief sought:

Leave to file brief of amicus curiae on behalf of Amazon Watch, Amnesty International, et al.

MOVING PARTY: Proposed Amici Curiae                    OPPOSING PARTY: Chevron Corporation, Plaintiff-Appellee

☐ Plaintiff          ☐ Defendant
☐ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Jonathan Moore                    OPPOSING ATTORNEY: Randy Mastro
[name of attorney, with firm, address, phone number and e-mail]

Gross Belsky Alonso LLP                              Gibson Dunn & Crutcher LLP

1 Sansome Street, Suite 3670; San Francisco, CA 94104    200 Park Ave., 47th Floor, New York, NY 10166

Tel: (415) 544-0200; Email: jmoore@blhny.com        Tel: (212)351-3825; Email: rmastro@gibsondunn.com

Court-Judge/Agency appealed from: U.S. District Court for the Southern District of New York; The Honorable Lewis A. Kaplan

**Please check appropriate boxes:**

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Has request for relief been made below?          ☐ Yes ☑ No
Has this relief been previously sought in this Court?   ☐ Yes ☑ No
Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

Is oral argument on motion requested?   ☐ Yes ☑ No   (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No   If yes, enter date: _____

**Signature of Moving Attorney:**
/s/Jonathan Moore                    Date: July 8, 2014        Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

## STATEMENT OF INTEREST

*Amici Curiae* ("*Amici*") are organizations dedicated to advancing environmental protection, human rights, corporate accountability, and economic justice.[1] *Amici* regularly engage in First Amendment-protected activities similar to those that the district court found to be predicate acts under RICO. *Amici* bring, participate in, and support strategic litigation intended to help achieve important societal goals  In conjunction with such litigation they seek to educate the public and to influence public opinion and government and corporate behavior through public relations campaigns, websites and blogs, press releases about ongoing litigation, corporate shareholder resolutions, public demonstrations, and letter-writing campaigns to government or corporate officials.  If the district court's finding of a RICO violation based on just such activities is upheld, *Amici*'s exercise of their First Amendment rights of free speech, association, and petitioning government will be severely chilled by the very real possibility that they will have to mount costly defenses to retaliatory litigation brought by deep-pocketed corporate defendants. Although they take great care to make only truthful statements, they may have to defend against charges that they acted in concert with others who made deceptive statements or that their own statements were on occasion misleading.

---

[1]  Appellees have not consented to the filing of this brief, so *Amici* are filing a motion for leave to file this brief**.**  No counsel of any party to this proceeding authored any part of this brief, and no person other than *Amici* contributed money to fund preparing or submitting this brief.

litigation they seek to educate the public and to influence public opinion and government and corporate behavior through public relations campaigns, websites and blogs, press releases about ongoing litigation, corporate shareholder resolutions, public demonstrations, and letter-writing campaigns to government or corporate officials.

One proposed *Amicus* – Amazon Watch, a California nonprofit engaged in advocacy concerning environmental issues in the Amazon – has a more direct interest:  Amazon Watch and its Executive Director were named in the Complaint in this case as "Non-Party Co-Conspirators," Amended Complaint ¶¶ 7-8 (ECF No. 283), and the district court explicitly named Amazon Watch in its opinion in this case as a "central player," SPA-51, in the publicity campaign that the district court found to be a racketeering enterprise, *id.* at 355.   Amazon Watch was also subjected to what the Northern District of California determined to be "egregiously overbroad.' discovery subpoenas. *Chevron Corp. v. Donziger*, 2013 U.S. Dist. LEXIS 49753, at *4 (April 5, 2013 N.D. Cal.).  A small non-profit with a limited budget and staff, Amazon Watch had to divert organizational resources to defend against the subpoenas, despite "the absence of a finding by Judge Kaplan that Chevron has established probable cause to believe that Amazon Watch's conduct falls outside the scope of the First Amendment because it is inciting unlawful activity or is fraudulent speech, and … all evidence before this Court suggests

otherwise." *Id.* at *3.

More detailed information about each proposed *Amici* and its interest in this appeal is set forth in the Appendix to this motion.

## II. THE PROPOSED *AMICUS CURIAE* BRIEF IS DESIRABLE AND RELEVANT

Under Rule 29 of the Federal Rules of Appellate Procedure, the Court may grant leave for the filing of an *amicus curiae* brief, and a party requesting leave must state its "interest," and "the reason why an *amicus* brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed. R. App. P. 29(b). Leave to file an *amicus curiae* brief should be freely granted. *See Neonatology Assocs., P.A. v. Comm'r,* 293 F.3d 128, 133 (3d Cir. 2002) (Alito, J.) ("[O]ur court would be well advised to grant motions for leave to file amicus briefs unless it is obvious that the proposed briefs do not meet Rule 29's criteria as broadly interpreted. I believe that this is consistent with the predominant practice in the courts of appeals"). As then-Judge Alito noted, *amicus* briefs may help "explain the impact a potential holding might have on an industry or other group." *Id*. at 132 (citation omitted).

Proposed *Amici* engage in petitioning and communication activities similar to those that the district court relied on as providing evidence of RICO activity. Proposed *Amici* possess deep institutional knowledge about the effects that the district court's holding, if upheld, is likely to have on nonprofits that engage in and

support strategic litigation as a method of achieving valid societal goals.  As described in detail in the proposed *amicus* brief, the district court's decision, if upheld, creates a danger that proposed *Amici* – and other advocacy organizations – will be forced to mount costly defenses to retaliatory litigation brought by deep-pocketed corporate defendants.   This very real possibility is likely to have a significant chilling effect on proposed *Amici*'s, and other nonprofits', exercise of their First Amendment rights of free speech, association, and petitioning government.  Even if nonprofits engaged in or supporting strategic litigation take meticulous care to make only truthful statements, they may have to defend against charges that they acted in concert with others who made deceptive statements or that their own statements were on occasion misleading.

The accompanying *amicus curiae* brief would aid this Court with respect to the foregoing points of argument, from the relevant perspective of nonprofit groups that support or engage in impact litigation, that engage in media and public relations campaigns concerning corporate actions and corporate accountability, that petition governmental entities to take actions against corporate damage, and that encourage and engage in shareholder advocacy.

## CONCLUSION

Proposed *Amici* are uniquely positioned to advise the Court on the ways in which the district court's opinion, if upheld, will profoundly and disastrously affect

and ultimately chill the exercise of petitioning and communication activities by them and other, similar nonprofits engaged in supporting and advocating about important societal issues.  Proposed *Amici* believe that their expertise will be of assistance to the Court in resolving the issues raised by this case.

Accordingly, proposed *Amici* respectfully request that the Court grant their motion for leave to file the accompanying *amicus curiae* brief.

Dated: July 8, 2014

Respectfully submitted,

JONATHAN MOORE
TERRY GROSS
ADAM C. BELSKY
MONIQUE ALONSO
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, CA 94104
Telephone: (415) 544-0200
Email: jmoore@gba-law.com

By: /s/ Jonathan Moore         .
       Jonathan Moore

THOMAS BENNIGSON
PUBLIC GOOD LAW CENTER
3130 Shattuck Avenue
Berkeley, CA 94705
Telephone:  (510) 336-1899
Email:  tbennigson@publicgoodlaw.org

*Attorneys for Amici Curiae*

## APPENDIX OF DETAILED STATEMENTS OF INTEREST

*Amici Curiae* Amazon Watch; Amnesty International; 350 Bay Area; Center for Environmental Health; CT Citizen Action Group; Food and Water Watch; Friends of the Earth,; Global Exchange; The Global Initiative for Economic, Social and Cultural Rights; Greenaction for Health and Environmental Justice; The International Accountability Project; Justice In Nigeria Now!; Marin Interfaith Task Force on the Americas; Media Alliance; Pachamama Alliance; Rainforest Action Network; Rights Action; and Sunflower Alliance, provide the following more detailed information concerning their interests in this appeal:

**Amazon Watch**

Amazon Watch is a nonprofit organization founded in 1996 to protect the rainforest and advance the rights of indigenous peoples in the Amazon Basin. Amazon Watch partners with indigenous and environmental organizations in campaigns for human rights, corporate accountability and the preservation of the Amazon's ecological systems.  As a non-profit environmental and indigenous rights advocacy organization, Amazon Watch supports the cause of the more than thirty thousand indigenous people living in and around the "Oriente" region of Ecuador—a region where Chevron's predecessor, Texaco, operated for more than three decades utilizing substandard technology that lead to systematic pollution

6

from multiple sources on a daily basis. On information and belief, during that time, Texaco spilled millions of gallons of crude oil, dumped billions of gallons of toxic wastewater into nearby rivers and streams, and abandoned hazardous waste in hundreds of unlined open-air pits littered throughout the Oriente region.

Amazon Watch believes that the pollution caused by Texaco in the Oriente was one of the worst environmental disasters in history. Since 2002, Amazon Watch has been involved in activism concerning Chevron's environmental legacy in Ecuador. Amazon Watch's role in such campaigns has been, and continues to be, to support the affected communities in achieving justice in Ecuador, which the communities have defined as obtaining: (1) a full remediation of contaminated sites; (2) potable water; and (3) funds for health care.

