# 14-826-cv(L)
## 14-832-cv(Con)

### United States Court of Appeals
### for the Second Circuit

───────────────────────────────

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

v.

STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCIATES, PLLC, HUGO GERARDO CAMACHO NARANJO,
JAVIER PIAGUAJE PAYAGUAJE,

*Defendant-Appellants*.

*(caption continued on inside cover)*

───────────────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────

**BRIEF OF THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE**

───────────────────────────────

| | |
|---|---|
| Kate Comerford Todd | Christopher J. Walker |
| Tyler R. Green | *Counsel of Record* |
| U.S. CHAMBER | THE OHIO STATE UNIVERSITY |
| LITIGATION CENTER, INC. | MORITZ COLLEGE OF LAW |
| 1615 H St., N.W. | 55 West 12th Avenue |
| Washington, D.C. 20062 | Columbus, OH 43210-1391 |
| (202) 463-5337 | (614) 247-1898 |

*Counsel for* Amicus Curiae

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

    *Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

    *Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

    *Respondents*.

# RULE 26.1 DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America is not a publicly traded corporation. It has no parent corporation, and there is no public corporation that owns 10% or more of its stock.

**TABLE OF CONTENTS**

**<u>Page</u>**

INTEREST OF *AMICUS CURIAE*...................................................................................1

SUMMARY OF ARGUMENT ......................................................................................2

ARGUMENT .................................................................................................................3

I.  Fraud on the Court, Such as What Occurred Here, Is a Serious and Escalating Problem Facing the Nation's Business Community.......................3

    A.  Fraud on the Court Has Become a Greater Problem as Plaintiffs' Attorneys Take Advantage of the Growing Number of Foreign Forums That Have Adopted Class-Action Devices. ............5

    B.  As Plaintiffs' Attorneys File Class Actions in Courts Outside the United States, Fraud on the Court Becomes More Likely in Those Countries Where the Rule of Law May Not Be as Strong.........7

II. The Harm to the Nation's Business Community from Fraud on the Court Extends Beyond the Courtroom and Balance Sheet, Such that Federal Courts Must Take All Appropriate Steps To Punish and Prevent Such Fraud...............................................................................................9

CONCLUSION .............................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ................. 3, 4, 6

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ................. 3, 9

*Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895 (2d Cir. 1985) ....................... 10

**Other Authorities**

Peter DeSchazo & Juan Enrique Vargas, *Judicial Reform in Latin America: An Assessment* (Ctr. for Strategic & Int'l Studies ed., 2006) .................................... 8

Jonathan C. Drimmer & Sarah R. Lamoree, *Think Globally, Sue Locally: Trends and Out-of-Court Tactics in Transnational Tort Actions*, 29 Berkeley J. Int'l L. 456 (2011) ................................................................................................ 4, 8, 10, 11

Due Process of Law Foundation, *Evaluation of Judicial Corruption in Central America and Panama and the Mechanisms To Combat It* (2007) ...................... 8

Due Process of Law Foundation, *Judicial Independence in Ecuador's Judicial Reform Process* (2014) ...................................................................................... 8

Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L. Rev. 1 (1991) ............................................................. 6

Marcus S. Quintanilla & Christopher A. Whytock, *The New Multipolarity in Transnational Litigation: Foreign Courts, Foreign Judgments, and Foreign Law*, 18 Sw. J. Int'l L. 31 (2011) ...................................................................... 4, 5

Transparency International, *2013 Corruption Perceptions Index* ............................ 9

U.S. Chamber Institute for Legal Reform, *Following Each Other's Lead: Law Reform in Latin America* (Aug. 2014) ............................................................. 5, 6

Christopher A. Whytock, *Some Cautionary Notes on the "Chevronization" of Transnational Litigation*, 1 Stan. J. Complex Litig. 467 (2013) ........................ 5

## INTEREST OF *AMICUS CURIAE*[*]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of concern to the Nation's business community.

The Chamber's members rely on the courts both in the United States and around the world to adjudicate claims and resolve disputes fairly, efficiently, and impartially. Acts of fraud on the court—such as those the District Court found in this case—cause serious harm to businesses. And this case, while perhaps extraordinary, is not an isolated incident. With the trend toward plaintiff class actions against transnational businesses being filed in courts outside the United States where rule-of-law protections may not be as strong, the Chamber's members face a

---

[*] All parties consent to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(c)(5) and this Court's Rule 29.1, the Chamber certifies that: (a) no party's counsel authored this brief in whole or in part; (b) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (c) no person, other than the Chamber, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

real and growing threat of judgments obtained by fraud.  The Chamber and its members have both a unique perspective on this problem and a substantial interest in ensuring that federal courts protect businesses against judgments obtained via fraud.

