# No. 14-826(L)

## No. 14-832(CON)

## In the United States Court of Appeals for the Second Circuit

———————————

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

V.

H̶U̶G̶O̶ ̶G̶E̶R̶A̶R̶D̶O̶ ̶C̶A̶M̶A̶C̶H̶O̶ ̶N̶A̶R̶A̶N̶J̶O̶,̶ ̶J̶A̶V̶I̶E̶R̶ ̶P̶I̶A̶G̶U̶A̶J̶E̶ ̶P̶A̶Y̶A̶G̶U̶A̶J̶E̶,̶
STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCIATES, PLLC, HUGO GERARDO CAMACHO NARANJO,
JAVIER PIAGUAJE PAYAGUAJE,

*Defendants-Appellants*,

(*caption continues on inside cover*)

———————————

On Appeal from the United States District Court for the
Southern District of New York (The Honorable Lewis A. Kaplan)

───────────────────────────────

**CORRECTED BRIEF FOR DEFENDANTS-APPELLANTS STEVEN
DONZIGER, THE LAW OFFICES OF STEVEN DONZIGER, AND
DONZIGER & ASSOCIATES PLLC**

───────────────────────────────

JUSTIN MARCEAU
JOHN CAMPBELL
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, CO 80208
(303) 871-6000

DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
Gupta Beck PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for Defendants-Appellants Steven Donziger,
The Law Offices of Steven Donziger, and Donziger & Associates PLLC*

July 16, 2014

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

# TABLE OF AUTHORITIES

**Cases**

*Aguinda v. Texaco*, 945 F. Supp. 626 (S.D.N.Y. 1996) .................................................. 8

*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001) ......................... 9, 10, 76

*Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002) ............................................ passim

*Anza v. Ideal Steel Corporation*, 547 U.S. 451 (2006) ................................................ 114

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001) ....................................................................................................... 99

*Banco Do Brasil v. Madison S. S. Corp.*, 307 N.Y.S.2d 341 (N.Y. Sup. Ct. 1970) ............................................................................................................................ 90

*Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995) .......................................... 109

*Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469 (2d Cir. 2006) ...................... 67

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2010) ................................ 101, 109

*Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011) ....................... 44, 45

*Chevron v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) ............................................... passim

*CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 792 N.E.2d 155 (N.Y. 2003) ............................................................................................................................ 89

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ................................................. 80

*Crouse v. McVickar*, 100 N.E. 697 (N.Y. 1912) .......................................................... 90

*Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238 (10th Cir. 2005) ............................................................................................................................ 82

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ................................................. 70

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ....................................... 113

*Diorinou v. Mezitis*, 237 F.3d 133 (2d Cir. 2001) ........................................................ 76

*Earle v. McVeigh*, 91 U.S. 503 (1875) .......................................................................... 82

*Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998) ............................ 95

*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) ......................................................... 76, 88

*Evans Prods. Co. v. West Am. Ins. Co.*, 736 F.2d 920 (3d Cir. 1984) ........................ 93

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) .................... 114

*Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59 (D.C. Cir. 1988) .......................... 98

*Grossman v. Johnson*, 674 F.2d 115 (1st Cir. 1982) ................................................. 98

*Guaranty Trust v. York*, 326 U.S. 99 (1945) ............................................................. 88

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum*, 512 F.3d 742 (5th Cir. 2008) ...................................................................................................................... 96

*Hendrick v. H.E. Avent*, 891 F.2d 583 (5th Cir. 1990) ............................................... 98

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) ........................................ 114

*Homola v. McNamara*, 59 F.3d 647 (7th Cir. 1995) ................................................. 95

*Hubbard v. Haley*, 262 F.3d 1194 (11th Cir. 2001) ................................................... 98

*In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010) .................... 26

*In re Application of Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y. 2010) ............. 26, 27

*In re Application of Chevron Corp.*, No. 3:10-cv-00686, Dkt. 108 (M.D. Tenn. Sept. 21, 2010) ........................................................................................................ 92

*In re Application of the Republic of Ecuador re Diego Borja*, No. C 10-00112 (N.D. Cal.) ................................................................................................................ 17

*In re Chevron Corp.*, 633 F.3d 153 (3d Cir. 2011) ..................................................... 24

*In re Goldstein*, 430 F.3d 106 (2d Cir. 2005) ............................................................. 83

*In re Robinson*, 151 A.D. 589, 136 N.Y.S. 548 (1st Dept. 1912) ................................ 83

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012) ................................ 68

*Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998) ........................................................ 9

