# 14-0826-cv

## 14-0832-cv(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

—against—

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC, HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,

*Defendants-Appellants,*

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants,*

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS HUGO GERARDO CAMACHO NARANJO AND JAVIER PIAGUAJE PAYAGUAJE

BURT NEUBORNE
40 Washington Square South
New York, New York 10012
(212) 998-6172
burt.neuborne@nyu.edu

*Counsel for Defendants-Appellants
Hugo Gerardo Camacho Naranjo
and Javier Piaguaje Payaguaje*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants,*

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

# TABLE OF CONTENTS

**TABLE OF CONTENTS**....…………………………………..…..i

**TABLE OF AUTHORITIES**.……………………………………..iii

**INTRODUCTION AND
SUMMARY OF ARGUMENT**..…………………………………1

**ARGUMENT**

**I.    CHEVRON MISCONCEIVES THE NATURE OF THE
AGENCY RELATIONSHIP BETWEEN THE
DONZIGER/FAJARDO LEGAL TEAM AND THEIR
ECUADORIAN CLIENTS**………..……………………………….6

> **A.    In the Absence of Proof of Personal Wrongdoing,
the District Court Lacked Power to Issue a
Common Law Injunction Barring Hugo Camacho
Naranjo and Javier Piaguaje Payaguaje From
Seeking to Enforce the Untainted Land
Remediation Judgment that Emerged from the
Ecuadorian Appeals Process**…………………..10

> **B.    The District Court Lacked Power to Attribute the
New York Contacts of Steven Donziger to his
Ecuadorian Clients in Order to Assert *In
Personam* Jurisdiction Over Them in New York in
Connection with a Cause of Action for Equitable
Relief Arising Out of Donziger's Activities in
Ecuador**……………………………………...…14

C.        The District Court Lacked Power to Attribute
Delay by Lawyers in Responding to Jurisdictional
Discovery to Their Innocent Clients in an Effort to
Assert In Personam Jurisdiction Under Rule 37
Over Persons Otherwise Beyond the
Constitutional Reach of the
Court……...……………………...…………………16

D.        The Donziger/Fajardo Legal Team Was Unable to
Provide Fully Adequate Legal Representation to
the Ecuadorian Victims in the District
Court………………..………………..…………..17

II.    THE INNOCENT ECUADORIAN VICTIMS ARE
ENTITLED TO AN OPPORTUNITY TO ENFORCE THE
UNTAINTED LAND REMEDATION JUDGMENT THAT
EMERGED FROM THE ECUADORIAN APPEALS
PROCESS………………………………………………………19

CONCLUDING STATEMENT…………………...………..….29

CONCLUSION……………………………………...…………..35

# TABLE OF AUTHORITIES

<u>Cases:</u>

*Addington v. Texas*, 441 U.S. 418 (1979)……………………………..31

*Amchem Products v. Windsor*, 521 U.S. 591 (1997)…………………19

*Assured Guar. (UK) Ltd. v. J.P Morgan, Inc.,*
18 NY3d 341, 62 N.E.2d 765,
939 N.Y.S.2d 274 (2011)…………………………………………...11

*Baker v. Dorfman*, 239 F.3d 415 (2d Cir. 2000)………………...…21

*Baldayesque v. United States,*
338 F.3d 145 (2d Cir. 2003)……………………………………....7

*Beggerly v. United States*, 524 U.S. 38 (1998)…………………………13

*Brookhart v. Janis*, 384 U.S. 1 (1966)………………………………..8

*Chevron Corp. v. Naranjo*,
667 F.3d 232 (2d Cir. 2012)…………………………………………*passim*

*Chevron Corp. v. Steven R. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014)………………………………*passim*

*Coleman v. Thompson*, 501 U.S. 722 (1991)……………………….…….7

*Daimler AG v. Baumann*, 134 S. Ct. 746 (2014)………………………...15

*Erie v. Tompkins,* 304 U.S. 64 (1938)…………………………………12

*Executive Benefits Insurance Agency v. Arkison*,
134 S. Ct. 2165, 2014 WL 2560461 (2014)………………………...26

*Fretz v. Stover,* 89 U.S. 198, 22 L. Ed. 769 (1874)……………………7

*Greene v. United States,* 13 F.3d 577 (2d Cir. 1994)…………………..21

*Hazel-Atlas Glass Co. v. Hartford Empire*,
322 U.S. 238 (1944)………………………………………………………12

*Hevesi v. Citigroup, Inc.,* 366 F.3d 70 (2d Cir. 2004)…………………..9

*Hilton v. Guyot*, 159 U.S. 113 (1895)…………………………………..11

*Holland v. Florida*, 130 S. Ct. 2549 (2010)……………………………..7

*Johnson v. Zerbst*, 304 U.S. 458 (1938)…………………………………8

*Link v. Wabash R. Co.,* 370 U.S. 626 (1962)……………………………7

*Maples v. Thomas,* 132 S. Ct. 912 (2012)……………….……………7, 18

*Matter of Storar*, 52 N.Y.2d 363, 420 N.E.2d 64,
438 N.Y.S. 2d 26 (1981), cert. denied,
454 U.S. 858 (1981)……………………………………………...……30

*Merrill Lynch & Co. v. Allegheny Energy, Inc.,*
500 F.3d 171, 181 (2d Cir. 2007)…………………………………..………30

*Microsoft v. i4i Limited Partnership*,
131 S. Ct. 2238 (2012)……………………………………..…….…..31

*Monaco v. Dulles*, 210 F.2d 760 (2d Cir. 1954)…………...…………..…23

*Morrel v. Nationwide Mut. Fire Ins. Co.*,
188 F.3d 218 (4th Cir. 1999)……………………..……..……………....13

*Murarka v. Bachrack Bros.*,
215 F.2d 547 (2d Cir. 1954)………………………………..………..23

*New York v. Hill*, 528 U.S. 110 (2000)……………………………..…7

*New York Times v. Sullivan*,
376 U.S. 254 (1964)…………………………………………………..…31

*Oppenheimer v. Westcott*, 47 N.Y.2d 595,
393 N.E.2d 982, 419 N.Y.S.2d 908 (1979)……………………….…13

*Riggs Nat'l Corp. v. Comm'r*,
295 F.3d 16 (D.C. Cir. 2002)……………………………………………23

*Ross v. Food Specialties*, 6 N.Y.2d 336,
160 N.E.2d 618, 189 N.Y.S.2d 857 (1959)……………………………31