Amazon Watch's advocacy campaign related to Chevron is focused on educating the public on the legacy of environmental and rights abuses in Ecuador by Chevron/Texaco, informing Chevron shareholders of the company's ethical responsibility to the ecosystems and people of Ecuador and the financial risks of failing to resolve this outstanding liability, and urging the company and its directors to accept responsibility for their actions and fund a full scale clean-up in compliance with the requests of the affected communities.

The Chevron Ecuador litigation is just one of several different avenues the

affected communities have employed in the efforts to obtain justice. As part of its mission, Amazon Watch has worked to draw attention to the litigation and the Ecuadorian judgment, highlighting it in the court of public opinion, and informing Chevron's shareholders of the risk it may pose to their investment.

On a routine basis, Amazon Watch organizes rallies, marches, and protests. Amazon Watch frequently produces information for the public aimed at raising awareness, including press releases, blogs, tweets, photo essays, videos, and other content that is disseminated widely and daily. Amazon Watch produces a newsletter for our supporters as well as a newsletter aimed at the investor community. Amazon Watch also produces online petitions and actions, and provides background documents and analysis on specific projects and general threats to the Amazon. Additionally, Amazon Watch coordinates fact-finding delegations to regions where it works for supporters, journalists and shareholders of companies, including Chevron.  Amazon Watch, in its communications, desires to disseminate truthful information.

**Amnesty International**

Amnesty International is a worldwide human rights movement of more than 2.8 million members and supporters in more than 150 countries and territories. It works independently and impartially to promote respect for human rights. It monitors

domestic law and practices in countries throughout the world for compliance with international human rights law and international humanitarian law and standards, and it works to prevent and end grave abuses of human rights and to demand justice for those whose rights have been violated. Amnesty International has previously appeared as amicus curiae before the United States Supreme Court in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013), involving corporate accountability, and in a range of other cases, including, *Rasul v. Bush*, 542 U.S. 466 (2004),*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), *Roper v. Simmons*, 543 U.S. 551 (2005) and *Samantar v. Yousuf*, 130 S.Ct. 2278 (2010).

## 350 Bay Area

350 Bay Area is a non-profit climate advocacy grassroots organization with the mission to reduce carbon pollution in the San Francisco Bay Area and beyond. It engages in many protected activities: supporting impact legislation, seeking to educate the public and to influence public opinion and government and corporate behavior through public relations campaigns. 350 Bay Area has several issue campaigns covering various environmental issues:  fracking, fossil fuel divestment, regional climate action plans, non-carbon transportation (electric vehicles, clean mass transit, bikes), environmental justice, and fossil fuel resistance. Notably, one campaign, Chevron Watch, focuses on Chevron, the world's largest corporate producer of GHGs. Chevron Watch's focus is the Chevron refinery in Richmond,

California, and its international headquarters in San Ramon, California.  350 Bay Area also has several websites (regional as well as five local/issue-specific websites) and blogs, issues press releases about ongoing litigation (fracking regulation and bans, renewable energy), and advocates concerning corporate shareholder meeting actions. 350 Bay Area holds or participates in many public demonstrations (ranging up to 5000 participants), and letter-writing and calling campaigns to government or corporate officials (*e.g.,* to the Bay Area Air Quality Management District, to California cities and counties, and to state legislators).

350 Bay Area is concerned that the district court's opinion will cause corporate entities that are the subject of 350 Bay Area's environmental campaigns to file lawsuits against 350 Bay Area, even though 350 Bay Area endeavors to provide completely truthful information.  Any such lawsuits will drain 350 Bay Area of its small resources and volunteer-only time.  Because of this concern, 350 Bay Area believes that the district court's opinion, if upheld, will cast a chilling, highly cautionary set of restrictions on its communications, civil rights exercises and expression of its free speech, since profitable and powerful businesses will have an immediate and structural advantage to suppress its work through the fear of liability that risks not only the small resources of 350 Bay Area, but also the few financial resources, homes and livelihood of 350 Bay Area's employees and volunteers, and other individuals providing services in support of 350 Bay Area.

**Center for Environmental Health**

The Center for Environmental Health ("CEH") is a nonprofit, non-governmental organization that protects people from toxic chemicals by working with communities, consumers, workers, government, and the private sector to demand and support business practices that are safe for public health and the environment. CEH has worked for 18 years, winning victories that make children and families safer and healthier by eliminating harmful chemical exposures in millions of consumer products and exposing the health effects of toxics in our environment.

CEH's work is an important counterweight to the power and influence of the chemical and petroleum industries, which spend millions of dollars annually to counter claims about the devastating effect of practices in these industries on the health of children, families, and communities. CEH's work requires that it, and other public interest groups, communicate about these concerns and environmental effects with communities, the general public, and private- and public-sector decision makers. CEH intends that all of its communications be truthful and accurate, and its work depends on the ability to make these communications to the affected communities and to governmental and private decision makers. The

district court's opinion, by making such communication efforts subject to litigation under RICO, threatens to involve CEH, as well as other similar social nonprofits, in litigation brought by the industries that CEH is communicating about, and this concern will affect CEH's ability to continue providing its important services.


**CT Citizen Action Group**

The CT Citizen Action Group (CCAG) is a statewide membership-based nonprofit organization dedicated to organizing concerned citizens in order to build a more just society.  CCAG works on a range of issues, including economic opportunity, environmental sustainability, strengthening democratic institutions, government and corporate accountability, education equity, and human rights.  To advance these efforts, CCAG utilizes a range of strategies, including litigation, citizen participation, organizing, direct action, lobbying, and communications.

**Food and Water Watch**

Food and Water Watch ("FWW") is a national nonprofit organization working to ensure that the food, water and fish consumed by the American public is safe, accessible and sustainably produced.  To help local communities enjoy and trust in what is available to eat and drink, FWW helps people take charge of where their food comes from, works to ensure that clean affordable public tap water flows

freely to peoples' homes, protects the environmental quality of oceans, communicates with government officials to ensure that the government does its job protecting citizens, and educates about the importance of keeping the global commons – our shared resources – under public control.

FWW regularly engages in many of the First Amendment protected activities that the district court deemed to be RICO predicate actions. FWW, in advocating for peoples' rights, often engages in extensive communications work to pressure corporations to act responsibly, communicates with its membership to take action through their elected officials, and engages in media and education campaigns to inform the general public about the misdeeds of corporate and governmental officials. FWW representatives often appear and speak at rallies, seminars and demonstrations about many of the core issues with which FWW is involved, including unsustainable agribusiness practices and fracking. When able, FFW exercise rights under the laws of the United States by supporting or bringing citizen suits under the Clean Water Act and other environmental and public health laws. The district court's decision, if it stands, will have an extremely chilling effect on both FFW's Constitutional and legal rights to engage in these activities, since FFW is concerned that it will be sued by corporations on which it is focusing, even though FFW endeavors to ensure that its communications and advocacy are accurate.

**Friends of the Earth**

Friends of the Earth is a nonprofit non-governmental environmental advocacy organization with members in all 50 states. It particularly works in the fields of climate change and energy, forests and oceans, food and technology, and economic and financial policy. In collaboration with its supporters, community groups and other organizations, Friends of the Earth educates and urges public policymakers, corporations and financiers to make decisions which result in a healthier environment for all people. In the course of its work, Friends of the Earth regularly engages in litigation, media and public outreach, shareholder resolutions, public demonstrations and letter-writing campaigns.

**Global Exchange**

Global Exchange (GX) is an international human rights nonprofit organization dedicated to promoting social, economic and environmental justice around the world. GX provides an education and action resource center, and communicates with members and constituents about environmental and social issues of concern, to empower its members and constituents to act against environmental contamination or social injustice.  GX communicates with numerous constituents and others about the effects of certain corporate practices,

and provides tours and hands-on experience for individuals to learn about corporate injustices, and engages in communications with such individuals about actions to take at home concerning these issues.  GX has communicated with various communities on issues concerning Chevron's environmental issues, such as through a network called the True Cost of Chevron, to assist these communities that have been negatively impacted by Chevron in various locations, from Ecuador to Alaska, Nigeria to Indonesia, and provide assistance for them to engage in concerted action in their communities and in the United States, such as through demonstrations, communications with government entities and social pressure on Chevron shareholders, to help create change.

**The Global Initiative for Economic, Social and Cultural Rights**

The Global Initiative for Economic, Social and Cultural Rights (GI-ESCR) in an international human rights nonprofit and non-governmental organization.  The vision of the GI-ESCR is of a world where economic, social and cultural rights are fully respected, protected and fulfilled and on equal footing with civil and political rights, so that all people are able to live in dignity. To that end, the GI-ESCR engages in strategic litigation in support of economic, social and cultural rights with the aim of achieving just remedies, particularly for marginalized communities, as well as shaping jurisprudence from a human rights perspective. Attorneys with the GI-ESCR have supported and contributed to

litigation in support of economic, social and cultural rights before national courts and international human rights mechanisms.