## SUMMARY OF ARGUMENT

**I.** The extent of the fraud on the court at issue here is extraordinary, as the District Court exhaustively found and detailed in the opinion below.  But it would be a mistake to conclude that similar fraudulent conduct is uncommon or unlikely to recur.  Indeed, businesses confront an escalating risk of falling victim to similar fraudulent schemes, especially those businesses with transnational operations.  That is because plaintiffs' attorneys are increasingly looking to file class actions and similar lawsuits in foreign countries where courts may lack impartial tribunals and procedures compatible with due process of law.  To be sure, class-action lawsuits and litigation outside the United States are not necessarily the cause of fraud on the court.  But these developments suggest that the scheme to defraud the court here may not be as extraordinary as the District Court believed.  The threat of such fraud is real and immediate.  And it will continue to grow as plaintiffs' attorneys take advantage of overseas class actions.

**II.** The harm caused by fraud on the court is not limited to monetary damages; it can be irreparable to the defendant businesses and to the rule of law.

Fraud on the court is, as the Supreme Court has long held, "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944), *overruled on other grounds*, *Standard Oil v. United States*, 429 U.S. 17, 18 & n.2 (1976). And it is often part of a larger scheme to defraud and extort businesses—a scheme that regularly includes sophisticated public relations campaigns to mislead and instill fear of a catastrophic outcome in shareholders, the public, and the regulators. Accordingly, the Chamber urges federal courts to take all steps appropriate and available under the law to punish and prevent fraud on the court.

## ARGUMENT

### I. Fraud on the Court, Such as What Occurred Here, Is a Serious and Escalating Problem Facing the Nation's Business Community.

As Judge Kaplan exhaustively details in the opinion below, the findings in this case of fraud on the court are indeed "extraordinary" and "include things that normally come only out of Hollywood." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 384 (S.D.N.Y. 2014). The lowlights include:

> [Defendant Appellant Donziger] and the Ecuadorian lawyers he led corrupted the Lago Agrio case. They submitted fraudulent evidence. They coerced one judge, first to use a court-appointed, supposedly impartial, "global expert" to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to "totally play ball" with the [Lago Agrio

3

> Plaintiffs] LAPs. They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment. If ever there were a case warranting equitable relief with respect to a judgment procured by fraud, this is it.

*Id.*

Although these findings seem more likely to be found in a movie script than a real court proceeding, it is a script prone to many real-world sequels. Fraud on the court is a serious and growing problem for businesses, especially those with a transnational presence. Plaintiffs' attorneys in transnational litigation are increasingly looking to foreign courts as forums in which to sue companies that have a presence in the United States. *See* Marcus S. Quintanilla & Christopher A. Whytock, *The New Multipolarity in Transnational Litigation: Foreign Courts, Foreign Judgments, and Foreign Law*, 18 Sw. J. Int'l L. 31, 32-34 (2011); *accord* Jonathan C. Drimmer & Sarah R. Lamoree, *Think Globally, Sue Locally: Trends and Out-of-Court Tactics in Transnational Tort Actions*, 29 Berkeley J. Int'l L. 456, 472-73 & nn.92-95 (2011).

Professor Whytock has explained that this "new multipolarity" occurs in part because "U.S. courts are no longer as attractive to litigants as they supposedly once were," whereas "other countries are increasingly drawing litigants to their courts

through a combination of ex ante forum selection agreements, and ex post forum shopping." Christopher A. Whytock, *Some Cautionary Notes on the "Chevronization" of Transnational Litigation*, 1 Stan. J. Complex Litig. 467, 469 (2013); *accord* Quintanilla & Whytock, *supra*, at 32-34. Two reasons for this trend merit mention here: the growing adoption of the class-action device in other countries, which makes it more lucrative for plaintiffs' attorneys to file suit as they can aggregate small damages claims of a class of plaintiffs in one lawsuit; and the lack of fair and impartial tribunals in some of the countries that have embraced the class-action device or are otherwise receptive to suits against transnational businesses. Each reason will be addressed in turn.

### A. Fraud on the Court Has Become a Greater Problem as Plaintiffs' Attorneys Take Advantage of the Growing Number of Foreign Forums That Have Adopted Class-Action Devices.