*Republic of Ecuador v. ChevronTexaco Corp.*, 269 F. App'x 124 (2d Cir. 2008) .................................................................................................................. 21

*Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452 (S.D.N.Y. 2007) .................................................................................................................. 21

*Republic of Ecuador v. TestAmerica Labs. Inc.*, No. 4:11-mc-00088 (N.D. Fla.) .................................................................................................................... 18

*Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168 (1st Cir. 1995) ................................ 93

*Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107 (D. Del. 1983) ................................................................................................ 92

*Schultz v. Boy Scouts of America, Inc.*, 480 N.E.2d 679 (N.Y. 1985) ............................ 92

*Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ........................... 115, 117, 118

*Sheppard v. River Valley Fitness One, L.P.*, 428 F.3d 1 (1st Cir. 2005) ......................... 83

*Smith v. Bayer*, 131 S. Ct. 2368 (2011) ......................................................................... 91

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) ................................................ 112

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178 (2d Cir. 2008) ............ 67, 116

*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............................ 40

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .......................................... 82

*Trane Co. v. O'Connor Sec.*, 718 F.2d 26 (2d Cir. 1983) ............................................ 118

*Trebilcox v. McAlpine*, 17 N.Y.S. 221 (N.Y. App. Div. 1891) ..................................... 90

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ............................ 99

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 (2d Cir. 2005) .................................... 68

*Veltze v. Bucyrus-Erie Co.*, 154 F.R.D. 214 (E.D. Wis. 1994) ...................................... 91

*Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977) ................................................. 91

*Vinokur v. Penny Lane Owners Corp.*, 703 N.Y.S.2d 35 (N.Y. App. Div. 2000) .................................................................................................................. 89

The scale of Chevron's efforts to avoid compensating its victims is breathtaking. But nobody should lose sight of the one thing that Chevron has chosen *not* to litigate: the fact that Chevron dumped billions of gallons of toxic waste across a region roughly the size of Rhode Island. Instead, Chevron has sought to reduce this long-running controversy to allegations that an expert report was prepared improperly and that an Ecuadorian trial judge was influenced inappropriately. As to the first, Ecuador's Supreme Court found that Chevron could point to no law or procedure that had been violated. As to the second, Chevron's case rested on a paid witness who admitted to making false statements to sweeten his deal with Chevron—a deal that has netted him well over a million dollars in benefits. If anyone here is guilty of bribery, it isn't Steven Donziger.

But the bigger problem with Chevron's alleged trial-level improprieties is that they have nothing to do with the Ecuadorian judgment that Chevron is attacking. A three-judge appellate court in Ecuador, consistent with the nation's civil-law system, conducted a de novo review of the full record—the equivalent of a retrial—and produced a substitute judgment. Chevron is akin to a criminal defendant who has been given a retrial and has been convicted again but still complains of alleged irregularities in the first trial.

Aware of this fatal causation problem, the district court had a backup argument. Just as it did the last time, the court condemned the entire Ecuadorian

2

ECF No. 65-4. Chevron requested that a private arbitration panel—meeting in secret without allowing the *afectados* to participate—declare that Chevron has "no liability or responsibility for environmental impact … or for performing further environmental remediation" in Ecuador and order Ecuador's executive branch to compel the judiciary to dismiss the case. *Republic of Ecuador*, 638 F.3d at 390. Chevron made two primary arguments: (1) that its sham cleanup during the 1990s precluded "any judgment issued against it," and (2) that "Ecuador's judicial branch" has disregarded "Ecuadorian law, international standards of fairness, and Chevron's basic due process and natural justice rights," and its executive branch "improperly interfered" with the case because the current president, Rafael Correa, expressed public "support for the plaintiffs." *Id.* Chevron also asked for fees, costs, and "moral damages." *Id.* Later, Chevron submitted Borja's secretly recorded videotapes to the panel, claiming that they showed Judge Núñez had been bribed. But after that scheme backfired, Chevron quietly dropped the allegation. The panel has not yet ruled.

**2.** Around this time, Chevron also began to train its focus on Steven Donziger—an American lawyer who had joined the case early in his legal career, after working as a newspaper reporter in Latin America and, following law school, as a public defender representing juvenile defendants and at a social-justice nonprofit. A-3387-88. Donziger was not the only lawyer on this case; he worked

alongside a team of Ecuadorian lawyers, one of whom (Pablo Fajardo) was the lead trial counsel. A-3391. But Donziger had emerged over time as a principal spokesperson for the *afectados* in the United States. In the mid-to-late 2000s, hoping to bring attention to their plight, he and Ecuadorian counsel decided to give an acclaimed American filmmaker (Joseph Berlinger) substantial behind-the-scenes access to make a documentary about the case, eventually entitled *Crude: The Real Price of Oil*, which premiered at the Sundance Film Festival in January 2009.