*Santosky v. Kramer*, 455 U.S. 745 (1982)………………...…..………....31

*Smith v. Ayer*, 101 U.S. 320 (1879)………….……………………………7

*Stump v. Sparkman,* 435 U.S. 349 (1978)……………...………………...32

*Texaco v. Pennzoil Co.,* 481 U.S. 1 (1987)……………….……...12

*Torres v. $36,256.80 U.S. Currency*,
25 F.3d 1154 (2d Cir. 1994)………………………………………...19

*United States v. King*, 44 U.S. (3 How.) 773,
11 L. Ed. 824 (1845)……………………….....………………..…23

*United States v. Peoples Benefit Life Ins.*,
271 F.3d 411 (2d Cir. 2000)……………………………….…..19

*United States v. The City of New York*,
717 F.3d 72 (2d Cir. 2013)……………………….………………35

*Virgilio v. City of New York,*
407 F.3d 105 (2d Cir. 2005)………………………………………21

*Younger v. Harris*, 401 U.S. 37 (1971) ………………………….12

Books and Articles:

Paul Barrett, THE LAW OF THE JUNGLE (2014)……….………..27

John C. Coffee, Jr., *The Kutak Symposium:*
*Professional Responsibility and the Corporate Lawyer*,
13 Geo. J. Legal Ethics, 331, 340-41 (2000)……………………..…9

Deborah A. Demott, *The Lawyer as Agent*,
67 Fordham L. Rev. 301 (1998) ……………………………..…6

William R. Mureiko, *The Agency Theory of the Attorney-Client*
*Relationship: An Improper Justification for Holding Clients*
*Responsible for Their Attorney's Procedural Errors*,
1988 Duke L. J. 733………………………………………..…6

M. Steinitz and P. Gowder, *Corruption and the Transnational*
*Prisoners' Dilemma*, available at http:/papers.
ssrn.com/so13/papers.cfm?abstract_id=2476386………………………33

## Introduction and Summary of Argument [1]

Chevron's Brief in 14-826 (L) (*Donziger et al.*), and 14-832 (Con) (*Naranjo and Payaguaje*) confirms that Appellants Hugo Camacho Naranjo and Javier Piaguaje Payaguaje are "guilty" of nothing more than believing in a team of lawyers, ultimately headed by Steven Donziger and Pablo Fajardo (the "Donziger/Fajardo legal team"), who promised to invoke the rule of law to compel Chevron to remediate the victims' rainforest habitat.

Chevron's brief in 14-826 (the "Chevron/ Donziger brief") alleges that the victims' lawyers improperly obtained an $18 billion Ecuadorian trial court judgment against Chevron by: (1) secretly ghost-writing an ostensibly neutral expert report for the trial court; and (2) providing secret assistance to the trial judge in preparing his final judgment. Chev. Br. 17-36. Chevron argues that the lawyers' alleged misconduct authorized a federal District Judge in New York to issue affirmative injunctive relief under both RICO and the common law barring the lawyers from seeking to enforce the Ecuadorian

---

[1] The portions of the Chevron brief dealing primarily with issues raised in 14-826 are referred to in this Reply Brief as "the Chevron/Donziger brief." Those portions of the Chevron brief dealing primarily with issues raised in 14-832 are referred to as "the Chevron/Naranjo brief." Citations to Chevron's brief are designated as "Chev. Br. at __."

1

judgment anywhere in the United States, or from profiting from it anywhere in the world. Chev. Br. 80-95.

If Chevron had stopped there, this case would be a conventional, if fiercely-contested, effort to prevent alleged wrongdoers from unjustly profiting from their alleged malfeasance.[2] But Chevron did not stop there. Chevron's brief in 14-832 (the "Chevron/Naranjo brief") argues that, as a matter of the law of agency, the lawyers' alleged wrongdoing is fully attributable to their innocent clients, empowering the same federal District Judge to issue common law injunctive relief against Hugo Camacho Naranjo and Javier Piaguaje Payaguaje,[3] in their capacities as parties to the Ecuadorian litigation, barring them from seeking to enforce the untainted $9 billion land remediation judgment that ultimately emerged from the Ecuadorian appellate process anywhere in the United States, and, perhaps, anywhere in the world.[4] Chev. Br. 150-172.

---

[2] Nothing in this brief is inconsistent with arguments in 14-826 defending the lawyers' behavior.

[3] Chevron does not assert a RICO claim against the innocent Ecuadorian victims.

[4] Since enforcement of the land remediation judgment anywhere in the world would "benefit" Hugo Camacho Naranjo and Javier Piaguaje Payaguaje by

The "Chevron/Naranjo brief" thus crosses a legal and equitable Rubicon by deploying the lawyers' alleged wrongdoing in the Ecuadorian trial court as a shield to insulate Chevron from the legal duty to remediate the land owed to the innocent victims. Chevron's effort in 14-832 to parlay the lawyers' alleged wrongdoing in the Ecuadorian trial court into an all-purpose Get-Out-of-Jail card rests on two errors of law.

# I

Chevron incorrectly treats the legal relationship between the Donziger/Fajardo legal team and their innocent Ecuadorian clients as a "complex and massive" conspiracy (Chev. Br. 1), applying a draconian theory of agency attribution that renders unsophisticated, innocent inhabitants of the Amazon rainforest legally responsible for unauthorized, allegedly fraudulent acts allegedly committed by their lawyers. Chev. Br. 162-167. When the more complex agency rules governing the lawyer-client relationship are applied (see *infra* at 6-9), Chevron's effort to treat the Donziger/Fajardo legal team and their innocent Ecuadorian clients as a single jural entity collapses at four crucial points:

---

providing funds to remediate their habitat, the common law injunction may well have worldwide reach.

3

A.

Even if a common law cause of action forbidding the
enforcement of a foreign money judgment survived *Chevron Corp. v.
Naranjo*, 667 F.3d 232 (2d Cir. 2012) (it did not, see *infra* at 10-12),
Chevron may not attribute the allegedly fraudulent behavior of the
Donziger/Fajardo legal team to their innocent Ecuadorian clients in
order to secure common law injunctive relief barring the innocent
clients from seeking to enforce the untainted land remediation
judgment that ultimately emerged from the Ecuadorian appellate
process anywhere in the United States. See *infra* at 12-14.

B.