**Greenaction for Health and Environmental Justice**

Greenaction for Health and Environmental Justice is a grassroots, multiracial, community-led nonprofit organization based in San Francisco and Kettleman City, California. Its mission is to mobilize community power to win victories that change industry and government policies and practices in order to protect health and promote environmental, economic and social justice. Greenaction was founded in 1997 by grassroots community organizations and environmental justice leaders from urban, rural and indigenous communities impacted by pollution and environmental racism and injustice, including communities negatively impacted by Chevron's industrial operations.  Its work, and those of our many environmental and environmental justice allies, is constantly a challenge due to the overwhelming odds faced by communities up against giant corporations, such as Chevron, that use their influence and vast financial resources to enable them to continue their pollution of communities. Greenaction is very concerned that the district court's opinion, if upheld, will allow Greenaction to be sued for providing support for litigation against these corporations, and for providing truthful and accurate statements in its attempt to

influence public opinion and governmental action, and such a situation will cause Greenaction's speech to be seriously chilled.

**The International Accountability Project**

The International Accountability Project (IAP) is a human rights advocacy nonprofit organization that seeks to end forced eviction and create new global policy and practice for development that respects people's homes, environment and human rights. In total, IAP works to win policy change, boost local advocacy efforts and support grassroots activists and communities to access influential decision-making spaces. IAP works to ensure all people can shape the decisions that affect their homes, environment and communities.  In order to accomplish these goals, IAP assists local activists and communities in media campaigns to raise interest and concerns about issues affecting the communities, in contacting government officials to convince the government to take actions to assist these communities, and to provide support for impact litigation by local communities to challenge corporate development policies that are harming the communities.

**Justice In Nigeria Now!**

Justice In Nigeria Now! is a San Francisco-based organization working in solidarity with communities in Nigeria and allies in the U.S. for peace and to hold multinational corporations accountable for their operations, promote peace and

17

corporate accountability and to ensure that extractive industries operate in a manner that respects human rights, protects the environment and enhances community livelihood. This includes informing and educating people about environmental and social justice issues, including legal cases such as multiple lawsuits brought by communities in Nigeria against Chevron. Justice in Nigeria Now provides support for such lawsuits, and encourages people to take actions supporting the plaintiffs in such cases, such as contacting governmental officials or engaging in shareholder initiatives.

## Marin Interfaith Task Force on the Americas

Marin Interfaith Task Force on the Americas is a nonprofit non-governmental organization that educates citizens of North America regarding the role of corporations in the Americas, as well as the role of the United States government.  The Task Force on the Americas works to expose the exploitation by corporations of natural resources to the detriment of indigenous communities, and to educate the American public about the effects of international trade agreements and corporate actions and policies that could be harmful to the indigenous communities and the American public.  The Task Force on the Americas regularly communicates with the American public, through educational delegations, organizing community educational events and producing a quarterly newsletter, in which it presents its analysis of U.S. corporate actions and policies.  The Task

Force on the Americas communicates information it has obtained about corporate impunity, conflicts, human rights abuses and environmental degradation, and regularly encourages U.S. citizens to contact their members of Congress, the Administration and companies with their concerns, particularly in cases where U.S. corporations are profiting from the exploitation of natural resources that harm people living nearby. Additionally, the Task Force seek ways to hold perpetrators responsible and encourage compensation for victims, such as providing support and communications assistance for impact litigation on these issues.

**Media Alliance**

Media Alliance is an Oakland-based nonprofit resource and advocacy center for media workers, nonprofit organizations, and social justice activists, in order to ensure excellence, ethics, diversity, and accountability in all aspects of the media in the interests of peace, justice, and social responsibility. Media Alliance and its members regularly participate in advocacy-based activities similar to those characterized by the district court in this case as creating RICO liability. Media Alliance also works with numerous nonprofit organizations and community and citizen groups on communication strategies for campaigns on many issues including income inequality, environmental justice, criminal rehabilitation, surveillance and immigrant rights, including providing support for impact litigation. Media Alliance is deeply concerned that the district court's opinion will

chill the first amendment activities by Media Alliance and other social impact organizations, due to the fear that these organizations may be sued by the very corporations that it is analyzing and communicating about.

**Pachamama Alliance**

The Pachamama Alliance (TPA) is a nonprofit non-governmental organization that partners with indigenous people of the Amazon region of Ecuador to preserve their land and cultures. TPA also provides transformational educational programs to hundreds of thousands of people worldwide about environmental and social justice issues, and how people can take action. Part of the Pachamama Alliance's mission is to shed light on areas of injustice in the world, and the systems and structures that perpetuate them. To accomplish this mission, the Pachamama Alliance informs and educates people about environmental and social justice issues, including legal cases such as the lawsuit in Ecuador against Chevron and Chevron's obligation to compensate its victims in Ecuador, provides financial and communications support for such lawsuits, and encourages people to take actions supporting the victims and plaintiffs in such cases, such as contacting governmental officials or engaging in shareholder initiatives.

**Rainforest Action Network**

The Rainforest Action Network's (RAN) mission is to campaign for the forests, their inhabitants and the natural systems that sustain life, through grassroots organizing, education and nonviolent direct action. RAN's Tropical Forests and Energy & Finance Programs work together to fundamentally change the relationship between the global marketplace and the natural world, taking a holistic approach in addressing the root causes of these inter-related crises. RAN routinely organizes rallies, marches, and protests on these issues. RAN also produces information for public awareness including press releases, blogs, tweets, photo essays, videos, and other content that is disseminated widely and daily. RAN also produces online petitions and actions, and provides background documents and analysis on specific projects and general threats to rainforests.  At times, RAN's works is specifically related to Chevron's (previously Texaco's) actions in Ecuador. RAN's work includes informing and educating people about environmental and social justice issues, including legal cases such as the lawsuit in Ecuador against Chevron and Chevron's obligation to compensate its victims in Ecuador, providing support for such lawsuits, and encouraging people to take actions supporting the plaintiffs in such cases, such as contacting governmental officials or engaging in shareholder initiatives.

**Rights Action**

Rights Action is a nonprofit non-governmental organization established in 1995 to fund community-designed and implemented development, environmental and human rights protection projects in Central America, mainly in Guatemala and Honduras, and to promote education and activism aimed at critically understanding and changing unjust north-south, global economic, military and political relationships. Rights Action funds community struggles, publishes articles and reports, coordinates speaking tours, accompanies threatened activists, and identifies and pressures responsible government agencies.  As part of this work, Rights Action also informs and educates people about environmental and social justice issues and corporate malfeasance, including providing communications and support about legal cases related to environmental and human rights crimes that involve corporate actors.

**Sunflower Alliance**

The Sunflower Alliance is an alliance of organizations whose common vision is a fossil-free Bay Area.  The Sunflower Alliance engages in many protected activities, such as providing support for impact legislation, seeking to educate the public and to influence public opinion and government and corporate behavior through public relations campaigns and campaigns to petition government

officials to take appropriate actions, and issuing press releases concerning ongoing litigation against corporations engaged in environmental damage.  The Sunflower Alliance also provides support for protest actions at corporate shareholder meeting actions, in attempts to convince corporations to change their destructive policies. Some of Sunflower Alliance's work has involved environmental damages caused by Chevron, such as providing communications and organizing and coordinating protests and direct actions against Chevron concerning Chevron's refinery fire in Richmond, California, which sent 15,000 people to the hospital and caused substantial environmental damage.

**AMICI BRIEF**

# 14-0826-cv(L)
## 14-0832-cv(CON)

# United States Court of Appeals
*for the*
# Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICI CURIAE* AMNESTY INTERNATIONAL, AMAZON
WATCH, 350 BAY AREA, CENTER FOR ENVIRONMENTAL HEALTH,
CT CITIZEN ACTION GROUP, FOOD AND WATER WATCH, FRIENDS
OF THE EARTH, GLOBAL EXCHANGE, THE GLOBAL INITIATIVE FOR
ECONOMIC, SOCIAL AND CULTURAL RIGHTS, GREENACTION FOR
HEALTH AND ENVIRONMENTAL JUSTICE, THE INTERNATIONAL
ACCOUNTABILITY PROJECT, JUSTICE IN NIGERIA NOW!, MARIN
INTERFAITH TASK FORCE ON THE AMERICAS, MEDIA ALLIANCE,
PACHAMAMA ALLIANCE, RAINFOREST ACTION NETWORK,
RIGHTS ACTION AND SUNFLOWER ALLIANCE IN SUPPORT OF
DEFENDANTS-APPELLANTS AND REVERSAL**

THOMAS BENNIGSON
PUBLIC GOOD LAW CENTER
3130 Shattuck Avenue
Berkeley, California 94705
Tel.:  (510) 336-1899
Fax:   (510) 849-1536
tbennigson@publicgoodlaw.org

JONATHAN MOORE
TERRY GROSS
ADAM C. BELSKY
MONIQUE ALONSO
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, California 94104
Tel.:   (415) 544-0200
Fax:   (415) 544-0201
jmoore@gba-law.com

*Counsel for Amici Curiae*

v.