The Chamber's Institute for Legal Reform has documented the growing worldwide trend of countries embracing class-action procedures (including a variety of related collective-action devices) as a means to resolve claims for damages—a procedural device that in the twentieth century was seldom found outside of a few common law countries such as Australia, Canada, and the United States. *See* U.S. Chamber Institute for Legal Reform, *Following Each Other's Lead: Law Reform in Latin America* 3-4 (Aug. 2014).

This is particularly true in Latin America where class actions in some form are now permitted in most countries, including Argentina, Brazil, Chile, Costa Rica, El Salvador, Mexico, Panama, Peru, Uruguay, and Venezuela. *Id.* at 7.  Ecuador, too, has enacted a form of collective-action device used in this case—the "Environmental Management Act of 1999 (the 'EMA'), which among other things created a private right of action for damages for the cost of remediation of environmental harms generally, as distinct from personal injuries or property damages to specific plaintiffs." *Donziger*, 974 F. Supp. 2d at 391 (footnote omitted).

To be sure, the use of a class or collective action, by itself, does not necessarily cause fraud on the court.  But it does amplify the financial incentives for plaintiffs' attorneys to engage in tactics to win at all costs.  And as Professors Macey and Miller have explained, members of the plaintiff class have little ability to regulate their attorneys' conduct, meaning their attorneys "operate with nearly total freedom from traditional forms of client monitoring."  Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L. Rev. 1, 20 (1991).  Indeed, "in the absence of a client actively interested in the litigation, plaintiffs' attorneys have less cause to fear bar discipline for misconduct simply because no one is likely to refer them to the disciplinary authorities if they misbehave." *Id.* at 20-21.

6

### B. As Plaintiffs' Attorneys File Class Actions in Courts Outside the United States, Fraud on the Court Becomes More Likely in Those Countries Where the Rule of Law May Not Be as Strong.

The financial allure of pursuing class-action lawsuits in foreign courts is exacerbated by the fact that some countries lack impartial tribunals and procedures compatible with due process of law. This case exemplifies the problem. Judge Kaplan found "abundant evidence that, at the time the Ecuadorian courts' decisions in the Lago Agrio case were rendered, the judicial system was not fair or impartial and did not comport with the requirements of due process." *Donziger*, 974 F. Supp. 2d at 610; *see id.* at 608-17 (documenting problems with Ecuadorian judicial system). Those problems are already detailed in the Plaintiff-Appellee's brief, *see* Chevron Br. 16-39, 128-46, and thus will not be repeated here.

But the Ecuadorian judicial system is not the only one lacking independence and susceptible to corruption. For example, over the last three decades, thousands of claimants from Nicaragua have filed lawsuits in the United States and Nicaragua against transnational companies for injuries allegedly caused by exposure to the pesticide Dibromochloropropane. As Jonathan Drimmer and Sarah Lamoree have documented, "judicial findings of impropriety and corruption have marked this litigation. One judge detailed a 'broad[] conspiracy of fraud' involving the falsification of plaintiff injuries, while another found that the plaintiffs' lawyers proffered a 'persistent use of known falsehoods,' and a third concluded that Nicaraguan law

7

does not 'even come close' to 'basic fairness.'" Drimmer & Lamoree, *supra*, at 456-57 (footnotes omitted); *see also id.* at 489-98 (further detailing litigation).

These examples justify the observation that "[j]udicial corruption in Central America is a serious problem and must be attacked purposefully and vigorously." Due Process of Law Foundation, *Evaluation of Judicial Corruption in Central America and Panama and the Mechanisms To Combat It* 1 (2007). Although judicial reform efforts in some Latin American countries over the last two decades have had some success, scholars have documented that "the overall record is disappointing, having failed to meet the high expectations created, largely due to poorly functioning new systems that are slow, lack transparency, pay scant attention to users, and lack independence in decisionmaking." Peter DeSchazo & Juan Enrique Vargas, *Judicial Reform in Latin America: An Assessment* 13 (Ctr. for Strategic & Int'l Studies ed., 2006). With respect to Ecuador specifically, the Due Process of Law Foundation has found as its "central thesis that Ecuador's justice system is currently being subjected to political usages that seriously jeopardize judicial independence in those cases where the government's interests are at stake." Due Process of Law Foundation, *Judicial Independence in Ecuador's Judicial Reform Process* 10 (2014).

At a minimum, these examples underscore that many countries in Latin America (and elsewhere) suffer from at least a perception that the public sector is

highly corrupt.  *See* Transparency International, *2013 Corruption Perceptions Index* 5-6 (providing map with country-by-country corruption perception ratings).

\* \* \*

In sum, the expanding embrace by plaintiffs' attorneys of the class-action device in countries outside the United States—especially in countries that lack fair and impartial judicial systems—has made the risk of fraud on the court a startling and immediate problem for transnational businesses.