*Crude* not only conveyed the painful saga of the *afectados* and their quest for justice; it also captured the unfiltered range of Donziger's personality: his brashness and tendency toward hyperbole; his tenacity and passion in the service of his clients; his courage in the face of Chevron's unremitting attacks; and his often irreverent, over-the-top sense of humor. When Chevron's public-relations team saw the film, it sensed an opportunity. After one strategist stated his belief that Chevron "should not tread on Berlinger" because he "put some balance into the documentary," a company publicist, in an internal email to his colleagues, stressed the game plan: "Our [long-term] strategy is to demonize Donziger. This film provides us a great opportunity to do so." CA-9-10. This came after another Chevron strategist wrote a memo to company officials recommending that they launch a campaign to cast Ecuador "as the next major threat to America"—like "Iran"; a "Cuban missile crisis in the making"—and Donziger as "the most

23

### H. Chevron forces Donziger to proceed *pro se* and drops its damages claim on the eve of trial to avoid a jury

In May 2013, shortly after its CEO declared that the case would not end until the other side's lawyers gave up, Chevron forced Donziger's lawyer to do just that. ECF No. 1100. In his withdrawal motion, John Keker explained why: "Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather than merit." *Id.* at 1-2. Donziger and his lawyers couldn't keep up with Chevron's "endless drumbeat of motions" and depositions "from Park Avenue to Peru." *Id.* The case, Keker lamented, had "degenerated into a Dickensian farce." *Id.* at 1. Donziger represented himself for the next five months.

One month before trial—faced with the prospect of having a jury evaluate its evidence—Chevron dropped its request for billions of dollars in damages against the Ecuadorian defendants. ECF No. 1404. It did so because the U.S. Constitution guarantees every defendant in a federal case the right to a jury only so long as "the amount in controversy shall exceed twenty dollars." U.S. Const. amend. VII. Three weeks later—on the last possible day—Chevron did the same with respect to Donziger, but only "upon a finding from [the] Court under Fed. R. Civ. P. 39(a)(2) that all issues in this case will be tried by the Court." ECF No. 1469. The court made the finding and denied the request for a jury trial. ECF No. 1500.

Nor did Chevron explain why the judgment would have denied many of the plaintiffs' damages requests if the plaintiffs had actually written it, as illustrated below:

| *Type of Remediation* | *Damages Requested By Plaintiffs* | *Damages Awarded By Court* |
|---|---|---|
| *Groundwater* | $394 to $910 million (Cabrera: $3.24 billion) | $600 million |
| *Potable Water System* | $536 to $541 million | $150 million |
| *Ecosystem Restoration* | $874 million to $1.697 billion | $200 million |

A-1217; A-1220-22; A-3139.186-87; A-3139.191-93.

Instead, Chevron based its ghostwriting theory on similarities between language in the preliminary judgment and in some of the plaintiffs' work product that was supposedly never filed. *See, e.g.,* PX 3800. Chevron's experts reached this conclusion without having reviewed by hand approximately 100,000 pages in the record—which is unavailable electronically—and without accounting for how Chevron had filed motions and other documents that are not part of the official record (either because they were never formally logged or because they were not properly maintained). *See* ECF No. 918-52.

---

*alegato*, or that their delay would actually have serious affects for the case. They were offered instead to show the lawyers' state of mind at the time: that they were worried the judge would rule against them. The emails thus fall under a well-recognized hearsay exception—despite the district court's conclusory assertion to the contrary. *See Headley v. Tilghman*, 53 F.3d 472 (2d Cir. 1995).

Judgment or the enforcement of the Judgment anywhere in the world"; and (2) an injunction against "[f]iling or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment … in any court in the United States." SPA-590. The court defined "New Judgment" as "any judgment or order that hereafter may be rendered in the Lago Agrio Case [by] any court in Ecuador." SPA-592. The district court determined that this relief was consistent with this Court's decision in *Naranjo* because *Naranjo* was "limited to the panel's interpretation of New York's Recognition Act." SPA-493.

In addition to Chevron's RICO claim, the court grounded the relief in what it called Chevron's "non-statutory claims for equitable relief with respect to the judgment." SPA-330. It did not identify which, if any, of the claims in Chevron's complaint constituted this category.