Chevron may not attribute the New York contacts of Steven
Donziger to his innocent clients in order to assert *in personam*
jurisdiction over the Ecuadorian clients in a New York court in
connection with a common law cause of action for fraud arising out of
alleged misbehavior by the Donziger/Fajardo legal team in Ecuador.
See *infra* at 14-16.

C.

The District Court lacked power under Rule 37 F.R.C.P. to
attribute delay by Ecuadorian lawyers in responding to the District

Court's discovery orders to their innocent clients in order to bootstrap the District Court into otherwise unconstitutional *in personam* jurisdiction over the Ecuadorian clients. See *infra* at 16-17.

D.

Once it became clear in the Court below that the interests of the Ecuadorian victims did not align fully with the interest of the Donziger/Fajardo legal team, the Donziger legal team became incapable of providing adequate legal representation to the innocent Ecuadorian victims, especially to members of the Waorani indigenous people who unsuccessfully sought to intervene below in defense of the appeals court judgment. See *infra* at 17-19.

II

Chevron pretends that time stopped with the issuance of the Ecuadorian trial court's allegedly tainted judgment (Chev. Br. 102-115). Chevron simply ignores or mischaracterizes the subsequent *de novo* judgment of the Provincial Court of Sucumbíos ("the intermediate appeals court"), dated January 3, 2012, as partially affirmed and partially reversed by the National Court of Ecuador on November 12, 2013, that: (1) declined to hold Chevron liable for individualized damages to inhabitants for injuries allegedly caused by

the massive oil pollution; but (2) compelled Chevron to remediate the

victims' ravaged habitat. Hugo Camacho Naranjo and Javier Piaguaje

Payaguaje are entitled to seek to enforce the untainted land

remediation judgment free from the worldwide constraints of the

lower court's injunction. See *infra* at 19-29.

## Argument

### I

### CHEVRON MISCONCEIVES THE NATURE OF THE AGENCY RELATIONSHIP BETWEEN THE DONZIGER/FAJARDO LEGAL TEAM AND THEIR ECUADORIAN CLIENTS

Chevron insists on attributing legal responsibility for the

allegedly wrongful behavior of the Donziger/Fajardo legal team to

their innocent Ecuadorian clients pursuant to an erroneous iron rule of

agency that inexorably saddles the client/principal with the sins of the

lawyer/agent. Chev. Br. at 162-167. The agency attribution rules

governing the  lawyer-client relationship are, however, considerably

more complex. See generally Deborah A. Demott, *The Lawyer as*

*Agent*, 67 Fordham. L. Rev. 301 (1998); William R. Mureiko, *The*

*Agency Theory of the Attorney-Client Relationship: An Improper*

*Justification for Holding Clients Responsible for Their Attorney's*

*Procedural Errors*, 1988 Duke L. J. 733, 734. While the actions of a

6

lawyer-agent are often attributed to the client-principal in connection with reasonably foreseeable tasks relevant to the prosecution of litigation (including lawyer-negligence in performing those tasks), once a lawyer crosses the line into unauthorized, unethical, or fraudulent behavior, standard agency rules reject attribution to the client, in the absence of a showing of personal wrongdoing. In short, when a lawyer goes rogue, he acts beyond the scope of an innocent client's agency authorization. Compare *Smith v. Ayer*, 101 U.S. 320 (1879); *Link v. Wabash R. Co.,* 370 U.S. 626 (1962); *Coleman v. Thompson*, 501 U.S. 722 (1991); and *New York v. Hill*, 528 U.S. 110 (2000) (attributing lawyer's ordinary litigation-related behavior to client, even when negligently performed), with *Fretz v. Stover,* 89 U.S. 198, 22 L. Ed. 769 (1874); *Holland v. Florida*, 130 S. Ct. 2549, 2565, 2568 (2010) (Alito, J., concurring) (discussing "attorney misconduct that is not constructively attributable to the [client]"); and *Maples v. Thomas,* 132 S. Ct. 912 (2012) (declining to attribute fraudulent, extraordinary, or unethical lawyer conduct to client). See also *Baldayesque v. United States,* 338 F.3d 145, 153 (2d Cir. 2003) (Jacobs, J. concurring) (same).

Similarly, the rules of agency do not authorize lawyers to take certain critical actions without the personal approval of the client. See *Brookhart v. Janis*, 384 U.S. 1 (1966) (no authority to waive confrontation rights); *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938) (no authority to waive right to counsel); and *Fretz v. Stover, supra* (no authority to settle civil case). If the lawyer-client relationship does not authorize a lawyer to go rogue, or to settle a civil case, without the personal approval of a client, it is difficult to understand how such a limited agency relationship could be deemed to "authorize" the Donziger/Fajardo legal team to engage in allegedly fraudulent behavior without their clients' knowledge or consent.

It is, moreover, impossible to characterize the relationship between the members of the Donziger/Fajardo legal team and their innocent Ecuadorian clients as a standard lawyer-client agency relationship. As both academic observers and Congress have recognized, the lawyer-client relationship in a case like the Lago Agrio litigation turns the usual assumptions underlying the agency relationship upside down, with entrepreneurial lawyer-agents often

calling the shots, and unsophisticated client-principals following the lawyers' lead.[5]

Responding to the reality that clients in mass actions are often unable to monitor their nominal attorney-agents in an effective manner, Congress, in 1995, enacted the Private Securities Litigation Reform Act (PSLRA) in an effort to encourage the participation of sophisticated institutional clients as lead plaintiffs in securities class actions in order to enable adequate monitoring of the entrepreneurial lawyer-agents. See *Hevesi v. Citigroup, Inc.,* 366 F.3d 70 (2d Cir. 2004) (discussing purpose of lead plaintiff provision of PSLRA).

It was, therefore, both a misapplication of the agency rules governing the lawyer-client relationship, and a distortion of reality, for the District Court to insist on imputing the lawyers' allegedly fraudulent behavior to their innocent Ecuadorian rainforest clients pursuant to a formal, counter-factual theory that, as nominal principals, they possessed theoretical power to direct their lawyers' activities. See 974 F. Supp. 2d at 566, n. 1304.

---

[5] John C. Coffee, Jr., puts it best: "[I]n a class action, the plaintiffs' attorney is not simply an agent; the attorney is also the financier of the class action…what's more, the attorney is not just a creditor; the attorney is a joint-venturer." John C. Coffee, Jr., *The Kutak Symposium: Professional Responsibility and the Corporate Lawyer*, 13 Geo. J. Legal Ethics, 331, 340-41 (2000).