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE
PAYAGUAJE, STEVEN DONZIGER, THE LAW OFFICES OF
STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants*,

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE
LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA
SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA
HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA
ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO
YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO
CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO
ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA,
CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO
YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA
CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA
TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA,
GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL
GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO
LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA
RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO
PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES
BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA,
SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA
HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS
LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA,
GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS
PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE,
MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO
PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO
LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO
MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE,
ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO
PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA
CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME
HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO,
BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI,
EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA
MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO
YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI,
NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI,
YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI,
TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA
GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI,
NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA

QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE
LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO
ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA,
MIMA YETI,

*Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents*.

## CORPORATE DISCLOSURE STATEMENT, RULE 26.1

All *Amici Curiae* are nonprofit corporations, and have no parent corporations and, as they have no stock, no publicly held company owns 10% or more of the stock of any *Amicus*.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITES ...................................................................iv

STATEMENT OF INTEREST..............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................4

ARGUMENT ...................................................................................8

    I.    DEFENDANTS' ACTIONS ARE PROTECTED BY
            THE FIRST AMENDMENT RIGHTS OF EXPRESSION
            AND ASSOCIATION ................................................................8

            A. Most of the "Enterprise's" Activities Were Within the
               Core of First Amendment Protections ......................................10

            B. Because the Challenged Conduct Occurred in a Context
               of Core Protected Activities, the Court Was Required-But
               Failed- to Scrutinize the Allegations With Heightened
               Care ..................................................................................13

    II.   DEFENDANTS' ADVOCACY AND LITIGATION
            ACTIVITIES, EVEN IF DECEPTIVE, ARE IMMUNIZED
            FROM RICO LIABILITY UNDER THE
            *NOERR-PENNINGTON* DOCTRINE .........................................16

            A. All of Defendants' Advocacy Activities Are Entirely
               Immunized From RICO Liability, Because Even
               Deceptive Advocacy Is Immunized Under
               *Noerr-Pennington* ..............................................................17

            B. Defendants' Litigation Activities Are Immunized Under
               *Noerr-Pennington*, Because the Litigation Was Not a
              Sham..................................................................................18

III.    RICO IS NOT AN APPROPRIATE TOOL FOR
POLICIING LITIGATION MISCONDUCT OR FOR
MOUNTING COLLATERAL ATTACKS ON
JUDGMENTS ................................................................................23

CONCLUSION ...................................................................................28

CERTIFICATE OF COMPLIANCE.....................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*,
 185 F.3d 154 (3d Cir. 1999) ...................................................................18, 21

*Associated Container Transportation (Australia) Ltd. v. United States*,
 705 F.2d 53 (2d Cir. 1983) ...........................................................................22

*Auburn Med. Ctr. v. Andrus*,
 9 F. Supp. 2d 1291 (M.D. Ala. 1998) ..........................................................26

*Baltimore Scrap Corporation v. David J. Joseph Company*,
 237 F.3d 394 (4th Cir. 2001) ..................................................................18, 21

*Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*,
 229 F.3d 1135 (2d Cir. 2000) .......................................................................17

*BE & K Construction Co. v. NLRB*,
 536 U.S. 516 (2002).......................................................................................17

*Bill Johnson's Restaurants, Inc. v. NLRB*,
 461 U.S. 731 (1983).................................................................................5, 17

*Brown v. Board of Education*,
 347 U.S. 483 (1954)....................................................................................8, 9

*California Motor Transportation Company v. Trucking Unlimited*,
 404 U.S. 508 (1972).........................................................................16, 17, 23

*Cheminor Drugs v. Ethyl Corp.*,
 168 F.3d 119 (3d Cir.1999) ..........................................................................21

*Chevron Corp. v. Donziger*,
 2013 U.S. Dist. LEXIS 49753 (April 5, 2013 N.D. Cal.) ..............................2

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
 499 U.S. 365 (1991)......................................................................................18

*Coastal States Marketing, Inc. v. Hunt*,
694 F.2d 1358 (5th Cir. 1983) ...................................................................22

*Coll v. First American Title Insurance Company*,
642 F.3d 876 (10th Cir. 2011) ...............................................................18, 20

*Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*,
758 F. Supp. 2d 153 (E.D.N.Y. 2010) ..........................................6, 25, 26, 27

*Curtis v. Law Offices of David M. Bushman, Esq.*,
443 F. App'x 582 (2d Cir. 2011) ...................................................................6

*Deck v. Engineered Laminates*,
349 F.3d 1253 (10th Cir. 2003) ............................................................25, 26

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)...............................................................................16, 18

*Engel v. CBS, Inc.*,
182 F.3d 124 (2d Cir. 1999) .......................................................................27

*Heck v. Humphrey*,
512 U.S. 477 (1994)....................................................................................27

*In re Burlington Northern, Inc.*,
822 F.2d 518 (5th Cir. 1987) ......................................................................19

*In re DDAVP Direct Purchaser Antitrust Litigation*,
585 F.3d 677 (2d Cir. 2009) ..................................................................19, 21

*International Brotherhood of Teamsters, Local 734 Health & Welfare
Trust Fund v. Philip Morris Inc.*,
196 F.3d 818 (7th Cir. 1999) ......................................................................17

*I.S. Joseph Co., Inc. v. J. Lauritzen A/S*,
751 F.2d 265 (8th Cir.1984) ....................................................................6, 25

*Kashelkar v. Rubin & Rothman*,
97 F.Supp.2d 383 (S.D.N.Y.2000) ..............................................................28

*Kelly v. Albarino*,
        485 F.3d 664 (2d Cir. 2007) ........................................................................13

*Liberty Lake Investments, Inc. v. Magnuson*,
        12 F.3d 155 (9th Cir. 1993) .........................................................................21

*NAACP v. Button*,
        371 U.S. 415 (1963)..............................................................................*passim*

*NAACP v. Claiborne Hardware Co.*,
        458 U.S. 886 (1982) ............................................................................*passim*

*NAACP v. State of Alabama ex rel. Patterson*,
        357 U.S. 449 (1958).....................................................................................15

*Oregon Natural Resources Council v. Mohla*,
        944 F.2d 531 (9th Cir. 1991) ................................................................ 21-22

*Primetime 24 Joint Venture v. National Broadcasting Company*,
        219 F.3d 92 (2d Cir. 2000) ....................................................................19, 22

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
        508 U.S. 49 (1993)...........................................................................19, 20, 21

*Sedima, SPRL v. Imrex Co., Inc.*,
        473 U.S. 479 (1985).....................................................................................23

*Sosa v. DIRECTV, Inc.*,
        437 F.3d 923 (9th Cir. 2006) ................................................................16, 17

*Spiegel v. Continental Illinois National Bank*,
        609 F. Supp. 1083 (N.D.Ill.1985)................................................................26

*United Mine Workers of America v. Pennington*,
        381 U.S. 657 (1965).....................................................................................16

*United States v. Alvarez*,
        132 S. Ct. 2537 (2012) ................................................................................12

*United States v. Eisen*,
   974 F.2d 246 (2d Cir. 1992) ....................................................24, 27

*United States v. Grace*,
   461 U.S. 171 (1983)...........................................................11, 12

*United States v. Pendergraft,*
   297 F.3d 1198 (11th Cir. 2002) ............................................. 24-25

*Vinokur v. Penny Lane Owners Corporation*,
   269 A.D.2d 226 (N.Y. App. Div. 2000)........................................28

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) .................................................19

*World Wrestling Entertainment, Inc. v. Jakks Pacfic, Inc.*,
   530 F. Supp. 2d 486 (S.D. N.Y. 2007) ...................................... 5-6

## STATE CASES

*Ribas v. Clark*,
    38 Cal. 3d 355 (1985)..................................................13

## OTHER AUTHORITIES

Anenson, T. Leigh, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*,
   31 Pepp. L. Rev. 915 (2004).......................................................12

Canan, Penelope & Pring, George W., *"Strategic Lawsuits Against Public Participation" ("SLAPPs"): An Introduction for Bench, Bar and Bystanders*,
   12 Bridgeport L. Rev. 937 (1992) ...................................................6

Canan, Penelope & Pring, George W., *Strategic Lawsuits Against Public Participation*,
   35 Social Problems 506, 506 (1988) .............................................5

Cassidy, Keith, *The Right to Life Movement: Sources, Development, and Strategies*, 7 J. Policy Hist. 128 (1995) ...............................................9

Kluger, Richard, *Simple Justice* (1976) ....................................................9

Rehnquist, William, *Get RICO Cases Out of My Courtroom*, *Wall St. J.*
    (May 19, 1989) ............................................................................23

# STATEMENT OF INTEREST

*Amici Curiae* ("*Amici*") are organizations dedicated to advancing environmental protection, human rights, corporate accountability, and economic justice.[1]  *Amici* regularly engage in First Amendment-protected activities similar to those that the district court found to be predicate acts under RICO.  *Amici* bring, participate in, and support strategic litigation intended to help achieve important societal goals  In conjunction with such litigation they seek to educate the public and to influence public opinion and government and corporate behavior through public relations campaigns, websites and blogs, press releases about ongoing litigation, corporate shareholder resolutions, public demonstrations, and letter-writing campaigns to government or corporate officials.  If the district court's finding of a RICO violation based on just such activities is upheld, *Amici*'s exercise of their First Amendment rights of free speech, association, and petitioning government will be severely chilled by the very real possibility that they will have to mount costly defenses to retaliatory litigation brought by deep-pocketed corporate defendants.  Although they take great care to make only truthful statements, they may have to defend against charges that they acted in concert with others who made deceptive statements or that their own statements were on occasion misleading.