## II. The Harm to the Nation's Business Community from Fraud on the Court Extends Beyond the Courtroom and Balance Sheet, Such that Federal Courts Must Take All Appropriate Steps To Punish and Prevent Such Fraud.

Federal courts must police fraud on the court.  Such extensive fraud as the District Court found here has a profound effect on businesses and on the rule of law that extends beyond the courtroom or the company balance sheet.

As the Supreme Court has underscored, "tampering with the administration of justice . . . involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."  *Hazel-Atlas Glass*, 322 U.S. at 238.  This Court has emphasized the need for flexibility to protect against fraud on the court:  "Courts should not forfeit truth for the sake of finality, nor let the technical intricacies of the law governing at-

9

tachments obscure their just administration." *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 901 (2d Cir. 1985).

And as this case shows, fraudulent acts on the court are often just part of a larger campaign to extort the defendant company. Judge Kaplan detailed this campaign, which he called the "Pressure Campaign," at length in the opinion below. *See Donziger*, 974 F. Supp. 2d at 401-11, 448-52, 540-44. Plaintiff-Appellee's Brief summarizes the Pressure Campaign, which included a sophisticated public relations effort to instill fear of a catastrophic outcome, repeated false statements to federal regulators and the company's shareholders regarding potential damages, and even the substantial funding of a film—labeled as a documentary—that reinforced this misleading narrative. *See* Chevron Br. 39-45; *accord Donziger*, 974 F. Supp. 2d at 401-11, 448-52, 540-44.

These tactics are neither novel nor unprecedented. A recent empirical study of twenty-five transnational tort cases revealed similar tactics employed by plaintiffs and their counsel. As the study found, "[i]n all twenty-five of the cases reviewed, plaintiffs used media-related approaches. These methods most commonly took the form of Internet campaigns, news articles, radio and television programs, films, and documentaries." Drimmer & Lamoree, *supra*, at 474. The study also "identified numerous instances of investment-related tactics by plaintiffs and their supporters; eighteen cases in all." *Id.* at 481. These "investment strategies directly

10

target corporate stock prices, executives, and shareholders.  The tactics include appearances at annual shareholder meetings, introducing resolutions, and divestment campaigns." *Id.* at 482.

When advanced as part of a scheme to commit fraud on the court and to extort a company, the harms arising from such tactics can extend beyond the company's balance sheet.  Such a scheme may destroy the company's good will and reputation.  It misleads the public as well as the company's shareholders and potential investors.  And it can even induce federal regulators to unduly investigate and overregulate.  Those additional harms can frustrate the company's everyday operations, or impede its long-term stability and growth, or both.  In some circumstances, such harms may well be irreparable.

## CONCLUSION

For these reasons, federal courts must punish and prevent fraud on the court—such as the massive fraud committed here—and protect the Nation's business community from the massive and sometimes irreparable harms that these fraudulent schemes inflict.

Respectfully submitted,

October 8, 2014

  /s/ Christopher J. Walker

| | |
|---|---|
| Kate Comerford Todd | Christopher J. Walker |
| Tyler R. Green | *Counsel of Record* |
| U.S. CHAMBER | THE OHIO STATE UNIVERSITY |
| LITIGATION CENTER, INC. | MORITZ COLLEGE OF LAW |
| 1615 H St., N.W. | 55 West 12th Avenue |
| Washington, D.C.  20062 | Columbus, OH 43210-1391 |
| (202) 463-5337 | (614) 247-1898 |

*Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(d) because it contains 2,585 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

| | |
|---|---|
| October 8, 2014 | /s/ Christopher J. Walker |
| | Christopher J. Walker |
| | *Counsel of Record* |
| | THE OHIO STATE UNIVERSITY |
| | MORITZ COLLEGE OF LAW |
| | 55 West 12th Avenue |
| | Columbus, OH 43210-1391 |
| | (614) 247-1898 |

**CERTIFICATE OF SERVICE**

I certify that on the date indicated below, I filed the foregoing brief using this Court's Appellate CM/ECF system, which effected service on all parties.  I will cause six paper copies to be sent to the Court.

October 8, 2014                     /s/ Christopher J. Walker
                                                    Christopher J. Walker
                                                      *Counsel of Record*
                                                    THE OHIO STATE UNIVERSITY
                                                    MORITZ COLLEGE OF LAW
                                                    55 West 12th Avenue
                                                    Columbus, OH 43210-1391
                                                    (614) 247-1898