Following the court's decision, Chevron moved for $32 million in attorneys' fees from Donziger, arguing that the fees are mandatory under RICO. ECF Nos. 1889-90. The district court deferred consideration of fees pending appeal.

## STANDARD OF REVIEW

A district court's determination of its own subject-matter jurisdiction is reviewed de novo. *Bechtel v. Competitive Techs., Inc.*, 448 F.3d 469, 471 (2d Cir. 2006). Whether a claim states a cause of action is also reviewed de novo. *See, e.g.*, *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). Finally, whether

determinations that it declined to challenge here—and the judgment against it disregarded the allegedly tainted evidence. That dooms its case for causation.

### 2. The district court's conclusion about the standard of review contradicts Ecuador's highest court on a question of Ecuadorian appellate procedure.

Aware of Chevron's causation problem, the district court tried to get around it in two ways: (1) by launching a wholesale attack on Ecuador's judiciary based on the testimony of a political talking head, SPA-326 n.1251, and (2) by "finding" that the three-judge court did not actually engage in de novo review. SPA-426. But questions of foreign law are questions of law, not fact. *See* Fed. R. Civ. P. 44.1. And in Ecuador, as in the United States, the question whether a court applied the correct standard of review is a question of law. It is also one the Ecuadorian Supreme Court answered: It found that the intermediate court properly exercised de novo review—directly contradicting the district court's "finding" in this case. A-3605 ("[T]here has been a correct weighing of the evidence in accordance with legal standards.").

A federal district court cannot use its authority as a fact-finder to make pronouncements of another nation's law that contravene that nation's highest court. The purpose of Rule 44.1 was "to abandon the fact characterization of foreign law and to make the process of determining [foreign] law identical with the method of ascertaining domestic law to the extent that it is possible to do so." Wright & Miller,

11 *Fed. Prac. & Proc.* § 2444 (3d ed. 2014). If the rule means anything, it is that the pronouncements of a foreign supreme court *on the same issue, in the same case* control. Federal courts are bound by the decisions of state high courts when sitting in diversity jurisdiction. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). A sovereign nation's high court deserves at least as much respect "as a matter of comity." *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001); *see* Doug M. Keller, *Interpreting Foreign Law Through an Erie Lens*, 40 Tex. Int'l L. J. 157 (2004).

Even beyond comity, it is difficult to understand how a U.S. trial judge would be better positioned than Ecuador's Supreme Court to assess an Ecuadorian appellate court's compliance with Ecuadorian standards of review. As Judge Rakoff noted in *Aguinda*, the idea that an American judge "is better equipped than an Ecuadorian judge to apply Ecuadorian law to Spanish-language testimony and documents relating to 30 years' of activities … in an Amazonian rain forest is preposterous." *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 552 (S.D.N.Y. 2001), *aff'd as modified*, 303 F.3d 470 (2d Cir. 2002). It is even more "preposterous" in light of the history: This litigation was moved from the U.S. to Ecuador in the first place based in part on Chevron's representation that "Ecuador's courts are far better suited to apply their own laws." Appellee Br. 67 in *Aguinda v. Texaco, Inc.,* No. 2001-7756 (2d Cir., filed Dec. 20, 2001).

indeed, a nation's entire legal system—to be unworthy of respect. *Naranjo*, 667 F.3d at 242-246.[20]

Neither Chevron nor the district court could point to a single case in which a U.S. court entertained a preemptive action to enjoin enforcement or collection of a foreign judgment based on alleged fraud on the foreign court. If comity considerations dictate that a federal district court in New York lacks authority to entertain a collateral attack on the judgment of a sister district court in, say, Connecticut, then *a fortiori*, it lacks "authority to evaluate [a lawyer's] actions before [foreign] courts." *Manez v. Bridgestone Firestone N. Am. Tire*, 533 F.3d 578, 588 (7th Cir. 2008) ("Whether the proceedings in [Mexico] were conducted in an honest and upright manner is a matter for the Mexican judicial authorities and bar authorities, not for us."); *Veltze v. Bucyrus-Erie Co.*, 154 F.R.D. 214, 217 (E.D. Wis. 1994) ("[T]he proper forum … to challenge the enforceability of the Peruvian judgment is in the Peruvian court"). One of the many district courts in which