A.

**In the Absence of Proof of Personal Wrongdoing, the District Court Lacked Power to Issue a Common Law Injunction Barring Hugo Camacho Naranjo and Javier Piaguaje Payaguaje From Seeking to Enforce the Untainted Land Remediation Judgment that Emerged from the Ecuadorian Appeals Process**

The District Court was doubly wrong in purporting to issue a common law injunction against Hugo Camacho Naranjo and Javier Piaguaje Payaguaje. As a preliminary matter, no common law cause of action exists in New York empowering a judgment debtor to enjoin an innocent client from seeking to enforce a foreign money judgment anywhere in the United States. If such a cause of action ever existed (it never existed), it has been overtaken by the New York Act for the Recognition of Foreign Money Judgments, which this Court construed in *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) (*Naranjo I*) as denying judgment debtors the power to seek affirmative injunctive relief in a New York court against the extraterritorial enforcement of an allegedly fraudulent foreign money judgment. Instead, *Naranjo I* confines judgment debtors (and New York judges) to asserting the alleged fraud as a defense, if and when judgment creditors actually

10

sought to enforce the foreign money judgment in New York. 667 F.3d at 241, 242, 244. [6]

In *Naranjo I*, the panel was troubled over the spectacle of a New York federal judge invoking the Recognition Act to instruct judges throughout the world as to the enforceability of foreign money judgments. 667 F.3d at 244. Ignoring the world-wide effect of the District Court's injunction, Chevron claims to have cured that problem by allegedly confining the reach of the anti-enforcement injunction to the United States. *Chevron Corp. v. Steven R. Donziger*, 974 F. Supp. 2d 362, 642-44 (S.D.N.Y. 2014). But, as Texaco learned a generation ago in *Texaco v. Pennzoil Co.,* 481 U.S. 1 (1987), where the enforcement of money judgments issued by another sovereign are concerned, judges in New York have no more supervisory authority

---

[6] Chevron's citation of *Assured Guar. (UK) Ltd. v. J.P Morgan, Inc.,* 18 NY3d 341, 62 N.E.2d 765, 939 N.Y.S.2d 274 (2011) for the proposition that the New York Recognition Act did not overtake the New York common law it was concededly designed to codify and replace is simply wrong. *Assured Guar.(UK)* dealt with whether a recent New York statute vesting the New York State Attorney General with power to enforce the securities laws should be read to preempt pre-existing privately enforceable common law causes of action for relief from the same conduct. The New York Court of Appeals correctly held that, in the absence of clear legislative intent, it would not construe the Martin Act to leave victims of securities fraud with no private cause of action for relief. In this case, judgment debtors retain their private right under *Hilton v. Guyot*, 159 U.S. 113 (1895) to oppose the enforcement of a foreign money judgment in a New York court on grounds of fraud. Under *Naranjo I*, judgment debtors may not go beyond their statutorily codified defensive rights in order to seek to instruct judges in other jurisdictions whether to enforce the judgment.

over their colleagues sitting throughout the United States than they have over their international colleagues.[7] *Naranjo I* and *Texaco v. Pennzoil* teach that judges in San Francisco and Singapore are entitled to decide for themselves whether to enforce a money judgment issued by another sovereign, free from the tutelage of supervisory judges in New York.

Moreover, even if a common law cause of action survived Chevron's statutory shipwreck in *Naranjo I* (under *Erie v. Tompkins,* 304 U.S. 64 (1938) no common law cause of action survives), under traditional principles of equity, no common law injunction may issue in the absence of personal wrongdoing by the target of the injunction. Chevron has cited no case in which an injunction against the enforcement of a judgment has been based solely on agency-attributed lawyer-client moral culpability. See Chev. Br. at 162-64. In every case cited by Chevron granting an injunction, the client had personally participated in the fraud. *Hazel-Atlas Glass Co. v. Hartford Empire*, 322 U.S. 238 (1944) (client actively participated in fraud); *Morrel v.*

_____

[7] Chevron's attempt to distinguish *Texaco v. Pennzoil* solely as an artifact of *Younger v. Harris*, 401 U.S. 37 (1971) (Chev. Br. at 168) overlooks the fact that the *Younger* doctrine is an expression of what Justice Black called "Our Federalism," (401 U.S. at 44), a concept that prevents federal judges sitting in New York from dictating to their colleagues throughout the United States.

*Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218 (4th Cir. 1999) (denying relief on ground the client did not engage in fraud); *Oppenheimer v. Westcott*, 47 N.Y.2d 595, 393 N.E.2d 982, 419 N.Y.S.2d 908 (1979) (plaintiff actively engaged in fraud); *Beggerly v. United States*, 524 U.S. 38 (1998) (denying relief in absence of showing of fraud by party). Chevron's failure to produce a single example of an injunction against an innocent client based solely on the lawyer-client agency relationship is persuasive evidence that no such cause of action ever existed.[8]

Finally, Chevron's Catch 22 argument that this case is, in fact, an attempt to enforce the Ecuadorian judgment within the meaning of *Naranjo I* because the Ecuadorian victims seek an opportunity to enforce the untainted judgment that emerged from the Ecuadorian appeals process is clearly incorrect. Chev. Br. 146. It cannot be that when, as here, a judgment debtor such as Chevron files an unauthorized effort to enjoin the enforcement of a foreign money judgment throughout the United States, any attempt by the judgment

---

[8] Since no effort has yet been made to enforce the Ecuadorian intermediate appeals court judgment in a New York court, the issue of what defenses might be available to Chevron in such a proceeding is not before this Court.

13

creditor to defend the validity of the judgment automatically turns the

unauthorized proceedings into an action to enforce the judgment

within the meaning of the New York Recognition Act. As Chevron

concedes by invoking NY CPLR 5303, the judgment

creditor/defendant in such an unauthorized proceeding must actually

seek to enforce the judgment through a counter-claim or an

affirmative defense in order to bring the proceeding under the New

York Act. Merely raising the judgment's asserted validity as a defense

to an unauthorized effort to enjoin its enforcement is not sufficient.