---

[1]  Appellees have not consented to the filing of this brief, so *Amici* are filing a motion for leave to file this brief.  No counsel of any party to this proceeding authored any part of this brief, and no person other than *Amici* contributed money to fund preparing or submitting this brief.

One *Amicus* – Amazon Watch – has already experienced such retaliation in this case.  Amazon Watch supported the indigenous plaintiffs in the underlying litigation in Ecuador, by helping to publicize the lawsuit, investigate the environmental damage caused by Chevron, bring matters to the attention of regulatory agencies, and reach out to Chevron shareholders.  Consequently, Amazon Watch and its Executive Director were named in the Complaint in this case as "Non-Party Co-Conspirators," Amended Complaint ¶¶ 7-8 (ECF No. 283), and subjected to "egregiously overbroad" discovery demands by Chevron, *Chevron Corp. v. Donziger*, 2013 U.S. Dist. LEXIS 49753, at *4 (April 5, 2013 N.D. Cal.), requiring diversion of organizational resources to defend against Chevron's subpoenas.  Although the court reviewing the subpoenas noted "the absence of a finding by Judge Kaplan that Chevron has established probable cause to believe that Amazon Watch's conduct falls outside the scope of the First Amendment because it is inciting unlawful activity or is fraudulent speech, and … all evidence before this Court suggests otherwise," *id.* at *3, Amazon Watch was expressly named in the District Court's opinion in this case as a "central player," SPA-51, in the publicity campaign that the district court found to be a racketeering enterprise (SPA-367).  Under the regime augured by this case, other *Amici* may expect similar consequences as they pursue their organizational missions through constitutionally protected activities.  *Amici* are also threatened by overreaching

issuance of subpoenas that seek to compel those organizations to turn over internal planning and strategy documents and the identities of their supporters, thus exposing their supporters to further risks.

Further detailed information about each *Amicus Curiae* is set forth in the Appendix to the Motion for Leave to File Brief of *Amicus Curiae*.

# INTRODUCTION AND SUMMARY OF ARGUMENT

In essence, this case is an effort by Chevron to retaliate against Ecuadorian villagers, their lawyers, and their supporters for suing, bringing public pressure, and petitioning government agencies to hold Chevron accountable for violations of human rights.  The district court's decision below, if allowed to stand, poses a severe threat to the rights to expression, association, political participation, and access to courts guaranteed by the First Amendment.  If the vaguely defined scope and heavy penalties of RICO – enacted to support law enforcement efforts against organized crime syndicates – may be wielded by private parties against public interest groups and activists who engage in First Amendment-protected activities to seek to hold those private parties accountable, democracy itself is threatened.

The American political system is premised on ensuring that citizens may freely seek to persuade the legislative, executive and judicial branches of government, as well as the public in general, in order to enact or modify legislation, influence executive or administrative action, or obtain judicial rulings that further important societal goals.  *See NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[o]ur form of government is built on the premise that every citizen shall have the right to engage in political expression and association").  When the exercise of these basic freedoms to attempt to persuade government officials and the public, to speak to the press, to participate in or organize public protests, or to

4

bring or support impact litigation brings the risk of having to defend in court

against racketeering charges, however, the likely consequence is not just a chilling

effect but a deep freeze on political expression and participation.

The district court's opinion means that participants in public discourse must

fear incurring crushing defense costs and possible liability if they act in

coordination with someone later found to have engaged in illegal activities or to

have issued false statements.  The cost of defending against non-meritorious RICO

charges imposes a formidable deterrent to advocating positions adverse to

powerful interests.  *Cf. Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731,

740-41 (1983);[2] *see also World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F.

---

[2] Indeed Chevron's lawsuit, aimed as it is at classic First Amendment petitioning activities, resembles nothing so much as a "SLAPP" suit ("strategic lawsuit against public participation"), a retaliatory action brought against citizens exercising their constitutional rights to speak out and advocate on matters of public concern and to petition the government.  Penelope Canan & George W. Pring, *Strategic Lawsuits Against Public Participation*, 35 Social Problems 506, 506 (1988).  In the words of a New York state trial judge:

> [T]he SLAPP filer foists upon the target the expenses of a defense. The longer the litigation can be stretched out, the more litigation that can be churned, the greater the expense that is inflicted and the closer the SLAPP filer moves to success. The purpose of such gamesmanship ranges from simple retribution for past activism to discouraging future activism.… The ripple effect of such suits in our society is enormous. Persons who have been outspoken on issues of public importance targeted in such suits or who have witnessed such suits will often choose in the future to stay silent. Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined.

5

Supp. 2d 486, 495-96 (S.D. N.Y. 2007) (a RICO action has "an almost inevitable stigmatizing effect on those named as defendants").

Under the district court's reasoning, a defendant in litigation can easily argue that aggressive litigation and public relation tactics by the other side are fraudulent or involve false evidence.  After all, defendants typically claim that litigation brought against them is baseless.  The possibility that routine litigation activities could form the basis for such staggering liability is "an absurd result [that] would chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts."  *Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010), *aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq.*, 443 F. App'x 582 (2d Cir. 2011); *see also I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265 (8th Cir.1984) (if threats to file a lawsuit could be found to constitute "a 'pattern of racketeering activity,' citizens and foreigners alike might feel that their right of access to the courts of this country had been severely chilled").

---

*Gordon v. Marrone*, No. 185 44/90, slip op. at 26-28 (Sup. Ct., Westchester Cty., N.Y. April 13, 1992), quoted in George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPs"): An Introduction for Bench, Bar and Bystanders*, 12 Bridgeport L. Rev. 937, 943-44 (1992).  The increasing prevalence of such tactics has been of such concern that twenty-eight states, the District of Columbia and one U.S. territory have enacted anti-SLAPP statutes to protect its citizens against them.  *See* http://www.dmlp.org/legal-guide/state-law-slapps.

The district court's ruling also invites losing defendants everywhere to use allegations of fraud or improper pressure to collaterally attack an adverse judgment in a forum perceived to be more favorable, burdening the courts, as well as litigants, and indefinitely delaying finality of judgment.

Fortunately, our Constitution and statutes demand that the district court's decision be overturned. The activities constituting the basis for this lawsuit are protected by First Amendment guarantees of free speech, association, and petitioning, as well as the litigation privilege. Even deliberate falsehoods remain protected by these doctrines, as are statements that cause or threaten economic harm to another party (even when that harm is intended), and also statements made outside the United States. This is not to say that fraud or extortion are constitutionally protected. But the illegal conduct that was found by the district court occurred in the context of activities at the core of First Amendment protections: expression on topics of public concern and petitioning of government through lobbying, public advocacy, and the courts. Under such circumstances, the First Amendment demands that allegations of wrongdoing be examined with more than usual rigor. The district court failed to do so. The First Amendment, as elucidated in the *Noerr-Pennington* doctrine, also protects against statutory liability for activities of petitioning the government, whether through advocacy or in the courts.

7

Constitutional and pragmatic considerations have also led the RICO statute to be interpreted as inapplicable for challenging alleged litigation misconduct and unavailable for attacking unfavorable judgments in another forum.

## ARGUMENT

## I.    DEFENDANTS' ACTIONS ARE PROTECTED BY THE FIRST AMENDMENT RIGHTS OF EXPRESSION AND ASSOCIATION

The district court's conclusion that a campaign for environmental justice was a racketeering "enterprise" runs afoul of the First Amendment in a number of ways.  Most of the activities attributed to the "enterprise" were entirely legal, falling within the core protections of the First Amendment.  But crucially, when illegal conduct is alleged within a context of concerted protected activities, heightened burdens of proof and greater precision than ordinary are required to establish liability.  Because the district court came nowhere near meeting such a heightened standard, its findings of liability must be reversed.

It is ironic that as the nation was preparing to celebrate the sixtieth anniversary of the Supreme Court's historic decision in *Brown v. Board of Education,* 347 U.S. 483 (1954), the district court should propound a legal standard that would likely have subjected the NAACP to racketeering liability for its decades of organizing that ultimately made its successful lawsuit possible.  *See*

8

Richard Kluger, *Simple Justice* (1976).[3]  What the district court designated a RICO
"enterprise" in this case resembled the (much larger) coalition of attorneys and
activists who paved the way for *Brown*: a collection of individuals and
organizations working with varying degrees of coordination to seek justice through
strategic litigation, public advocacy, and efforts to spur government action.  *See*
SPA-367; *see also* SPA-53 (describing the co-conspirators as engaged in a multi-
faceted "pressure campaign against Chevron").

Such orchestrated campaigns for social change are a revered part of
American history, and are accorded the highest degree of constitutional protection.
"[E]xpression on public issues has always rested on the highest rung of the
hierarchy of First Amendment values."  *NAACP v. Claiborne Hardware Co.*, 458
U.S. 886, 913 (1982).  It receives the highest protection no less when advocacy
organizations and individuals "exercise … First Amendment rights" "of speech,
assembly, association, and petition" "to bring about political, social, and economic
change."  *Id.* at 911 (referring to boycott and associated protests and advocacy).
Litigation seeking to effect societal change is likewise "a form of political
expression" entitled to the highest degree of constitutional protection, as is
"vigorous advocacy."  *NAACP v. Button*, 371 U.S. 415, 429 (1963).