---

[20] By preemptively enjoining enforcement in all 50 states, the district court's injunction also raises a *domestic* comity problem. *Cf. Pennzoil v. Texaco*, 481 U.S. 1, 11 (1987). Indeed, "the Anti-Injunction Act bars federal injunctions against the enforcement of judgments allegedly obtained by fraud." 19 Stacy L. Davis & Lisa A. Zakolski, *Federal Procedure, Lawyer's Ed.*, 47:117 (2014); 28 U.S.C. § 2283; *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977). But the district court precluded enforcement proceedings in all 50 states without even considering whether "the relevant legal standards differed." *Smith v. Bayer*, 131 S. Ct. 2368 (2011); *see also Yahoo! v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1213 (9th Cir. 2006) (highlighting the "difficult" question of "whose law governs" when a dissatisfied litigant seeks a ruling that a foreign' court's judgment is "unenforceable anywhere in this country").

Chevron has filed a case with the Constitutional Tribunal of Ecuador in which it has raised its fraud claims. The availability of these local remedies should counsel further hesitation before any unnecessary and unauthorized intervention by U.S. courts.

Finally, the district court's invention of a new common-law claim after trial raises serious due-process concerns. In our system, courts may not surprise defendants with decisions on "totally unpleaded, unlitigated claim[s]." *Pinkley v. City of Frederick*, 191 F.3d 394, 402 (4th Cir. 1999). In an apparent anticipation of this objection, the district court decreed, under Federal Rule of Civil Procedure 15(b) that "all of the issues were tried by consent even if all were not specifically raised in the pleadings." SPA-475. But Rule 15(b) permits relief on a theory that didn't appear in the complaint "only if that theory was squarely presented and litigated by the parties at some stage or other of the proceedings." *Evans Prods. Co. v. West Am. Ins. Co.*, 736 F.2d 920, 923–24 (3d Cir. 1984). Here, "the absence of express or implied consent renders it impossible to fit the district court's freelancing within the confines of Rule 15(b)." *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1173 (1st Cir. 1995). A court so quick to condemn another nation's courts for lacking due process should take better care to ensure it at home.

improprieties Lilly believes may have occurred in … the Italian [courts] … lie[s] with the … Italian courts," not under RICO). Indeed, our research has not uncovered a single case in which an American court has found it appropriate to invoke RICO as authority to vindicate a claim that a foreign court's judgment has been procured by fraud, or to preemptively enjoin the enforcement and collection of a foreign judgment.

*Gulf Petro Trading Co. v. Nigerian National Petroleum*, 512 F.3d 742, 749 (5th Cir. 2008), a case much like this one, shows how other circuits have approached the problem. There, an American oil company filed a complaint in federal court under RICO and the common law, arguing that bribery, corruption, and *ex parte* communications had tainted a foreign arbitral proceeding. *Id.* at 749. The company's argument was that it had "alleged a pattern of racketeering and conspiratorial conduct that, while arising in the context of [the foreign] proceedings, constitute[d] an independent violation of federal and state law and compel[led] relief analytically distinct from vacatur." *Id.* at 747. The Fifth Circuit disagreed. Even though "the specific allegations of bribery and corruption" were "separate" from the underlying dispute, the claims nevertheless constituted a collateral attack because the company's fundamental claim was "that wrongdoing had tainted" the proceedings such that the result was procured by fraud. *Id.* at 750.

a broad, general statute would implicate foreign relations, the Supreme Court has proceeded cautiously and looked for a clear expression of congressional intent as to the statute's scope." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001). As Judge Hand explained, "we are not to read general words … without regard to the limitations customarily observed by nations upon the exercise of their powers." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945). This Court has endorsed this approach in interpreting RICO. *See R.J. Reynolds*, 268 F.3d at 128 ("Adherence to this principle will ensure that the courts interpret RICO consistently with international law."). And in *Naranjo*, this Court held that concerns for the law of nations are "particularly weighty" when a court in one jurisdiction acts pursuant to legislation in its own jurisdiction to issue opinions about the courts of the world. 667 F.3d at 244. The radical step of transforming RICO into a right of global appellate review should not be taken without the explicit approval of Congress.

### III. Chevron's wholesale attack on the integrity and competence of the Ecuadorian judiciary is foreclosed by judicial estoppel, offensive to international comity, and contradicted by Chevron's own evidence.

As explained in Part I, Chevron's case has an Achilles' heel: Chevron cannot prove that any of the alleged misconduct about which it complains actually *caused* the three-judge appellate court's substitute judgment or the Ecuador Supreme Court's affirmance of it. It hasn't even tried. Instead, Chevron argued below, and