## B.

### The District Court Lacked Power to Attribute the New York Contacts of Steven Donziger to his Ecuadorian Clients in Order to Assert *In Personam* Jurisdiction Over Them in New York in Connection with a Cause of Action for Equitable Relief Arising Out of Donziger's Activities in Ecuador

Virtually ignoring constitutional constraints, Chevron claims

that the issue of *in personam* jurisdiction over the Ecuadorian victims

is controlled by New York's extremely broad definition of

"transacting business" under Section 302 NY CPLR, which asks

merely whether the defendants' New York contacts are "manifestly

unrelated" to the merits of a cause of action arising elsewhere. Chev.

Br. at 151-158. Whatever the doubtful constitutional merit of New

York's "manifestly unrelated" jurisprudence in a case where the same person commits allegedly unlawful acts elsewhere, while engaging in activity in New York that is not "manifestly unrelated" to the out-of-state unlawful activity, the Supreme Court has held that the due process clause forbids New York from asserting long-arm jurisdiction over a foreign principal (the Ecuadorian clients) based solely on the attributed New York contacts of an agent (Steven Donziger) in cases where the foreign principal is being sued on the basis of unlawful activity that took place in another jurisdiction (Ecuador). *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).

In *Daimler AG*, the 9th Circuit attributed the substantial California contacts of a wholly-owned agent/subsidiary (Mercedes Benz (USA)) to its German parent-principal (Daimler) in connection with allegations that Daimler had committed human rights violations in Argentina. The Supreme Court unanimously rejected the 9th Circuit's exercise in principal/agent attribution. Unless inhabitants of the Ecuadorian rainforest have fewer due process rights than large German corporations, the District Court's effort to use the attributed New York contacts of an agent as the sole basis for *in personam*

15

jurisdiction over the innocent Ecuadorian victims in connection with claims arising in Ecuador must be reversed.[9]

C.

**The District Court Lacked Power to Attribute Delay by Lawyers in Responding to Jurisdictional Discovery to Their Innocent Clients in an Effort to Assert *In Personam* Jurisdiction Over Persons Otherwise Beyond the Constitutional Reach of the Court.**

Chevron argues that Judge Kaplan was empowered to punish Hugo Camacho Naranjo and Javier Piaguaje Payaguaje for their Ecuadorian lawyers' delay in responding to jurisdictional discovery by striking their jurisdictional defenses under Rule 37. Chevron's suggestion that utilizing a Rule 37 sanction to expand *in personam* jurisdiction beyond a court's constitutional reach is indistinguishable from applying Rule 37 to parties within the court's territorial jurisdiction is flatly wrong. (Chev. Br. at 158-162). Precisely because such a sanction expands the territorial reach of a District Court beyond its constitutional limits, it requires an antecedent finding of

---

[9] Chevron's attempt (Chev. Br. 157) to link the Ecuadorian plaintiffs to Donziger's alleged conduct personally, by alleging that they read the Chevron complaint in the lower court and, nevertheless, remained loyal to their long-time lawyer, does not even begin to demonstrate culpable personal knowledge by the clients of the lawyer's alleged wrongdoing. Moreover, only by refusing to acknowledge the existence of an untainted appellate court judgment can Chevron argue that innocent Ecuadorian clients are seeking to benefit from Donziger's alleged wrongdoing.

16

personal culpability and knowing evasion, neither of which are present in this case. Chevron concedes that the two reported cases in this Circuit involving the assertion of punitive *in personam* jurisdiction under Rule 37 involved wrongdoing by the client, but argues lamely that the description of client wrongdoing in each case was not necessary to the holding. Chev. Br. 159-160. As with Chevron's inability to cite a case involving the issuance of a common law injunction against an innocent client, failure to produce a Rule 37 *in personam* jurisdiction case aimed at a client innocent of wrongdoing demonstrates that no such power exists.

Finally, Chevron's concession that the Ecuadorian lawyers eventually turned-over the requested material, albeit late (Chev. Br. 60-61), renders the assertion of extra-constitutional punitive Rule 37 *in personam* jurisdiction disproportionate to any alleged wrongdoing by the Ecuadorian lawyers themselves, much less by their innocent clients. Rule 37 is not a device to bootstrap a District Court into wider *in personam* jurisdiction than the constitution permits.

D.

**The Donziger/Fajardo Legal Team Was Unable to Provide Fully Adequate Legal Representation to the Ecuadorian Victims in the District Court**

17

Understandably consumed with defending themselves against Chevron's charges in the District Court, Donziger and his beleaguered legal team were unable to provide fully adequate legal representation to the Ecuadorian victims. *Maples v. Thomas,* 132 S. Ct. 912, 925 n.8 (2012) (recognizing conflict of interest created by law firm's interest in denying its allegedly erroneous behavior). In pointing out such an involuntary conflict of interest, counsel implies no criticism of the efforts of members of the Donziger legal team to preserve the Ecuadorian judgment by opposing Chevron's efforts to "demonize" them. The Supreme Court's decision in *Maples v. Thomas* teaches, however, that an unavoidable conflict arises between lawyer and client once it became apparent the clients' best interests might call for distancing themselves from the allegedly wrongful behavior of their lawyers. Chevron is, therefore, clearly wrong in insisting that Donziger could simultaneously provide adequate legal representation in the District Court for himself, his innocent Ecuadorian clients, and the members of the Waorani indigenous people. A. 514-23 (denying motion to intervene).[10]

_____

[10] Given the conflict of interest, the Ecuadorian victims are not estopped by the decision of the Donziger/Fajardo legal team to oppose intervention by the

Finally, Chevron's claim that the Waorani intervenors, whose habitat was destroyed by oil pollution, lacked an adequate interest in the preservation and enforcement of the Ecuadorian land remediation judgment is flatly wrong. The very case Chevron cites (*United States v. Peoples Benefit Life Ins.*, 271 F.3d 411 (2d Cir. 2000)) actually supports the adequacy of the Waorani's interest. See also *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154 (2d Cir. 1994) (recognizing similar interest).

## II

## THE INNOCENT ECUADORIAN VICTIMS ARE ENTITLED TO AN OPPORTUNITY TO ENFORCE THE UNTAINTED LAND REMEDATION JUDGMENT THAT EMERGED FROM THE ECUADORIAN APPEALS PROCESS

Strictly speaking, the question of whether an enforceable remediation judgment emerged from the Ecuadorian appellate process is not before the Court. Resolution of that important issue must await an attempt to enforce the appellate judgment. Hugo Camacho Naranjo and Javier Piaguaje Payaguaje raise the question as a defense to this proceeding to demonstrate the importance of vacating the erroneous

_____

Waorani. Chev. Br. at 179-80. See *Amchem Products v. Windsor*, 521 U.S. 591 (1997) (conflicts of interest preclude adequate representation).