---

[3] All corners of the political spectrum engage in such campaigns.  *See, e.g.,* Keith
Cassidy, *The Right to Life Movement: Sources, Development, and Strategies*, 7 J.
Policy Hist. 128 (1995).

## A. Most of the "Enterprise's" Activities Were Within the Core of First Amendment Protections

As an initial matter, most of the activities of the alleged enterprise were entirely legal, core protected expression.  The principal activities engaged in by the enterprise, recited with apparent distaste in the district court opinion, were ones protected by the First Amendment:  an "expansive media campaign" (SPA-307); "efforts to precipitate disinvestments in Chevron stock" (*id.*); "overtures to government officials and agencies to investigate Chevron" (*id.*); enlistment of celebrities and NGOs to apply pressure (SPA-47); "issu[ing] press releases and blog posts to generate media interest in the case" (SPA-49) "lobby[ing] regulatory agencies and elected officials (SPA-51); "using strategies and tactics … employed in political campaigns" (SPA-50);  "submitt[ing] [complaints] to the SEC and memoranda . . . to elected officials regarding Chevron" (SPA-52-53); "launch[ing] a website . . . [d]ubbed 'ChevronToxico' [that posted] information about the litigation" (SPA-53); "organiz[ing] several demonstrations outside the courthouse to protest [the judge's] rulings" (SPA-80); and the list goes on.[4]

Advocacy remains protected even when it includes efforts to apply

---

[4] *See also* SPA-46 ("an aggressive media strategy"); (SPA-307) ("attempts to "driv[e] Chevron to the settlement table"); (SPA-47) (efforts to obtain coverage by the "national, international, and Ecuadorian press"); (SPA-51) ("apply[ing] shareholder pressure on Chevron" and "publiciz[ing] the lawsuit,"); (SPA-51-52) seeking "support among Chevron shareholders for a settlement, and … media attention through press releases"); (SPA-471) ("efforts to pressure Chevron to settle without exhausting the legal process").

economic or social pressure to influence others. "The claim that … expressions were intended to exercise a coercive impact … does not remove them from the reach of the First Amendment." *Claiborne Hardware*, 458 U.S. at 911. "Speech does not lose its protected character … simply because it may embarrass others or coerce them into action." *Id.* at 910. "'[T]hreats' of 'social ostracism, vilification, and traduction,'" *id.* at 921, unlike intimidation by threats of violence, are constitutionally protected. *Id.* at 926. Foreseeing – and even intending – that the target of a campaign sustain economic injury likewise does not remove First Amendment protections from a nonviolent, politically motivated campaign designed to force governmental and economic change and to effectuate rights. *Id.* at 914. Consequently, such pressure tactics cannot constitute extortion.

Organizing demonstrations outside a courthouse, cited by the district court as an instance of coercive tactics, *see* SPA-80, is likewise an entirely legitimate exercise of core First Amendment rights. *See United States v. Grace*, 461 U.S. 171, 180 (1983) ("public sidewalks forming the perimeter of the Supreme Court grounds … are public forums and should be treated as such for First Amendment purposes").[5] Such demonstrations are protected, notwithstanding the possibility

---

[5] Ironically, a recent documentary, *The Case Against 8*, is a celebration of how Theodore Olson, appellate counsel for Chevron, orchestrated a massive media and publicity campaign – including protests in front of courthouses – to support his litigation against California's same-sex marriage ban. *See* http://thecaseagainst8.com.

11

that they might convey the appearance that the court is subject to outside pressure. *Id.* at 183.

Finally, false and even deceptive statements also receive a significant measure of constitutional protection. *See Button*, 371 U.S. at 444-45 ("the Constitution protects expression and association without regard to the truth … of the ideas and beliefs which are offered"). To safeguard "breathing space" for First Amendment freedoms, *id.* at 433, even deliberate deceptions are protected. *See United States v. Alvarez*, 132 S. Ct. 2537, 2548 (2012) (striking down law punishing false representations that one has received a military decoration, because countenancing such "broad censorial power" would cast a "a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom").

For this reason, false representations in legal proceedings have long been protected by the centuries-old common law litigation privilege, recognized in almost every state. T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*, 31 Pepp. L. Rev. 915, 917 (2004). The litigation privilege is "the broadest of possible privileges and any matter which, by any possibility, under any circumstances, at any stage of the proceeding, may be or may become material or pertinent is protected by an absolute privilege

…irrespective of the motive of the speaker or writer." *Kelly v. Albarino*, 485 F.3d 664, 666 (2d Cir. 2007).

While traditionally limited to defamation claims, it has more recently been applied as a defense to many other actions. Thus, in California, where many of the activities relied on by the district court for its finding of RICO liability took place,[6] the litigation privilege has been broadly applied. *See, e.g., Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) ("although the statutory privilege accorded to statements made in judicial proceedings appears in the code in the chapter on defamation, it applies to virtually all other causes of action, with the exception of an action for malicious prosecution").

### B. Because the Challenged Conduct Occurred in a Context of Core Protected Activities, the Court Was Required – But Failed – to Scrutinize the Allegations With Heightened Care

Most crucially for this case, "[b]ecause First Amendment freedoms need breathing space to survive," *Button*, 371 U.S. at 338, when allegedly illegal

---

[6] These include findings that Amazon Watch took actions "to support and publicize the lawsuit and to pressure Chevron, … to lobby regulatory agencies and elected officials, sought support among Chevron shareholders for a settlement, and sought media attention through press releases"; "submitted [complaints] to the SEC and memoranda . . . to elected officials regarding Chevron"; and "launch[ed] a website . . . [d]ubbed 'ChevronToxico' [that posted] information about the litigation. SPA-51.

conduct[7] occurs "in the context of constitutionally protected activity, … 'precision of regulation' is demanded." *Claiborne Hardware*, 458 U.S. at 916 (quoting *Button*, 371 U.S. at 438). "A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a [criminal] conspiracy simply by reference to the ephemeral consequences of relatively few [criminal] acts." *Claiborne Hardware*, 458 U.S. at 933 (with reference to campaign against discriminating businesses including boycott, protests, and public mobilization, but also violence and intimidation).

Additionally, given "the importance of avoiding the imposition of punishment for constitutionally protected activity," *id.* at 934, a heightened burden of proof – and a heightened degree of scrutiny by a reviewing court – is required. *See id.* at 933-34 ("[t]he burden of demonstrating" that "[a] massive and prolonged effort to change the social, political, and economic structure of a local environment" is predominantly a criminal conspiracy is "heavy"); *id.* at 915 (a context of constitutionally protected activity "imposes a special obligation … to examine critically the basis on which liability was imposed"); *id.* at 919 (there must be "clear proof" of specific intent to further an unlawful aim; "intent must be judged according to the strictest law").

---

[7] *Amici* believe that the district court's findings of illegal activities are not entitled to deference, but the concern here is that the district court decision runs severely afoul of the First Amendment regardless.

The district court in this case came nowhere near the "precision of regulation" required when entering such a "sensitive field." *Id.* at 916, 920.  Even though a heightened burden of proof was demanded, the district court stated explicitly that it was applying the "preponderance of evidence" standard appropriate to an ordinary civil case.  SPA-353.  Nor did the court give any indication that it was exercising "extreme care," *Claiborne Hardware*, 458 U.S. at 927, to examine Chevron's allegations "critically," *id.* at 915, or that it was "wary" of the conspiracy charges.  *Id.* at 934.  To the contrary, it regularly excluded exculpatory evidence that should have been admitted even in an ordinary civil case. *See*, *e.g.*, SPA-286.  The court erred also in treating the legal and illegal aspects of concerted action as a unity "without differentiation," *Claiborne Hardware*, 458 U.S. at 921, transmogrifying the entirety of a "massive and prolonged" campaign, *id.* at 933, for environmental justice into a racketeering conspiracy.  Finally, the court erred in concluding that the LAP defendants were liable for the actions of other members of the "enterprise" under agency law.  SPA-350 n.1304.  In order that the "freedom to engage in association for the advancement of beliefs and ideas," *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958), not be curtailed, the First Amendment requires that in the context of a concerted action pursuing social justice through protected activities, each individual's liability be individually assessed.  *Claiborne Hardware*, 458 U.S.

at 916-17, 933-34.[8]

On the basis of just such errors, the Supreme Court in *Claiborne Hardware* overturned entirely a lower court decision finding leaders and participants liable for the economic consequences of a "concerted action" that included both protected First Amendment activity and illegal actions in pursuit of a worthy social goal.  458 U.S. at 888.  This Court must do the same here.