19

District Court injunction that prevents them from even seeking to enforce such an untainted judgment anywhere in the United States.

Chevron's half-hearted claim that Hugo Camacho Naranjo and Javier Piaguaje Payaguaje waived the ability to invoke the *de novo* remediation judgment by failing to raise the issue in the District Court borders on frivolous. (Chev. Br. at 102-05). The issue of *de novo* appellate review of the allegedly flawed trial court judgment was initially raised *sua sponte* by the panel in *Naranjo I*, decided 23 days after the *de novo* decision of the Provincial Court of Sucumbíos. Judge Lynch, writing for the *Naranjo I* panel, noted that even Chevron's experts did not contest the fact that the intermediate appeals court possessed *de novo* review power under Ecuadorian law. 667 F. 3d at 237. The National Court of Ecuador, whose decision was announced during the trial before Judge Kaplan, explicitly singled out the judgment of the intermediate appeals court as having supplanted the trial court judgment, and criticized Chevron's lawyers for refusing to acknowledge the independent legal status of the intermediate appeals judgment. A. 3548. Appellants argued in the District Court that the intermediate appeals court judgment had broken the chain of causation between any alleged trial court misbehavior and the

judgment of remediation. The District Court dedicated a section of its opinion to rejecting it. 974 F. Supp.2d at 604-08. Judge Kaplan sought to brush aside the *de novo* issue by erroneously claiming that the three randomly selected intermediate appeals judges had only five weeks to review the massive Ecuadorian trial record. 974 F. Supp. 2d at 607-08. In fact, the record demonstrates that a relay of judges, including the President of the court who served throughout the period and authored the opinion, had more than nine months to complete the important task. A.1228. Finally, although it is not necessary in this case where the record so clearly rebuts waiver, the long-standing practice of the Second Circuit is to waive the waiver doctrine in settings where justice requires consideration of an issue. *Greene v. United States,* 13 F.3d 577, 586 (2d Cir. 1994) ("The rule is not an absolute bar to raising new issues on appeal; the general rule is disregarded when we think it necessary to remedy an obvious injustice…Entertaining issues for the first time is discretionary with the panel hearing the appeal."). Accord, *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000) (considering issue); *Virgilio v. City of New York,* 407 F.3d 105, 116 (2d Cir. 2005) (declining to exercise

discretion because new issue inconsistent with position taken in lower court).

On the merits, Chevron argues that, as a formal matter, there is no freestanding appellate judgment because the intermediate appeals court merely affirmed the allegedly tainted lower court judgment, as opposed to issuing a freestanding *de novo* judgment of its own. Chev. Br. 115-118. But Chevron (and its *amici*) ignore the explicit holding of the National Court of Ecuador to the contrary. Responding to similar arguments in Ecuador, the National Court of Ecuador stated:

> ...the court decision sought to be annulled [appealed] here is the one rendered by the court of appeal and not the one issued by a trial court, something [Chevron] has confused....

A.3548. Accordingly, as a matter of controlling Ecuadorian law, the untainted *de novo* judgment issued by the randomly selected judges of the Provincial Court of Sucumbíos, as corrected by the National Court of Ecuador, has supplanted the tainted Ecuadorian trial judgment as the only judgment in play.

Chevron's insistence that the intermediate appeals court merely "rubber-stamped" the tainted trial court judgment (Chev. Br. 107), thereby failing to carry out its duty under Ecuadorian law to engage in genuine *de novo* appellate review, is based, not on evidence, but on

Chevron's contempt for the Ecuadorian system of justice. Despite: (1) a two year lapse between the issuance of the *de novo* appellate judgment and the trial below; (2) the National Court of Ecuador's explicit holding that the *de novo* intermediate appeals court judgment had become the sole relevant judgment; (3) and the presumption of regularity routinely applied to the actions of foreign officials (*United States v. King*, 44 U.S. (3 How.) 773 (1845) (Spanish officials governing New Orleans; rebutting presumption); *Murarka v. Bachrack Bros.*, 215 F.2d 547, 552-53 (2d Cir. 1954) (Indian Vice Consul; applying presumption); *Monaco v. Dulles*, 210 F.2d 760, 763 (2d Cir. 1954 (Italian military; presenting rebuttal evidence)); *Riggs Nat'l Corp. v. Comm'r*, 295 F.3d 16 (D.C. Cir. 2002) (Brazilian court; applying presumption),  Chevron utterly defaulted on its obligation to present clear and convincing evidence to rebut the presumption of regularity that attaches to the activities of the Ecuadorian intermediate appeals court.

Instead of presenting evidence, Chevron doubles down on its claim that insufficient time for *de novo* review existed. But Chevron ignores the record fact that more than nine months elapsed from the appointment of the President of the court and the two original

associate judges, to the release of the appeal's court opinion and judgment. A. 1228. The fact that a relay of multiple substitute judges were appointed during that period to aid the court's President (who served continuously) demonstrates the intensity of the *de novo* review process, not its non-existence. Under the presumption of regularity, no basis exists to suggest that the substitute judges ignored the hard work by their predecessors in completing a *de novo* review of the relevant portions of the trial record.

Chevron's insistence that the reluctance of the intermediate appeals court to become entangled in the allegations of fraud at the trial level proves that *de novo* review did not take place is wholly unpersuasive. Chev. Br. at 105; 113. In fact, it proves precisely the opposite. It was not necessary for the intermediate appeals court to entangle itself in charges and counter-charges of fraud at the trial level in order to determine that a *de novo* review of the record clearly justified an order of land remediation. Moreover, the National Court of Ecuador, by reversing the intermediate appeal's court award of $9 billion in "punitive" damages to individuals (A. 3894), erased any aspect of the intermediate appeals court judgment that might have

rested on contested items of evidence.[11] The order of land remediation issued by the intermediate appeals court, as affirmed by the National Court of Ecuador, rests on bedrock evidence of massive and widespread pollution that, despite Chevron's protestations, is essentially uncontested. When the uncontested evidence of massive pollution is paired with the legal theory of dominant party causation adopted *de novo* by the Ecuadorian appeals courts (Appellant's Br. in 14-832 at 44-46), the *de novo* intermediate appeals court land remediation judgment, as ultimately corrected and affirmed by the National Court of Ecuador, bears absolutely no trace of tainted evidence.