## II.  DEFENDANTS' ADVOCACY AND LITIGATION ACTIVITIES, EVEN IF DECEPTIVE, ARE IMMUNIZED FROM RICO LIABILITY UNDER THE *NOERR-PENNINGTON* DOCTRINE

The conduct for which defendants have been found liable occurred mostly in the course of bringing litigation and seeking to influence other branches of government and administrative agencies.  Consequently, it is protected by the First Amendment right "to petition the Government for a redress of grievances," which has the consequence that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (summarizing and explaining *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)).  The

---

[8] The district court was correct as to the general parameters of agency law.  But the lesson of *Claiborne Hardware* is that stricter standards for liability are required where defendants were principally engaged in core protected First Amendment activities.

*Noerr-Pennington* doctrine, first applied to find that petitioning for anti-competitive legislation did not violate antitrust law, has been found to "extend[] to all departments of the Government" including administrative agencies and the courts, *Cal. Motor*, 404 U.S. at 510, and to "apply with full force in other statutory contexts" outside antitrust. *Sosa*, 437 F.3d at 930 (citing *BE & K Construction Co. v. NLRB,* 536 U.S. 516, 525 (2002) and *Bill Johnson's*, 461 U.S. at 743).

*Noerr-Pennington* immunity is applicable to RICO actions. *Sosa*, 437 F.3d at 930-42; *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999); *see also Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000).

All of Defendants' petitioning activities in this case are protected under this doctrine. Lobbying and public relations campaigns are completely immunized from statutory liability under RICO, even when they are deliberately deceptive. Defendants' activities concerning the Ecuador litigation are also immunized, even if deceptive, because, as explained below, the Ecuador litigation was not a sham.

### A.    All of Defendants' Advocacy Activities Are Entirely Immunized From RICO Liability, Because Even Deceptive Advocacy Is Immunized Under *Noerr-Pennington*

*Noerr* itself demonstrates that immunity extends to all petitioning of the elected branches, regardless of truthfulness, and thus protects all of Defendants' public relations and lobbying activities. The Supreme Court in *Noerr*, after noting

that both the railroad and trucking industries in their lobbying and public relations campaigns for favorable legislation and law enforcement "deliberately deceived the public and public officials," concluded: "[T]hat deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned.  That Act was not violated."  365 U.S. at 145; *accord City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 383 (1991) ("a 'conspiracy' exception to *Noerr* must be rejected").  *See also Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 900 (10th Cir. 2011) ("alleged bribery, extortion and corruption ... do not remove a case from the ambit of ... *Noerr–Pennington*") (internal quotation marks and citation omitted); *id.* at 898 (the Supreme Court in *City of Columbia* "went further, rejecting exceptions to ... *Noerr* immunity even for conspiracies involving 'corruption'"); *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 404 (4th Cir. 2001) ("the Supreme Court has not approved a fraud exception to *Noerr-Pennington* immunity at all"); *Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 162 (3d Cir. 1999) (liability for injuries caused by private parties urging state action is "precluded even where it is alleged that a private party urging the action did so by bribery, deceit or other wrongful conduct that may have affected the decision making process").

### B.   Defendants' Litigation Activities Are Immunized Under *Noerr-Pennington*, Because the Litigation Was Not a Sham

As to litigation activities, under *Noerr-Pennington* bringing a lawsuit can

never be a basis for liability, unless the lawsuit is a "sham." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993) ("*PREI*"); *see also id.* at 65 (hotel operators suing movie studios for antitrust liability for having brought unsuccessful copyright infringement action against them "could not pierce … *Noerr* immunity without proof that [the] infringement action was objectively baseless or frivolous"); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 685 (2d Cir. 2009) ("a finding that the act of litigating …itself is culpable conduct …would be impermissible under the *Noerr-Pennington* doctrine"); *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("With respect to petitions brought in the courts, the Supreme Court has held that a lawsuit is unprotected [under *Noerr-Pennington*] *only* if it is a "sham – i.e., 'objectively baseless'") (quoting *PREI*, 508 U.S. at 60)) (emphasis added).

The party opposing *Noerr-Pennington* immunity has the burden to prove that the litigation in question was a sham. *PREI*, 508 U.S. at 60; *accord, Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 100 (2d Cir. 2000); *In re Burlington N., Inc.*, 822 F.2d 518, 533 (5th Cir. 1987). To do so the opposing party must meet a two-part test: *first,* it must show that the litigation was "objectively baseless"; and, *second,* if *and only if* that threshold is met, it must show there was subjective intent to use governmental process to interfere directly with the other party's business. *PREI*, 508 U.S. at 60; *accord, Primetime 24*, 219

F.3d at 100-01.

Chevron cannot meet either element of its burden. Regarding the threshold element, "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." *PREI*, 508 U.S. at 69 n.5. In any event, the district court did not find that Chevron met either element of its burden, as it "assume[d], without deciding, that there was a plausible basis for bringing the Lago Agrio case in the first place and that Donziger at its inception had a good faith belief that his clients were entitled to recover something." A-374. Given that failure, the district court was incorrect that intentional misrepresentation in the adjudicatory process "removes any shield that the First Amendment otherwise would provide" to Defendants' conduct. SPA-377. In any event, that there was environmental damage caused by ChevronTexaco's operations in Ecuador, and that the indigenous Ecuadorian plaintiffs have suffered health and other injuries, were undisputed; thus, the Ecuadorian case cannot be held to be objectively baseless.

Moreover, given that it is established that *Noerr-Pennington* is a defense against a RICO action, the district court cannot as a matter of logic be correct that any misconduct takes litigation wholly outside the doctrine's protection. What then would be left of the doctrine? Conduct that is not otherwise wrongful or illegal does not need to be immunized. *Cf. Coll*, 642 F.3d at 898 ("carving out a

special exclusion to *Noerr-Pennington* when the corruption involves some ill-defined and open-ended concept of bribery or other acts that might violate state or federal law … would, of course, vitiate *Noerr-Pennington* almost entirely").  *See also Armstrong Surgical*, 185 F.3d at 162 (noting, in the context of allegations of submitting false information to an administrative agency adjudicative body, "[l]iability … is precluded even where it is alleged that a private party urging the action did so by bribery, deceit or other wrongful conduct").[9]

---

[9] Chevron may argue for a fraud exception to *Noerr-Pennington* by which some deceptive acts within overall-protected non-sham litigation might nevertheless lose protection.  The Supreme Court has left open this possibility, but has explicitly declined to decide the question.  *PREI*, 508 U.S. at 61 n.6.  This Court has suggested that it there is no fraud exception.  *See In re DDAVP*, 585 F.3d at 686 (finding that fraudulent petition to agency was unprotected by *Noerr-Pennington* only after first establishing that opposing party had satisfied the two steps required to establish that the petition was a sham).  As noted *supra*, the Third Circuit in *Armstrong Surgical* strongly suggested likewise that there is no fraud exception. 185 F.3d at 162; *see also id.* at 160 (knowingly submitting false information to an adjudicative body did not defeat immunity in an antitrust action); *Baltimore Scrap*, 237 F.3d at 404 (declining to decide whether there is any fraud exception at all, but noting "concerns weigh[ing] heavily" about consequence that "[a] broad fraud exception would allow federal collateral litigation over conduct in state courts that never affected the core of a state judgment").

Other courts generally agree that litigation deception loses protection – if at all – only when the deception reaches the core of the case.  *See Cheminor Drugs v. Ethyl Corp.,* 168 F.3d 119, 123-24 (3d Cir.1999) ("While we do not condone misrepresentations in a judicial setting, neither will we deprive litigants of immunity derived from the First Amendment's right to petition the government if the alleged misrepresentations do not affect the core" of the case); *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155, 159 (9th Cir. 1993) (knowing fraud upon or intentional misrepresentations to the court do not obviate application of the two-part test for sham litigation unless they are such as to deprive the litigation of its legitimacy); *Oregon Natural Res. Council v. Mohla*, 944 F.2d 531, 536 (9th Cir.

Finally, it is incorrect to argue, as Chevron did below, *see* Post-Trial Mem. at 149, that it is well established that the Petition Clause does not immunize interactions with foreign governments.  First, this is not well established at all, and the opinion of this Court cited in support does not even mention the issue.  *See Primetime 24*, 219 F.3d at 99.  The conclusion of the only federal Court of Appeals to have addressed the issue[10] – and the more persuasive view – is that "petitioning immunity is not limited to the domestic political arena."  *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1365 (5th Cir. 1983); *see also id.* at 1366 ("We reject the

---

1991) (allegation of use of false affidavits is "insufficient by itself to overcome *Noerr-Pennington* immunity").

Consequently, even if there were a fraud exception to *Noerr-Pennington*, the vast majority of the conduct found to be deceptive by the district court would still be protected.  The purported misconduct did not reach the core of the case or deprive it of legitimacy, first, because, as explained in the Lago Agrio Plaintiff Appellants' Opening Brief at 34, appellate courts in Ecuador reviewed the factual evidence *de novo*, setting aside any contaminated evidence.  Second, most of the purported deception and other misconduct did not address the core of the case – whether Chevron was responsible for toxic pollution in the Amazon basin of Ecuador – but rather addressed evaluation of the extent of harm caused to its inhabitants.  The charge of attempted extortion, for example, was based largely on efforts to pressure Chevron to reach a settlement maximally favorable to plaintiffs by inflating estimates of damages.  *See, e.g.,* SPA-380-383 (conveying deceptive estimates of damages, and deceptive comparisons to scale of Exxon Valdez disaster); 360-61 (engineering appointment of expert who would secretly cooperate in preparing a multi-million dollar estimate of damages in order to pressure Chevron into settling).  The charge of wire fraud was based on electronically communicating plans to convey the same purportedly deceptive information that purportedly inflated Chevron's liability.  *Id.* at 382.