Finally, Chevron's invitation to parse the written opinion of the intermediate appeals court (but to ignore the opinion of the National Court of Ecuador) does not disprove *de novo* review. In fact, a reading of the intermediate appeals court opinion reflects appellate judges actively engaged with the trial record. A. 454. According to Chevron,

_____

[11] Evidence in the Ecuadorian trial court fell into two rough categories: (1) evidence of widespread pollution; and (2) evidence of the pollution's impact on individual victims. Chevron fiercely contested evidence of the pollution's impact, but made relatively little effort to challenge the undeniable fact of widespread pollution. The award of "punitive" damages to individuals arguably rested on contested evidence concerning the effects of oil pollution. The National Court of Ecuador reversed the grant of punitive damages, affirming only the portion of the intermediate appeals judgment resting on evidence of widespread pollution.

the intermediate appeals court was obliged to reconsider each item of evidence in the more than 250,000 page trial record, make a detailed assessment of the extent that the allegedly fraudulent activity affected the evidence, and make an itemized set of findings as to each item of evidence. Chev. Br. at 106-113. It was, however, unnecessary for a court exercising *de novo* review to undertake to replicate eight years of work at the trial level. As the American experience with *de novo* review reveals,[12] once the intermediate appeals court decided to bifurcate claims of lawyer fraud from the merits of a remediation decree (Appellants' Br. in 14-832 at 29-31; 52-53), the court conducted a *de novo* review of the written record in order to satisfy itself that sufficient evidence of massive pollution existed to support both an order of land remediation, and the award of individualized damages. The National Court of Ecuador's decision to reverse that portion of the intermediate appeals court judgment granting individualized damages (A. 3894) purged the intermediate appeals

---

[12] In *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, 2014 WL 2560461 (2014), a District Judge rescued an Article I bankruptcy court's unconstitutional grant of summary judgment by (1) satisfying himself that a *de novo* review of the written record revealed the absence of a material question of fact; (2) writing a "reasoned" opinion granting summary judgment; and (3) codifying the result of his *de novo* review in an independent order that supplanted the defective order issued in the bankruptcy court. 134 S. Ct. at 2174. That is exactly the process followed by the Provincial Court of Sucumbíos.

court judgment of any award even arguably based on tainted evidence,

leaving a bedrock land remediation order supported by a *de novo*

review of the untainted evidence demonstrating widespread oil

pollution.

Finally, Chevron's claim that the entire Ecuadorian judiciary is

incapable of applying the rule of law (Chev. Br. at 119-142) is both

unsupported by credible evidence, and is barred by judicial estoppel.

See Brief of Appellants in 14-832 at 54-59.  Chevron's argument that

it is free from judicial estoppel under the doctrine of "unclean hands"

cannot succeed against the innocent Ecuadorian clients and victims,

whose hands are perfectly clean. Having induced this court in 2002 to

transfer the underlying litigation to Ecuador by repeatedly assuring

the court of the capability of Ecuador's legal system, Chevron may

not reverse course because the political complexion of the Ecuadorian

judiciary has changed since 2002. Chevron's preference for the 2002

version of the Ecuadorian judiciary was influenced by the presence of

numerous judges appointed by Ecuadorian governments dominated by

military juntas. See Paul Barrett, THE LAW OF THE JUNGLE

(2014) (noting that Ecuador was governed by a military dictatorship in

2002). Given the non-democratic provenance of the 2002 Ecuadorian

27

judiciary, the District Court's expression of concern about the replacement of numerous sitting judges by new judges appointed by a democratically-elected government (974 F. Supp.2d at 610-14) was unwarranted. Re-constituting a judiciary shaped by decades of military rule hardly constitutes evidence of a breakdown of the rule of law. In fact, the painful evolution from a military-dominated judiciary to one appointed by democratically-elected officials is what may explain the uptick in the State Department's annual evaluation of the Ecuadorian judiciary. As the State Department reports chronicle, however, serious problems of inadequate funding, a history of corruption, and the risk of political influence persist today, as they existed in 2002. Chevron has, however, been unable to unearth an iota of evidence of improper political influence or corruption of the appellate judges in this case.

No American court has ever found the courts of a sister-democracy incapable of administering justice fairly on such a flimsy record. Surely Chevron must produce more probative evidence than the self-interested, anecdotal testimony of a disgruntled political journalist, who is an avowed political opponent of the current President of Ecuador. Judged by the "clear and convincing" burden of

28

proof that governs such an extraordinary venture in international judicial slander, the District Court's experiment with conducting its own foreign policy must be reversed.

## Concluding Statement

Chevron (and its *amici*) argue that the Ecuadorian trial court judgment was irremediably tainted by judicial bribery.[13] Analogizing the alleged proceedings in the Ecuadorian trial court to the acceptance of bribes by the notorious Judge Manton, Chevron argues that a judgment reached through judicial bribery can never be redeemed, even by honest appellate judges exercising *de novo* review on behalf of innocent victims.

The only evidence in the record supporting Chevron's allegation of judicial bribery (as opposed to the bribery of ex-judge Alberto Guerra by both sides) is, however, the testimony of Alberto Guerra himself, a crooked Ecuadorian ex-judge who was removed from the bench for corruption, and who has cynically played both parties against each other by soliciting bribes from each, culminating in the payment by Chevron of approximately $2 million in cash and

---

[13] Chevron alleges a $500,000 bribe to the Ecuadorian trial judge to permit Donziger and his associates to ghost-write the trial court's final opinion. Chev. Br. at 25-26.

valuable benefits to Guerra (including relocation of his entire family to the United States, an automobile, sophisticated computers, free housing, free medical insurance, free legal representation, and a generous monthly stipend) in return for Guerra's intensively rehearsed trial court testimony implicating Judge Zambrano in a scheme to solicit a $500,000 bribe in return for his judgment.