[10] This Court did not address the issue in a case involving petitioning activity of both United States and foreign agencies.  *See Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 57-60 (2d Cir. 1983).

notion that petitioning immunity extends only so far as the first amendment right to petition and then ends abruptly").  Second, the actions complained of in this case included many interactions with federal agencies. SPA-47, SPA-51, SPA-57

In sum, the *Noerr-Pennington* doctrine immunizes all of Defendants' lobbying, publicity and litigation activity from RICO liability.  None of this is to say that deliberate deception in a judicial proceeding is not a serious issue or that it may not be penalized – generally through court sanctions, perjury prosecutions, *California Motor Transport*, 404 U.S. at 512, or in a proceeding to enforce a judgment.  Nevertheless, the *Noerr-Pennington* doctrine prohibits such conduct from serving as a predicate for RICO liability or for any other collateral attack.

## III.   RICO IS NOT AN APPROPRIATE TOOL FOR POLICING LITIGATION MISCONDUCT OR FOR MOUNTING COLLATERAL ATTACKS ON JUDGMENTS.

The vaguely defined scope and heavy penalties of RICO render it susceptible to abuse.  It is particularly inappropriate in the hands of private parties seeking to retaliate for protected First Amendment activities or of losing litigants seeking to relitigate in a more favorable forum.  Courts have long been concerned about such potential for abuse.  *See Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985) (expressing "concern over the consequences of an unbridled reading of the statute"); *id.* at 500 (noting doubts about "the breadth of the predicate offenses … and the failure … to develop a meaningful concept of 'pattern'"); William Rehnquist, *Get RICO Cases Out of My Courtroom*, Wall St. J. (May 19, 1989).

Accordingly, the courts have interpreted RICO with sensitivity to its potential for impinging on the right to petition the courts (as well as First Amendment activities generally), in particular making clear that litigation and litigation activities – even when involving fraud or other misconduct – cannot be RICO predicate offenses. Considerations similar to those that have protected attorneys for centuries from liability for their litigation conduct under the common law litigation privilege strongly counsel against allowing the heavy force of a racketeering statute to be wielded as weapon against attorneys for actions taken to represent their clients within the normal scope of litigation. *See* Point I.A, *supra*, at 17-20. Courts have also been sensitive to the danger that RICO might become a tool for relitigating judgments, and have made clear that it is not a proper vehicle for doing so.

Neither bringing nor threatening to bring litigation, nor the ordinary activities attendant on litigation, may serve as a predicate act for RICO liability, even if the lawsuit is brought in bad faith, lacks merit, or employs deliberate falsehoods. *See United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992) ("Congress did not wish to permit instances of federal or state court perjury as such to constitute a pattern of RICO racketeering acts. Apparently, there was an understandable reluctance to use federal criminal law as a back-stop for all state court litigation"); *United States v. Pendergraft,* 297 F.3d 1198, 1208 (11th Cir.

24

2002) ("threat to file litigation against Marion County, even if made in bad faith and supported by false affidavits, was not 'wrongful'" within the meaning of 18 U.S.C. § 1951). If RICO liability could be predicated on litigation activities (even malicious prosecution or fraudulent lawsuits), "almost every state or federal action could lead to corollary federal RICO actions…. [T]his absurd result would chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Curtis & Associates. v. Law Offices of David M. Bushman*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010).

More specifically, litigation, threats to bring litigation, and associated litigation activities cannot constitute extortion. *See e.g., Deck v. Engineered Laminates*, 349 F.3d 1253, 1257-58 (10th Cir. 2003) ("we join a multitude of other courts in holding that meritless litigation is not extortion under [18 U.S.C.] § 1951" even "when the plaintiff resorts to fraudulent evidence" or used "fraudulent pleadings or false testimony"); *I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) (even assuming that threat to bring civil suit "was groundless and made in bad faith," it was not extortion and thus not a RICO predicate, because it "did not involve 'force' or 'violence'"). The Tenth Circuit explained further:

> [R]ecognizing abusive litigation as a form of extortion would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim. Whenever an adverse verdict results from failure of the factfinder to believe some evidence presented

> by the plaintiff, the adverse party could contend that the plaintiff engaged in extortionate litigation. Comfortable that the adjective "wrongful" in the extortion statute was not intended to apply to litigation, we hold that Plaintiff's allegations of bad-faith litigation do not state the predicate act of extortion.

*Deck*, 349 F.3d at 1258.

Similarly, use of the mail and wires for litigation activities cannot constitute the predicate acts of mail or wire fraud, even when the litigation has fraudulent aspects. *See Spiegel v. Continental Illinois Nat'l Bank,* 609 F. Supp. 1083 (N.D.Ill.1985), *aff'd*, 790 F.2d 638 (7th Cir.1986) (subjecting correspondence between attorneys concerning an issue in pending litigation "to the mail fraud statute would chill an attorney's efforts and duty to represent his or her client in the course of pending litigation. It also would, as it did here, give birth to collateral suits"); *see also Curtis*, 758 F. Supp. 2d at 173 ("this court joins a long line of cases in finding, as a matter of law, that the 'litigation activities' pleaded in the Complaint [which involved mailing of pleadings and litigation correspondence in a series of allegedly 'fraudulent and frivolous lawsuits'] cannot constitute predicate acts for the purposes of RICO"); *Auburn Med. Ctr. v. Andrus*, 9 F. Supp. 2d 1291, 1297 (M.D. Ala. 1998) ("engaging in the type of litigation activities described in this action does not constitute mail fraud for purposes of supporting a RICO claim").

*Amici* do not condone fraud – or any deception or other misconduct – in litigation.  But the greater danger here is not facilitating fraud on the courts – who

have ample remedies already,[11] but that the threat of the heavy penalties, stigma and broad sweep of RICO lawsuits such as this one will significantly deter civil society organizations and others seeking social change, and the attorneys who might represent them, from exercising their First Amendment right to petition the courts and from exercising their other First Amendment freedoms.

The additional danger is that the courts, as well as meritorious litigants, will be burdened with collateral efforts to relitigate adverse decisions in other fora. *See, e.g., Heck v. Humphrey*, 512 U.S. 477, 484-85 (1994) ("This Court has long expressed **…** concerns for finality and consistency and has generally declined to expand opportunities for collateral attack").  The district court's opinion threatens just such an expansion of collateral attack opportunities on a massive scale.  Its application of RICO to litigation activities is "untenable and would result in the inundation of federal courts with civil RICO actions that could potentially subsume all … litigation in an endless cycle where any victorious litigant immediately sues opponents for RICO violations."  *Curtis*, 758 F. Supp. 2d at 173; *see also Eisen*, 974 F.2d at 254 (noting "understandable reluctance to use federal criminal law as a back-stop for" litigation in another forum); *Engel v. CBS, Inc.*, 182 F.3d 124, 129 (2d Cir. 1999) (noting, in context of malicious prosecution claim, "strong public policy of open access to the courts … and [need] to avoid *ad infinitum* litigation

---

[11] The proper remedy in this case would be a defense against an actual enforcement action, and sanctions could be moved for in that action if appropriate.

with each party claiming that the opponent's previous action was malicious and meritless"); *Kashelkar v. Rubin & Rothman,* 97 F.Supp.2d 383, 392 (S.D.N.Y.2000) (warning of danger of "turn[ing] every … lawsuit into a predicate for a subsequent federal RICO action").[12]

## CONCLUSION

Because the broad reading below of the scope of the RICO statute threatens to impinge significantly on First Amendment freedoms and to invite a flood of collateral litigation, the district court's opinion should be reversed and the injunction vacated.

Dated: July 8, 2014

Respectfully submitted,
JONATHAN MOORE
TERRY GROSS
ADAM C. BELSKY
MONIQUE ALONSO
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, CA 94104
Telephone: (415) 544-0200
Email: jmoore@gba-law.com

By: /s/ Jonathan Moore              .
    Jonathan Moore

THOMAS BENNIGSON
PUBLIC GOOD LAW CENTER
3130 Shattuck Avenue

---

[12] Under New York law, "[a] litigant's remedy for alleged fraud in the course of a legal proceeding "lies exclusively in that lawsuit itself, … not a second plenary action collaterally attacking the judgment in the original action." *Vinokur v. Penny Lane Owners Corp.*, 269 A.D.2d 226 (N.Y. App. Div. 2000).

Berkeley, CA 94705
Telephone:  (510) 336-1899
Email:  tbennigson@publicgoodlaw.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I, Jonathan Moore, counsel for amici herein, certify pursuant to Federal Rule of Appellate Procedure 29(d) and Second Circuit Rule 32(a)(7) that the attached amicus brief is proportionally spaced, has a type face of 14 points or more and contains 6,800 words.

Date: July 8, 2014

/s/ Jonathan Moore            .
Jonathan Moore

Counsel for *Amici Curiae*