The District Court, mistakenly applying a preponderance of the evidence standard, credited Guerra's bought-and-paid-for bribery story, erroneously refused to admit emails tending to disprove the bribery allegations (See Brief of Appellants in 14-832 at p.3, n.7), and declined to believe the Ecuadorian trial judge's sworn testimony flatly denying judicial bribery. Properly analyzed, the evidence of judicial bribery in the record does not come close to satisfying Chevron's heightened burden of proof under New York common law. Since an allegation of judicial bribery is an "exceptional civil matter" involving allegations of fraud and moral turpitude, New York common law requires the allegations to be established by clear and convincing evidence. *Merrill Lynch & Co. v. Allegheny Energy, Inc.,* 500 F.3d 171, 181 (2d Cir. 2007) (New York law requires fraud to be proven by clear and convincing evidence); *Matter of Storar,* 52 N.Y.2d 363, 420

N.E.2d 64, 438 N.Y.S. 2d 26 (1981), cert. denied, 454 U.S. 858

(1981) (New York requires "clear and convincing proof" in

"exceptional civil matters"); *Ross v. Food Specialties*, 6 N.Y.2d 336,

160 N.E.2d 618, 189 N.Y.S.2d 857 (1959) ("clear and convincing

evidence needed to secure reformation of contract). See also *Microsoft*

*v. i4i Limited Partnership*, 131 S. Ct. 2238 (2012) (defense to patent

infringement requires clear and convincing evidence); *New York*

*Times v. Sullivan*, 376 U.S. 254 (1964) (actual malice requires proof

by clear and convincing evidence); *Addington v. Texas*, 441 U.S. 418

(1979) (civil commitment requires clear and convincing evidence);

*Santosky v. Kramer*, 455 U.S. 745 (1982) (parent-child termination

requires clear and convincing evidence).

    The uncorroborated word of Alberto Guerra, a conceded liar

and cheat who was paid at least $2 million by Chevron for his

intensely rehearsed testimony (Guerra met with Chevron's lawyers at

least 53 times to prepare his testimony), cannot possibly be deemed

clear and convincing evidence of judicial bribery, especially in the

teeth of the sworn denial by the Ecuadorian trial judge, the complete

failure of Chevron's mighty fact-generating machine to uncover

corroborating evidence of such a massive bribe, and the trial court's

31

erroneous exclusion of crucial email evidence demonstrating that the Ecuadorian lawyers had a state of mind completely inconsistent with Guerra's bribery fairy tale. In fact, the evidence of judicial bribery in the record is insufficient as a matter of law even under a preponderance of the evidence standard. If such thin, uncorroborated testimony by a conceded liar and crook justifies a finding of judicial bribery, no verdict (or judge) is safe from corrupt collateral attack. *Stump v. Sparkman,* 435 U.S. 349, 355 (1978) (explaining basis of judicial immunity).

Chevron's remaining allegations of misconduct at the trial level, while troubling and worthy of sanction if they took place, do not sink to the level of irremediable evil. Neither an effort by a lawyer to assist an expert in preparing a report for the court, nor the submission of proposed detailed findings of fact and conclusions of law to a trial judge, is inherently improper. Both occur on a routine basis in our adversary system. But they do not take place secretly. Careful procedural rules assure that each side is notified and given an opportunity to respond. It was the alleged failure to provide notice to Chevron that renders the lawyers' alleged *ex parte* behavior so troubling.

32

In a civil law system like Ecuador's, adversary submission of dueling expert evidence and proposed findings of fact and conclusions of law are virtually unknown. Instead, the civilian court is expected to appoint and compensate neutral experts, and to prepare the ultimate findings of fact and conclusions of law on its own. Predictably, the immensely complex Lago Agrio litigation overwhelmed the capacity of the underfunded trial court to process the case as a classic civil law proceeding. Instead, the litigation settled into an untidy blend of civil and adversary procedures. If Chevron's allegations of *ex parte* influence in connection with the expert's report and *ex parte* assistance to the trial judge in preparing his judgment opinion are true, they reflect a misguided effort by the Donziger/Fajardo legal team to utilize the adversary techniques of party-driven experts and party-driven proposed findings of fact and conclusions of law to counteract the lawyers' fear that Chevron might be doing exactly the same thing. See M. Steinitz and P. Gowder, *Corruption and the Transnational Prisoners' Dilemma*, available at http:/papers. ssrn.com/so13/papers.cfm?abstract_id=2476386.

While such *ex parte* behavior, if proven, renders the lawyers subject to sanction, it does not sink to the level of irremediable moral

evil that renders 21 years of litigation, including eight years of work in the trial court, incapable of rescue by a thoughtful Ecuadorian appeals process that: (1) bifurcated the merits of the pollution claim from allegations of misbehavior; (2) remitted the misbehavior issues to alternative *fora*; (3) purged the intermediate appeals court judgment of the award of individualized damages resting on potentially tainted evidence (A. 3894) (reversing award of individual damages); and (4) carried out a *de novo* review of the untainted evidence of oil pollution in the record in order to satisfy itself of the propriety of entering an independent land remediation judgment on behalf of blameless inhabitants of the Ecuadorian rainforest.

**Conclusion**

The District Court's order enjoining Appellants Hugo

Camacho Naranjo and Javier Piaguaje Payaguaje from seeking to

enforce the untainted judgment of the Provincial Court of Sucumbíos,

as modified by the National Court of Ecuador, should be reversed. [14]

Dated: New York, New York
        October 28, 2014

                              Respectfully submitted,


                              Burt Neuborne
                              40 Washington Square South
                              New York, New York 10012
                              (212) 620-0559
                              burt.neuborne@nyu.edu

                              Counsel for Appellants
                              Hugo Camacho Naranjo and
                              Javier Piaguaje Payaguaje

---

[14] In order to avoid the appearance of partiality, future efforts to enforce the
Ecuadorian judgment in the United States, if any, should proceed before a new
judge who has not already expressed strong opinions on the merits. See *United
States v. The City of New York*, 717 F.3d 72, 99-100 (2d Cir. 2013) (removing
judge from future proceedings on which he had expressed an opinion in order to
prevent the appearance of prejudgment).

35

## CERTIFICATE OF COMPLIANCE WITH
### Rule 32(a)(7)(C) F. R. App. Proc.

1. This reply brief complies with the type-volume limitations of F. R.

   App. Proc. 32(a)(7)(B)(ii). The brief contains 6,977 words

   excluding the material described in F. R. App. Proc. 37(7)(B)(iii).

2. This reply brief complies with the typeface and style requirements

   of F. R. App Proc. 32(a) (5) and (6). It has been prepared in a

   proportionately spaced typeface using *Microsoft Word 2002* in

   Times New Roman 14 point type.

   Dated: October 28, 2014

                                        /s/ Burt Neuborne
                                        _____

                                        Burt Neuborne